CULLEN & DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.

Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
|                        | :                        |
| In re:                 | : Chapter 11             |
|                        | :                        |
| JOSEPH KLAYNBERG,      | : Case No. 22-10165 (MG) |
|                        | :                        |
|                        | :                        |
| Debtor.                | :                        |
|                        | :                        |
-------------------------------------------------------------x

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on August 17, 2022 at 10:00 a.m., Joseph Klaynberg (the

"Debtor"), by and through his attorneys Cullen and Dykman LLP, will move (the "Motion")

before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States

Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New

York, New York 10004, or as soon thereafter as counsel can be heard, for an Order Authorizing

Private Sale of Interest in Sands Point Property Free and Clear of Liens, Claims and

Encumbrances.

**PLEASE TAK FURTHER NOTICE** that this hearing will be conducted via Zoom for

Government. If you wish to participate, you must register your appearance by eCourt

Appearances by 4:00 p.m. on August 16, 2022, using the following link: https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl

PLEASE TAKE FURTHER NOTICE, that objections, if any, to the Motion must be (a) in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, (c) filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) by registered users of the Bankruptcy Court's case filing system must file electronically and all other parties in interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows' based word-processing format), (d) submitted in hard-copy form directly to the chambers of the Honorable Martin Glenn, Chief United States Bankruptcy Judge, and (e) served upon (i) the attorneys for the Debtor, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York, 11530, Attn: Matthew G. Roseman and Bonnie L. Pollack; (ii) the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014 (Attn: Tara Tiantian, Esq.); (iii) all parties who have filed a notice of appearance and request for service of documents, so as to be actually received by no later than 4:00 p.m. (prevailing Eastern Time) on August 10 , 2022.

Dated: Garden City, New York
     July __, 2022

         CULLEN AND DYKMAN LLP
         Counsel for the Debtor


         By: /s/ Bonnie L. Pollack
            Matthew G. Roseman, Esq.
            Bonnie L. Pollack, Esq.
            100 Quentin Roosevelt Boulevard
            Garden City, New York, 11530
            (516) 357-3700

CULLEN & DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.

Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                          :

In re:                                    : Chapter 11
                                            :

JOSEPH KLAYNBERG,             : Case No. 22-10165 (MG)
                                            :
                                            :

                      Debtor.              :
                                            :

------------------------------------------------------------ x

### MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 363, AUTHORIZING PRIVATE SALE OF INTEREST IN SANDS POINT PROPERTY <u>FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES</u>

**TO THE HONORABLE MARTIN GLENN, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Joseph Klaynberg (the "**<u>Debtor</u>**"), by and through his counsel Cullen and Dykman LLP, as and for his motion for an order authorizing the private sale of his interest in property located in Sands Point, New York, respectfully alleges as follows:

### <u>JURISDICTION</u>

1.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and venue of this case and the Motion is proper in this District pursuant 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

2.     By this motion, the Debtor respectfully requests the entry of an order pursuant to sections 105 and 363 of title 11, United States Code (the "**Bankruptcy Code**") and Rule 6004 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), substantially in the form annexed hereto as Exhibit "A", authorizing and approving the Debtor's private sale of his interest in real property located at 5 Lillian Court, Sands Point, New York (the "**Property**"), free and clear of all liens, claims and encumbrances, pursuant to the Purchase Agreement annexed hereto as Exhibit "B" (the "**Agreement**").

## BACKGROUND

3.     On February 11, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

4.     The Debtor has remained in possession of his property and continues in the operation and management of his business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     Simultaneously with the filing of its petition, the Debtor filed an Affidavit pursuant to Local Bankruptcy Rule 1007-2 (the "**1007 Affidavit**"). A more detailed factual background of the Debtor's business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the 1007 Affidavit, the contents of which are incorporated herein by reference.

6.     The Debtor is the owner of a 50% interest in the Property, as tenants in common with his former wife, Emily Klaynberg ("**Emily**"). Prior to the parties' divorce, the Property was owned as joint tenants with a right of survivorship. Pursuant to the parties' separation agreement, title to the Property was changed to a tenancy in common, with Emily having the right to reside in

the Property until the occurrence of certain events, none of which have transpired to date. See, Separation Agreement, ¶ 7.3.2, annexed as Exhibit "C".

7.     Pursuant to an appraisal recently obtained, the Property is valued at $4 million. See, Exhibit "D". Emily has offered, and the Debtor has accepted, for her to purchase the Debtor's 50% interest in the Property for $1,900,000. As set forth in the proposed Agreement, the existing mortgage held by JP Morgan Chase Bank ("**Chase**") in the approximate amount of $1.2 million would remain a lien on the Property and remain the responsibility of Emily, as is provided in the Separation Agreement. Exhibit "C", ¶ 7.3.3. Moreover, from the sale proceeds, the Debtor would pay his portion of the gains tax associated with the sale, also as contemplated in the Separation Agreement. Exhibit "C", ¶ 7.3.7. Since the sale would be incident to the Debtor's Chapter 11 plan, the Debtor proposes what the sale be exempt from transfer taxes pursuant to section 1146 of the Bankruptcy Code.

8.     The sale proposed by the Agreement is a cash sale without financing contingencies, which would close within fourteen (14) days of entry of an order by the Bankruptcy Court. The Debtor is holding a down payment of 5% as set forth in the Agreement.

9.     If the Debtor were to seek to sell his interest to a third party, it is unlikely that such third party would pay more than $1.9 million for the interest. Furthermore, if the Property were to be sold in its entirely, it is equally unlikely that the Debtor would net more than $1.9 million for his interest, even assuming under either scenario that there is a purchaser willing to buy the Property subject to Emily's right to reside in same.

10.     As a result, the Debtor believes that the sale of his interest in the Property to Emily under the Agreement is in the best interest of the estate, and will achieve the greatest value for this asset.

11.    The Debtor therefore requests that he be authorized to sell his interest in the Property to Emily in a private sale, free and clear of liens, claims and encumbrances.

## BASIS FOR RELIEF REQUESTED

**A.    The Sale of the Property is Authorized by Section 363(b) of the Bankruptcy Code**

12.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(l). The terms of such sale are generally within the sound discretion of the Debtor. *See In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 679 (Bankr. S.D.N.Y. 1989).

13.    Courts have uniformly held that approval of a proposed use of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. *See e.g., In re Chrysler LLC*, 405 B.R. 84, 97–100 (Bankr. S.D.N.Y. 2009), aff'd, 576 F.3d 108 (2d Cir. 2009); *In re General Motors Corp.*, 407 B.R. 463 (S.D.N.Y. 2009); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Ionosphere Clubs, Inc.*, 100 B.R. at 675; *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D. Mo. 1988).

14.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkam*, 488 A.2d 858, 872 (Del. 1985)).

15.    Here, since the Debtor is liquidating, it is necessary for the Debtor to sell his interest in the Property. Moreover, as set forth above, the sale to Emily represents the best value for his

interest in the Property. As set forth above if the Debtor were to seek to sell his interest to a third party, it is unlikely that such third party would pay more than $1.9 million for the interest, subject to Emily's right to reside in the Property.

16.     The Debtor therefore believes that the sale of his interest in the Property to Emily is justified by sound business reason and in the best interest of the Debtor and his estate. Accordingly, pursuant to section 363(b) of the Bankruptcy Code, the Debtor requests approval of the sale pursuant to the Agreement.

### B.     Private Sale

17.     The Debtor believes that a private sale to Emily is in the estate's best interest and should be authorized. Section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 govern the sale of assets outside of the ordinary course of a debtor's business. Section 363 provides in relevant part, that "[t]he trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. 11 U.S.C. § 363(b)(1). Under Bankruptcy Rule 6004(f)(1), a trustee is permitted to sell property of the estate pursuant to section 363(b) by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1).

18.     While it is common to sell assets through an auction, private sales are expressly authorized and, in some instances, are more appropriate or are the only option. Here, it is more appropriate to sell the Debtor's interest in the Property in a private sale.

19.     Courts have noted that private sales are appropriate under section 363 of the Bankruptcy Code. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("Unlike judicial sales under the Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property."); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174

(Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction").

20.    Accordingly, courts in this District have approved private sales of assets when they think the general standards for approval under section 363 of the Bankruptcy Code are satisfied. See, e.g., *In re The College of New Rochelle*, Case No. 19-23694 (RDD) (Bankr. S.D.N.Y. May 13, 2020) (three orders approving sales of various types of property by private sale); *In re Sizmek Inc.*, Case No. 19-10971 (SMB) (Bankr. S.D.N.Y. April 29, 2019) (sale of technology platform by private sale approved); *In re Dewey & Leboeuf LLP*, Case No. 12-12321 (MG) (private sale of artwork approved); *In re Wellman, Inc.*, Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sales of one of the debtors' facilities' by private sale, not subject to higher and better offers); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft").

21.    A private sale is warranted in this case. The purchase price for the Debtor's interest in the Property is fair and reasonable, and is consistent with the Appraisal. However, the value to be received would be significantly reduced if the Debtor were required to go through an entire auction process. It is unlikely that a third party would purchase the Property given Emily's right to reside in same, and even if it could be sold, undoubtedly the commissions and fees associated with an auction sale would lessen the net amount to the estate. As a result, selling the interest in a private sale will permit the Debtor to collect the proceeds of the sale while avoiding substantial administrative costs and expenses. Accordingly, the Debtor believes that a private sale of his interest in the Property as requested herein should be approved.

22420.2000 20318338v1

6

**C.**   **The Property Should be Sold Free and Clear of Liens, Claims and Encumbrances**

22.     Pursuant to section 363(f) of the Bankruptcy Code, property may be sold . . . free and clear of any interest in such property of an entity other than the estate, only if:

> (i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (ii)    such entity consents;
>
> (iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (iv)    such interest is in bona fide dispute; or
>
> (v)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Thus, a debtor may sell property of a bankruptcy estate free and clear if one of the five conditions under section 363(f) is satisfied. *See In re Grubb & Ellis Co.*, Case No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at *31 (Bankr. S.D.N.Y. Mar. 27, 2012) (discussing section 363(f) of the Bankruptcy Code); *In re Borders Group, Inc.*, 453 B.R.477, 483–84 (Bankr. S.D.N.Y. 2011) (same).  Property may be sold free and clear to the extent that holders liens and encumbrances do not object.  *See Borders Group*, 453 B.R. at 484 ("Under 363(f)(2), a lienholder who receives notice of a sale but does not object within the prescribed time period is deemed to consent to the proposed sale, and assets thereafter may be sold free and clear of liens.")

23.     In this case, the only known liens against the Property are the mortgage lien of Chase, and the purported lien by virtue of the entry of the Nahla Judgment. Pursuant to the Agreement, the mortgage lien will be satisfied by Emily as required by the Separation Agreement, and therefore the sale of the Debtor's interest in the Property should be free and clear of that lien,

22420.2000 20318338v1

7

as the Debtor believes that Chase could be compelled to satisfy that lien from Emily's interest, and

not the Debtor's. As to the Nahla Judgment, that purported lien is in *bona fide* dispute, and is the

subject of an action to avoid same as a preferential transfer under section 547 of the Bankruptcy

Code. Given the foregoing, grounds exist to sell the Debtor's interest free and clear of such liens,

claims and encumbrances under section 363(f) of the Bankruptcy Code.

**D.     Section 363(m) Protection Should Be Afforded to the Purchaser**

24.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does
> not affect the validity of a sale or lease under such authorization to
> an entity that purchased or leased such property in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

25.     The Second Circuit has indicated that a party would have to show fraud or collusion

between the buyer and the debtor-in-possession or trustee or other bidders in order to demonstrate

a lack of good faith. *See In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically,

the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders").

26.     The Agreement with Emily is the result of a negotiated, arm's-length transaction,

in which Emily and the Debtor at all times acted in good faith. The value being paid for the

Debtor's interest is significantly more than could be achieved by a sale to a different buyer, and

Emily is the most logical purchaser. Emily did not negotiate a steep discount; instead the Debtor

will receive greater net value from this sale than from a third party. The Debtor thus requests that

the Court find that Emily will be purchasing his interest in the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## NOTICE AND NO PRIOR REQUEST

27.    The Debtor has provided notice of this motion to the Office of the U.S. Trustee, and all creditors and all parties who filed a notice of appearance in this case. The Debtor respectfully submits that no other or further notice is necessary.

28.    No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, the Debtor respectfully requests that this Court grant the relief requested herein, together with such further relief as this Court deems just and proper.

Dated: Garden City, New York
      July 14, 2022

                        CULLEN AND DYKMAN LLP

                        BY: Bonnie L. Pollack
                        Matthew G. Roseman, Esq.
                        Bonnie L. Pollack, Esq.
                        100 Quentin Roosevelt Boulevard
                        Garden City, New York 11530
                        (516) 357-3700

                        Attorneys for the Debtor

# EXHIBIT A

## PROPOSED SALE ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
                                                             :
In re:                                                       :  Chapter 11
                                                             :
JOSEPH KLAYNBERG,                                            :  Case No. 22-10165 (MG)
                                                             :
                                                             :
                  Debtor.                                    :
                                                             :
------------------------------------------------------------ x
```

**ORDER APPROVING THE PRIVATE SALE OF PERSONAL PROPERTY**
**FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

Upon the motion (the "**Motion**") of Joseph Klaynberg ("**Debtor**"), seeking entry of an order pursuant to sections 105 and 363 of title 11, United States Code ("**Bankruptcy Code**") and Rule 6004 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") approving a private sale of the Debtor's interest in the Property identified in the Agreement annexed as Exhibit "B" to the Motion[1]; and a hearing on the Motion having been held on _____ \_\_, 2022 (the "**Hearing**"); and good and sufficient notice of the Motion and Hearing having been given and no other or further notice being required; and objections, if any, having been overruled, withdrawn, or resolved:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

---

[1] Defined terms not otherwise defined herein shall have the same meanings ascribed to them in the Motion.

B.     The statutory predicates for the relief sought in the Motion and the basis for the approvals and authorizations contained in this Order are Bankruptcy Code sections 105 and 363, and Bankruptcy Rules 2002, 6004 and 9014.

C.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.     Venue of this case and the Motion in this district is proper under 28 U.S.C. § 1408.

E.     Sufficient notice of the relief sought in the Motion has been given and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to interested persons and entities.

F.     The Debtor determined in his best business judgment that a private sale of his interest in the Property to Emily Klaynberg ("**Emily**") for $1,900,000 (the "**Purchase Price**") is in the best interests of the Debtor's estate and creditors.

G.     The Purchase Price to be paid by Emily constitutes adequate and fair value for the Debtor's interest in Property.  The sale was negotiated and entered into in good faith and from arm's length bargaining positions by and between the Debtor and Emily.

H.     The Debtor's interest in the Property may be sold free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code.

BASED ON THE FOREGOING, AND AFTER DUE CONSIDERATION AND GOOD CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.     All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

2.     Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized to sell his interest the Property pursuant to the Agreement annexed to the Motion as

2

"B", and upon such sale, all right title and interest of the Debtor in and to the Property shall vest in Emily free and clear of any and all liens, claims and encumbrances of whatever kind or nature, with such liens, claims and encumbrances, if any, to attach to the proceeds of sale in order of their priority and each and every Entity (as defined in Bankruptcy Code section 101(15)) is forever barred from asserting against Emily, as applicable, its successors and assigns, or against the Property, any mortgages, liens, interests, Claims (as defined in Bankruptcy Code 101(5)) or other encumbrances of any kind or nature (including, without limitation, any judgment liens) (collectively "**Encumbrances**") held by such Entity against the Debtor or the Property. Notwithstanding the foregoing, the mortgage lien held by Chase shall remain as a lien against the Property, and Emily shall be responsible to satisfy such mortgage lien in its entirety.

3.     The Debtor is authorized to take all actions and execute all documents necessary or appropriate to effectuate the sale of his interest in the Property to Emily consistent with this Order.

4.     At the closing of the sale, any capital gains taxes associated with the sale of the Debtor's interest in the Property shall by paid by the Debtor, together with any closing costs with respect to the sale.  The remaining amount of the Purchase Price shall be held by the Debtor's counsel for distribution through the Debtor's Chapter 11 Plan.

5.     Following the closing of the sale, no holder of any Encumbrance against the Debtor or the Property shall interfere with Emily's rights in, title to or use and enjoyment of the Property.

6.     The provisions of this Order authorizing the sale of the Debtor's interest in the Property free and clear of liens, claims and encumbrances, shall be self-executing, and neither the Debtor nor Emily shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.  However, the Debtor and Emily, as applicable, and each of their respective employees

3

and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or Emily, as applicable, deems necessary or appropriate to implement and effectuate the terms of this Order. This Sale Order (i) shall be effective as a determination that, at the closing, all Encumbrances existing against the Property before the closing have been unconditionally released, discharged and terminated, and that the transfer and conveyance of the Property has been effected, and (ii) shall be binding upon and shall govern the acts of all persons and Entities. If any person or Entity that has filed financing statements or other documents or agreements evidencing any Encumbrances against the Property shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, and/or releases of all Encumbrances which the person or entity has with respect to the Property, then Emily and/or the Debtor are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or Entity with respect to such Property. A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorder to act to cancel any Encumbrances of record against the Property, and all such clerks and recorders are hereby directed to accept this Sale Order as proof that such Encumbrances have been extinguished and released. Notwithstanding the foregoing, the Debtor shall not be under any obligation to record a certified copy of this Sale Order.

7.     Emily shall not be deemed for any purpose to: (i) be a successor, continuation or alter ego (or other such similarly situated party) to the Debtor or its estate by reason of any theory of law or equity, including, without limitation, any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability; or (ii) have, de facto or otherwise, merged with or into the Debtor; or (iii) be a mere continuation, alter ego, or substantial continuation of the Debtor. Emily is not assuming, nor shall it be liable for, any of the Debtor's debts, obligations or liabilities, and shall have no successor

4

or vicarious liabilities of any kind or character under any theory of law relating to the Debtor's debts, obligations and liabilities, except that Emily shall be fully responsible for the payment of the mortgage held by Chase against the Property.

8.  No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the sale authorized by this Sale Order.

9.  Pursuant to section 1146(a) of the Bankruptcy Code, and subject to entry of an Order Confirming a Chapter 11 Plan in the Debtor's case (a "**Confirmation Order**"), any transfers of an interest in property pursuant to the Agreement, including the recording of any mortgages or liens or amendments thereto, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment in the United States (including any state, municipality, or county), and based upon the entry of a Confirmation Order and this Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. For the avoidance of doubt, the foregoing exemption includes sales and use taxes or any similar government assessment. Pending entry of a Confirmation Order, the Debtor shall hold in escrow any taxes that would otherwise be payable as a result of the sale pursuant to the Agreement, and in the event a Confirmation Order is not entered, shall pay such taxes forthwith.

10. The transaction contemplated by the Motion is undertaken without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. Emily is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the

22420.2000 20318338v1

full protections of section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Order shall not affect the validity of the sale of the Debtor's interest in the Property to Emily.

11.     This Court shall retain jurisdiction to enforce the provisions of this Order and to resolve any disputes concerning this Order.

Dated: New York, New York
        _____ \_\_, 2022

_____
MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

6

# EXHIBIT B

# PURCHASE AGREEMENT

# ASSET PURCHASE AND SALE AGREEMENT

This Asset Purchase and Sale Agreement, made this 14th day of July, 2022 (the "Agreement"), by and between Joseph Klaynberg, an individual residing at 114 Mulberry Street, New York, New York 10013 (the "Seller") and Emily Klaynberg, an individual residing at 5 Lillian Court, Sands Point, New York 11050 (the "Purchaser").

## PRELIMINARY STATEMENTS

1.      On February 11, 2022 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.      The Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Property (as hereinafter defined).

3.      The execution and delivery of this Agreement and the consummation of the transactions set forth in this Agreement are conditioned upon, among other things, the entry of an order of the Court approving this Agreement and the transactions contemplated by this Agreement under sections 363(b), (f) and (m) of the Bankruptcy Code.

## AGREEMENTS

In consideration of the foregoing and the mutual agreements contained in this Agreement, the Seller and the Purchaser agree as follows:

## SECTION I. DEFINITIONS

1.1      <u>General Terms</u>. When used in this Agreement, the following terms have the following meanings:

"Agreement" means this Asset Purchase and Sale Agreement.

"Bankruptcy Code" has the meaning set forth in the first Preliminary Statement.

"Closing" means the date and time at which the Seller consummates the sale, transfer and delivery of the Property to the Purchaser as provided in this Agreement by the contemporaneous execution and delivery by the Seller of the documents and instruments referred to in this Agreement and delivery by the Purchaser of the documents and payments provided in this Agreement.

"Closing Date" means the date on which the Closing occurs, which shall take place on or before a date that is fourteen (14) days after entry of the Sale Order, or at such other time and such other day as is agreed upon in writing by Seller.

"Court" has the meaning set forth in the first Preliminary Statement.

"Liens" means, collectively, any and all liens, pledges, security interests, claims, charges, encumbrances or other interests of any kind against the Premises and the Property.

"Mortgage" means the mortgage of JP Morgan Chase Bank dated April 15, 2015 in the original principal amount of $1,470,000, constituting a Lien against the Premises.

"Petition Date" has the meaning set forth in the first Preliminary Statement.

"Premises" means the real property located at 5 Lillian Court, Sands Point, New York 11050, as more specifically described in Exhibit A attached hereto and made a part hereof, together with all buildings, improvements, fixtures attached to the Premises; and all privileges and appurtenances pertaining thereto including any right, title and interest, if any, of the Seller in and to adjacent streets or rights of way, or to any tangible personal property and fixtures located on, attached to, or used in connection with the Premises.

"Property" means the Seller's 50% ownership in the Premises.

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Sale Hearing" means the hearing to be scheduled and conducted by the Court for approval of the transactions contemplated by this Agreement.

"Sale Order" means an order entered by the Court, reasonably satisfactory to the Purchaser, approving the transactions contemplated by this Agreement under sections 363(b), (f) and (m) of the Bankruptcy Code, which order holds, at a minimum (a) that the Purchaser is a "good faith" purchaser within the meaning of, and entitled to the protections of, section 363(m) of the Bankruptcy Code; and (b) that the Property is to be transferred to the Purchaser as is, where is, free and clear of all Liens except as set forth in this Agreement, pursuant to sections 363(b) and (f) of the Bankruptcy Code.

"Separation Agreement" means the Separation Agreement between Emily Klaynberg and Joseph Klaynberg, dated November 17, 2020.

1.2     Accounting Terms. Any accounting terms used in this Agreement which are not specifically defined in this Agreement should have the meanings customarily given them in accordance with GAAP.

1.3     Other Definitions.

(A)     The words "hereof", "herein", "hereunder" and "hereto" and words of similar import when used in this Agreement refer to this Agreement as a whole and not any particular provision of this Agreement, and section, subsection, clause, exhibit and schedule references are to this Agreement, unless otherwise specified.

(B)     All terms defined in this Agreement in the singular have comparable meanings when used in the plural and vice versa, unless otherwise specified.

## SECTION 2. <u>PURCHASE AND SALE OF PROPERTY; LIABILITIES</u>

2.1     <u>Assets to be Purchased and Transferred</u>. Subject to the terms of the Sale Order, the provisions set forth in this Agreement and sections 363(b), (f) and (m) of the Bankruptcy Code, at the Closing and effective as of the Closing Date, the Purchaser will purchase and acquire from the Seller, and the Seller will sell, assign, convey, transfer and deliver to the Purchaser, the Property, as is, where is, free and clear of all Liens.  Notwithstanding the foregoing, the Property will be conveyed to the Purchaser subject to the Mortgage and subject to the title exceptions set forth on Exhibit "B" attached hereto ("Permitted Exceptions", and the condition of the title subject only to the Permitted Exceptions is referred to herein as "Acceptable Title").

2.2     11.     <u>Title Company Approval</u>: Purchaser shall accept title subject to the Mortgage and the Permitted Exceptions. Notwithstanding anything in this Agreement to the contrary: (a) Purchaser need not purchase a title insurance policy; (b) If Purchaser desires to purchase title insurance from any company, Purchaser may do so, at Purchaser's discretion, at Purchaser's sole cost and expense and Seller shall not be obligated to cause the title company chosen by Purchaser to omit an exception to title if it is a Permitted Exception. Without limiting the generality of the preceding sentence: (a) Seller shall have no obligation to satisfy any exception to title relating to the filing of Seller's federal or state tax return; and (b) Seller's obligation to deliver an affidavit of title at closing shall be limited to the delivery of a customary affidavit of title. Purchaser shall not have the right to terminate this Agreement if Seller is able to provide Acceptable Title and Purchaser's title insurance company is unwilling to insure same at regular rates. In the event that the Seller is unable to cure such defects or deliver Acceptable Title within a reasonable time after receipt of written notice of such defects, then either party may cancel this Agreement and Seller's liability hereunder shall be limited to the return of the Deposit, and a reasonable fee for the title search and survey performed by the Purchaser, which amount shall not exceed $500.00.

2.3     <u>Violations</u>: Purchaser shall accept the Property subject to all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental department having authority as to lands, housing, buildings, fire and health and labor conditions affecting the Premises at the date hereof, known or unknown. This provision shall survive Closing. Seller shall furnish Purchaser with any authorization necessary to make the searches that could disclose these matters.

2.4     <u>Closing Adjustments</u>:  There sale be no Closing adjustments apportioned to the Seller, and all taxes, fuel and water charges shall be borne by the Purchaser; provided however, that the Seller shall be responsible for transfer taxes, if any.

2.5     Intentionally Omitted:

2.6     Affidavit as to Judgments, Bankruptcies: If a title examination discloses judgments, bankruptcies or other returns in the State of New York against persons having names the same as or similar to that of Seller, Seller shall deliver a standard affidavit at Closing reasonably satisfactory to the Designated Title Company showing that they are not against the Seller. Nothing in this section shall be construed as applying to Seller's bankruptcy case filed on the Petition Date.

2.7     No Assumption of Liabilities: Purchaser shall not assume, shall not purchase the Property subject to, and shall in no event be liable for, any liabilities, obligations or responsibilities of the Seller whether arising prior to or after the Closing, all of which shall remain obligations of the Seller, except that the Purchaser shall be solely responsible to satisfy the Mortgage. For the avoidance of doubt, in accordance with section 7.3.7 of the Separation Agreement, the Seller shall remain responsible for any capital gains taxes in connection with the transactions contemplated by this Agreement. To the extent the Property is subject to any Liens against Seller, the Property shall be sold free and clear of such Liens pursuant to section 363(f) of the Bankruptcy Code, such Liens (to the extent valid, enforceable and perfected) shall attach to the proceeds of sale and shall be paid by the Seller from said proceeds and shall in no event be paid or payable by the Purchaser.

2.8     Intentionally Omitted:

2.9     No Representation; Purchaser's Duty to Review:

(A)     The Property and any personal property sold pursuant to this Agreement are sold in an "As-Is" condition. Purchaser has inspected the building on the Premises and is thoroughly acquainted with its physical condition and state of repair. Purchaser agrees to purchase the Property and the Premises "as is" and in its present condition subject to reasonable use, wear and tear, and natural deterioration between now and Closing. Seller specifically makes no representation regarding the condition of the Premises.

(B)     Purchaser acknowledges that Purchaser has not relied and will not rely upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by the Seller or others, including, but not limited to, any relating to the description or physical condition or state of repair of the Premises, the building, or the size of the dimensions of the building or property or the rooms therein contained or any other physical characteristics thereof, or any other data, except as may be specifically represented herein. Purchaser has relied on Purchaser's own examination and investigation thereof. No person has been authorized to make any representations on behalf of the Seller. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Property, without offset or any claim against, or liability of, the Seller, whether or not any layout or dimension of the Premises or any part thereof, as shown on the floor plans, is accurate or correct and (b) that Purchaser shall not be relieved of any Purchaser's obligations hereunder by reason of any inaccuracy or error. The provisions of this paragraph shall survive the Closing.

(C)     Any factual information such as Premises dimensions, floor plans, square footage or sketches shown to Purchaser or set forth herein are or may be approximate and Purchaser represents to Seller that Purchaser has inspected and verified facts and information prior to the execution of this Agreement. No liability for inaccuracies, errors or omissions is assumed by the Seller or his agents.

## SECTION 3.  PURCHASE PRICE

3.1     Purchase Price. Subject to the terms of the Sale Order and the provisions set forth in this Agreement, the full consideration for the purchase and transfer of the Property is one million nine hundred thousand ($1,900,000) dollars in cash (the "Purchase Price"). The Purchase Price shall be paid as follows: (a) the sum of five (5%) percent of the Purchase Price shall be paid by the Purchaser upon the execution of this Agreement (the "Deposit") in the manner set forth in Section 3.2 below, and (b) the balance of the Purchase Price (the "Balance") shall be paid by the Purchaser at the Closing by certified check or by wire transfer.

3.2     Deposit. The Deposit shall be made by certified check payable to the order of Cullen and Dykman LLP ("C&D"), as attorneys for the Seller, or by wire transfer, and shall be held in trust by C&D subject to the terms and conditions of this Agreement. C&D shall hold the Deposit in an interest bearing trust account. In the event this Agreement is terminated for a reason other than as set forth in Section 8.1(B)(i), the Deposit, together with all interest accrued thereon, will be returned to Purchaser in accordance with Section 8.2 below.

## SECTION 4.  CLOSING

4.1     General. The Closing will take place at the offices of C&D at 10:00 a.m. on the Closing Date.

4.2     Deliveries by the Seller. At the Closing, the Seller will deliver to the Purchaser the following:

(A)     A Bargain and Sale Deed without covenants against Grantor's Acts; and

(B)     New York State Real Property Transfer Tax return for the Real Property, New York City Real Property Transfer Tax return for the Property and the Form 5217;

(C)     Seller's affidavit under penalty of perjury stating the Seller is not a "foreign person," as defined in Section 1445 of the Internal Revenue Code of 1986 and the U.S. Treasury Regulations thereunder, setting forth Seller's taxpayer identification number; and

(D)     Such other instruments and documents as counsel for the Purchaser may reasonably determine to be necessary for transferring, assigning and conveying to the Purchaser the Property pursuant to this Agreement.

4.3     Deliveries by the Purchaser.  At the Closing, the Purchaser will deliver to the Seller the following:

(A)     the Balance in accordance with Section 3 hereof.

## SECTION 5. **CONDITIONS**

5.1     Conditions to Purchaser's Obligation. The obligation of the Purchaser to consummate the transactions provided for by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by the Purchaser:

(A)     Covenants. The Seller has performed and complied with all covenants and agreements required to be performed or complied with by it hereunder.

(B)     Condition of Property.  Except for normal wear and tear the Premises shall, on the Closing Date, be in the same general condition as on the date of this Agreement.

(C)     No Removal of Assets.  The Seller shall not remove any fixtures or improvements from the Premises.

(D)     No Proceeding or Litigation.   No litigation, action, suit, investigation, claim or proceeding challenging the legality of or seeking to restrain, prohibit or materially modify, the transactions provided for in this Agreement has been instituted and not settled or otherwise terminated.

(E)     Sale Order. The Court has entered the Sale Order in form reasonably acceptable to Purchaser, which has not been reversed, stayed, modified or amended prior to the Closing.

(F)     Good Faith Purchaser Status. The Court shall have found that the Purchaser is a "good faith purchaser" in accordance with and entitled to the protections of section 363(m) of the Bankruptcy Code.

5.2     Conditions to Seller's Obligations. The obligation of the Seller to consummate the transactions provided for by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived by the Seller:

(A)     Covenants. The Purchaser has performed and complied with all covenants and agreements required to be performed or complied with by it hereunder.

(B)     No Proceeding or Litigation. No litigation, action, suit, investigation, claim or proceeding challenging the legality of, or seeking to restrain, prohibit or materially modify, the transactions provided for in this Agreement has been instituted and not settled or otherwise terminated.

(C)     Sale Order. The Court has entered the Sale Order, which has not been

reversed, stayed, modified or amended prior to the Closing.

## SECTION 6.  **REPRESENTATION AND WARRANTIES**

6.1     Seller's Representations.

(A)     Subject to Court approval, the Seller has full power and authority to execute, deliver and perform in accordance with this Agreement and any and all documents contemplated hereunder.

(B)     No broker or similar intermediary has acted for or on behalf of the Seller in connection with the transactions contemplated hereby.

6.2     Purchaser's Representations.

(A)     Purchaser has full power and authority to execute, deliver and perform in accordance with this Agreement and the transactions contemplated hereby.

(B)     No broker or similar intermediary has acted for or on behalf of the Purchaser in connection with the transactions contemplated hereby.

## SECTION 7.  **COVENANTS**

7.1     Intentionally Omitted.

7.2     Intentionally Omitted.

7.3     Cooperation. The Seller shall cooperate fully with the Purchaser in executing and delivering any and all further documents, or performing any acts, necessary to effectuate the transactions contemplated herein whether at or after the Closing. After the Closing, the Seller shall promptly deliver to the Purchaser all notices, correspondence and other items relating to the Property which are received by him or are in his possession. The provisions of this Section 7.3 shall survive the Closing and shall be a continuing obligation.

7.4     Notice of Hearing. The Seller represents and warrants that he will provide notice of the Sale Hearing to all creditors, holders of Liens and other parties in interest in such a manner as approved or required by the Court.

## SECTION 8.  **TERMINATION**

8.1     Termination. This Agreement and the transactions contemplated by this Agreement may be terminated at any time prior to the Closing:

(A)     By the Purchaser:

(i)     if there has been a material breach by the Seller of any of his warranties, covenants, obligations or agreements set forth in this Agreement or in any writing delivered by the Seller under this Agreement, which breach has not been cured within five (5) business days after notice provided in accordance with Section 10.4 hereof; or

(ii)    if any condition precedent to the Purchaser's obligation to effect the Closing as set forth in Section 5.1 is not satisfied, or has become incapable of fulfillment, and such condition is not waived, if waivable, by the Purchaser, which has not been cured within five (5) business days after notice provided in accordance with Section 10.4 hereof.

(B)    By the Seller:

(i)     if there has been a material breach by the Purchaser of any of her warranties, covenants, obligations or agreements set forth in this Agreement or in any writing delivered by the Purchaser under this Agreement, which breach has not been cured within five (5) business days after notice provided in accordance with Section 10.4 hereof; or

(ii)    if any condition precedent to the Seller's obligation to effect the Closing as set forth in Section 5.2 is not satisfied, or has become incapable of fulfillment, and such condition, as not waived, if waivable, by the Seller, which has not been cured within five (5) business days after notice provided in accordance with Section 10.4 hereof.

(C)    By either the Purchaser or the Seller:

(i)     if the Sale Order is vacated, modified or withdrawn prior to the Closing; or

(ii)    if the Court disapproves this Agreement or enters an order providing for a transaction to sell or transfer the Property to any entity other than the Purchaser.

8.2     <u>Effect of Termination</u>. If this Agreement is terminated under Section 8.1, written notice thereof will forthwith be given to the other party and this Agreement will thereafter become void and have no further force and effect and, except for those provisions that expressly survive the termination of this Agreement, all further obligations of the Seller and the Purchaser to each other under this Agreement will terminate without further obligation or

liability, except that if this Agreement is terminated for any reason other than under Section 8.1(B)(i) hereof, C&D shall immediately repay the Deposit and all accrued interest thereon to Purchaser and the Seller shall not have any right to assert any claims against Purchaser. In the event the Seller terminates this Agreement pursuant to Section 8.1(B)(i), the Seller's remedy shall be to terminate this Agreement and retain the Deposit with accrued interest thereon as liquidated damages. The provisions of this Section 8.2 shall survive termination of this Agreement.

## SECTION 9. **INTENTIONALLY OMITTED**

## SECTION 10. **MISCELLANEOUS**

10.1    Amendment. This Agreement may be amended only by a writing executed by all of the parties to this Agreement.

10.2    Entire Agreement. This Agreement and the other agreements expressly provided for in this Agreement contain the entire agreement of the parties with respect to the transactions contemplated by this Agreement and supersede all prior contracts, agreements, arrangements, communications and discussions whether oral or written with respect thereto.

10.3    Governing Law; Jurisdiction. This Agreement is in all respects governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law principles thereof.  For so long as the Seller is subject to the jurisdiction of the Court, the parties irrevocably elect the Court as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement and consent to the jurisdiction of the Court.

10.4    Notices. Any notice, request or other communication required or permitted under this Agreement must be in writing and are deemed to have been duly given (i) when received if personally delivered, (ii) within five calendar days after being sent by registered or certified mail, return receipt requested, postage prepaid, (iii) after being sent by facsimile, with confirmed answerback and (iv) within one business day of being sent by established overnight courier, to the parties at their respective addresses set forth below.

To the Seller:

Joseph Klaynberg
114 Mulberry Street
New York, New York  10013

With a copy to:

Cullen and Dykman LLP
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
100 Quentin Roosevelt Boulevard
Suite 402

Garden City, New York 11530

To the Purchaser:

Emily Klaynberg
5 Lillian Court
Sands Point, New York 11050

With a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
Fred Stevens, Esq.
200 West 41st Street, 17th Floor
New York, New York  10036

Any party by written notice to the others given in accordance with Section 10.4 may change the address or the persons to whom notices or copies thereof are to be directed.

10.5    Counterparts. This Agreement may be executed in any number of counterparts, each of which is deemed to be an original and of which together will constitute one and the same instrument, and by original or facsimile signature.

10.6    Assignment. This Agreement is binding upon and inures to the benefit of the successors and assigns of each party to this Agreement.  Purchaser shall not assign this Agreement without the prior written consent of the Seller. Any purported assignment by Purchaser in violation of this Agreement shall be voidable at the option of the Seller. The Seller's refusal to consent to an assignment shall not entitle Purchaser to cancel this Agreement nor give rise to any claim for damages against the seller.  Notwithstanding the foregoing, Purchaser may request the conveyance be made to another person or entity ("Nominee"), upon notification in writing delivered to Seller at least five days prior to the date of Closing. Purchaser's designation of a Nominee to take title to the Property shall not relieve the Purchaser of any obligation hereunder.

10.7    Waivers. Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any other agreements provided for in this Agreement, by the other parties must be in writing and will not be construed as, or constitute, a continuing waiver of such provision, or waiver of any other violation of, breach of or default under any other provision of this Agreement or any other agreements provided for in this Agreement.

10.8    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

10.9    Construction. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this

Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute is deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.10  Third Parties. Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any person or entity other than the Purchaser and the Seller any rights or remedies under or by reason of this Agreement.

10.11  Schedules and Exhibits. The Schedules and Exhibits attached to this Agreement are incorporated in this Agreement and are a part of this Agreement for all purposes.

10.12  Headings. The headings in this Agreement are solely for convenience of reference and will not be given any effect in the construction or interpretation of this Agreement.

10.13  References to Agreements. All references in this Agreement to other agreements refer to such agreements as amended, restated, supplemented or otherwise modified from time to time, unless such reference specifically states otherwise.

10.14  Waiver of Jury Trial. EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, CONNECTED WITH, OR RELATING TO THIS AGREEMENT, OR THE RELATIONSHIP CREATED HEREBY. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

EXECUTED AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN.

The Seller:                                      The Purchaser:

By: _____              By: _____
      Joseph Klaynberg                             Emily Klaynberg


ESCROW TERMS AGREED TO:

Cullen and Dykman LLP

By: _____
      Bonnie L. Pollack
      A Member of the Firm

**EXHIBIT "A"**

**Legal Description**

Schedule A Description



Page    1

ALL that certain plot, piece or parcel of land, situate, lying and being in the Incorporated Village of Sands Point, Town of North Hempstead, County of Nassau and State of New York, known and designated as and by Lot 281 and part of Lot 282 on a certain map entitled "Map of Riccardo Acres, Section 1" surveyed June 23, 1971 by Charles E. Wood, Inc., and filed in the Office of the Clerk of the County of Nassau on September 19, 1973 as Case No. 8482 which said lot and part of lot are bounded and described as follows:

BEGINNING at a point on the southerly line of Lillian Court distant 543.30 feet westerly from the westerly end of a curve which connects the westerly line of Forest Drive with the southerly line of Lillian Court;

RUNNING THENCE south 16 degrees 00 minutes 42 seconds 80.00 feet;

THENCE south 19 degrees 38 minutes 11 seconds 391.64 feet;

THENCE south 71 degrees 35 minutes 47 seconds west 310.04 feet;

THENCE north 1 degree 17 minutes 22 seconds west and partly along the land of the Map of Sands Point Section 2 121 feet east;

THENCE north 71 degrees 35 minutes 47 seconds east 35.00 feet;

THENCE north 37 degrees 05 minutes 10 seconds east 508.59 feet to a point on the westerly line of Lillian Court;

RUNNING THENCE easterly along the line of Lillian Court being the arc of a curve bearing to the left having a radius of 115.00 feet and a length of 78.54 feet to the point or place of BEGINNING.

RECEIVED IN
THIS CONDITION

## EXHIBIT "B"

## Permitted Exceptions

1. Zoning laws and regulations and landmark, historic or wetlands designation.

2. Consents for the erection of any structure or structures on, under or above any street or streets on which the building may abut.

3. Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the building.

4. Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Building over any street or highway or over any adjoining property.

5. Any state of facts which an accurate survey of the building would disclose.

6. Notes or notices of violations of law or governmental orders, ordinances or requirements noted or issued by any governmental department, agency or bureau having jurisdiction.

7. Any other matters or encumbrances subject to which Purchaser is required to accept title to the Property pursuant to this Agreement.

22420.2000 20319561v2

# EXHIBIT C

## PROVISIONS OF SEPARATION AGREEMENT

### 7.3  5 Lillian Court, Sands Point, New York 11050

7.3.1    The HUSBAND and WIFE acknowledge that they own property known as 5 Lillian Court, Sands Point, New York as joint tenants with a right of survivorship (hereinafter "Lillian Court Residence") and the property is subject to a mortgage with Chase Manhattan Bank having a principal balance of $1,299,761 as of November 1, 2020.

7.3.2    The WIFE and HUSBAND agree that the WIFE shall be entitled to the sole and exclusive occupancy of the Lillian Court Residence until the first to occur of the following events:

(a). the death of the WIFE;
(b). the Wife's cessation of the use of the Lillian Court Residence as her permanent place of abode;
(c). receipt by the HUSBAND of the election of the WIFE to sell the Lillian Court Residence;
(d). the remarriage of the WIFE, whether the marriage is void or voidable or subsequently dissolved.
(e).the cohabitation by the Wife with an unrelated adult male for a period of thirty (30) consecutive days.

12



7.3.3   Upon the execution of this Agreement, the WIFE shall pay the expenses in connection with the Lillian Court Residence, including but not limited to, payments on the Chase Mortgage and any and all obligations or expenses with respect to real estate taxes, water and sewer charges, insurance, utilities, repairs and maintenance. The WIFE shall indemnify and hold the HUSBAND harmless of all losses, expenses (including reasonable attorney's fees and disbursements) and damages which he may incur as the result of a failure on the part of the WIFE to perform her agreement as set forth in this paragraph 7.3.3.

7.3.4   The WIFE shall keep, in full force and effect, the existing policy of homeowner's insurance protecting the Lillian Court Residence and pay all premiums due thereon. The Wife agrees that the Husband shall continue to be named as an insured on the policy for the duration of her exclusive occupancy period. Upon the entry of the Judgment of Divorce the parties agree that their ownership of the Lillian Court Residence shall be as Tenants in Common.  Both parties agree that neither party shall further pledge, encumber or dissipate the value of the Lillian Court Residence until such time as the property is sold. Each party shall indemnify and hold the other harmless, including the payment of any reasonable attorneys' fees, for the breach of this paragraph 7.3.4.

7.3.5   Upon the happening of one of the events set forth in paragraph 7.3.2  the parties, or their personal representatives,  shall communicate with one another for the purpose of establishing a "Selling Price" for the property and selecting a broker to determine the manner in which the property will be sold. If the parties cannot agree upon a price, they shall have the property appraised by two



qualified real estate appraisers, each party to select one of the appraisers, and the "Selling Price" shall be determined by averaging the two appraisals. The parties will place the property on a multiple listing with a mutually agreed upon broker retained on a non-exclusive basis. The HUSBAND and WIFE shall execute any and all contracts, Deeds, instruments or any other documents or papers which may be required or requested of them in connection with the transfer of the home as herein provided and the HUSBAND's and WIFE'S obligations in such respects and the obligations under this Article may be specifically enforced.

7.3.6 Upon the sale of the Marital Residence, the proceeds thereof shall be disbursed in the following order of priority:

(a). Payment shall be made to satisfy any mortgages or liens on the property; and
(b). then, payment shall be made for any expenses of the sale chargeable to the Sellers, pursuant to the contract of sale, such as recording or filing fees; and
(c). then, payment shall be made for any ordinary closing adjustments required pursuant to the applicable contract of sale; and
(d). then, payment shall be made for any real estate brokerage commissions, if actually incurred;
(e). then, payment shall be made for reasonable attorney's fees and disbursements incurred for the representation of the Sellers in connection with the sale of the Marital Residence;
(f). then, the balance of such proceeds shall be equally divided between the HUSBAND and the WIFE, subject to the following:
(g). If there are any judgments or liens against the HUSBAND or the WIFE, the judgment, or lien shall be paid and then deducted from the person named in the judgment from their share of the net proceeds.

7.3.7 Each party shall be responsible for the capital gains taxes, if any, due in connection with the sale of the Lillian Court Residence. Each party shall be chargeable with one-half (50%) of the sale proceeds and each party shall be entitled to claim one-half (50%) of the cost basis (acquisition and other allowable costs).



**EXHIBIT D**

**APPRAISAL**

**REAL ESTATE APPRAISAL REPORT**
**OF A ONE FAMILY PROPERTY LOCATED AT:**

**5 Lillian Court**
**Sands Point, NY 11050**
**[Emily Klaynberg]**

**WITH AN EFFECTIVE DATE OF VALUATION OF :**

**June 14, 2022**

**APPRAISED VALUE - $4,000,000**

**PREPARED FOR:**

**Emily Klaynberg**
**5 Lillian Court**
**Sands Point, NY 11050**

**PREPARED BY:**

**East Coast Appraisal Service**
**50 Court Street**
**Suite # 508**
**Brooklyn, NY 11201**



Commercial and Residential Real Estate Appraisers
50 Court St. #508 Brooklyn New York 11201

Email:info@eastcoastappraisal.com
www.eastcoastappraisal.com
Phone:718-834-1700 Fax:718-834-1807

June 14, 2022


RE:
5 Lillian Court
Sands Point, NY 11050

To whom it may concern,

As requested, I have conducted an inspection of the property cited above on June 14, 2022 to estimate the fair and reasonable market value. The only purpose of the appraisal is to assist in a buyout. The scope of work only includes the Direct Sales Comparison Approach, as it is the appraiser's opinion that it would produce the most credible results as it best illustrates the trends of buyers and sellers who trade such properties. The client and intended user are exclusively the addressee of this report.

**The global outbreak of a "Novel Coronavirus" known as COVID-19 was officially declared a pandemic by the World Health Organization (WHO) on March 13, 2020. It is currently unknown the extent this event either directly or indirectly will have on the national economy, the local economy, or the market in which the subject property is located. The reader is cautioned that the conclusions presented in this report apply only as of the effective date(s) indicated. There is insufficient statistically relevant post COVID-19 data available. The value opinion stated herein is predicated upon analysis of the market data available to the appraiser at the time of this assignment is performed. The appraiser makes no representation as to the effect on the subject property of this event, or any event after the effective date of this appraisal.**

The property is in Nassau County's Sands Point neighborhood on a residential street. The subject parcel measures 2 acres. The improvements consist of a two-story fully detached framed residence one family containing approximately 5840 square feet of living area. The property is in overall very good, condition. Subject is taxed and recognized by The County of Nassau, NY as a 1 family dwelling. There is no published Certificate of Occupancy available. As per the client the subject is a legal 1 family dwelling with a one family floorplan and as per the client it is being appraised as 1 family.

Sands Point offers typical suburban amenities including public transportation, and local shopping. Our market conditions survey studying marketing times, days on market & re-sales of similar one family residences indicate values are currently flat/stable with typical marketing times.

<div style="border: 1px solid black; padding: 1em;">

### <u>VALUATION</u>

In our opinion, the fair and reasonable valuation of the subject premises as of June 14, 2022 is:

### FOUR MILLION DOLLARS

**$4,000,000**

</div>

Should you require any additional information, please do not hesitate to contact the undersigned.

Respectfully,

*Lloyd S Flett*

Lloyd Flett
Appraiser
New York State Certified Appraiser
NYS Certification # 45000039905    Exp. 03/16/2023

# SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| LOCATION: | 5 Lillian Court |
| | Sands Point, NY 11050 |
| COUNTY: | Nassau |
| REAL ESTATE TAXES: | $60,174 [TAX YEAR 2022] |
| | |
| CERTIFICATE OF OCCUPANCY | On file- taxed & recognized as one family by Nassau County. Present functional use is that of a one family dwelling. There is no Certificate of Occupancy available to the appraiser with the County of Nassau |
| | |
| THREE YEAR SALES HISTORY: | The property has not sold or listed over the past 36 months. |
| | |
| ASSESSORS PARCEL # | 04 B 02814 |
| | |
| SECTION VOLUME: | 4 |
| BLOCK: | 8 |
| LOT: | 281 |
| | |
| ZONING: | 210 Residential |
| LOT SIZE | 2 acres |
| IMPROVEMENTS: | 2 story fully detached framed 1 family dwelling |
| SUBJECT VIEWS: | Golf course views |
| | |
| GROSS LIVING AREA: | 5,840 square feet [+-] |
| GROSS BASEMENT AREA: | 2,000 square feet [+-] |
| | |
| FLOOD HAZARD INFORMATION: | ZONE X- Not in a flood zone |
| | Map Panel #36059C0106G 09/11/2009 |
| VALUE BY THE SALES COMPARISON APPROACH: | $4,000,000 |
| VALUE BY COST APPROACH: | Not Applicable |
| VALUE BY INCOME APPROACH: | Not Applicable |
| | |
| FINAL APPRAISED VALUE; | $4,000,000 |
| | |
| EFFECTIVE DATE OF VALUATION: | June, 14, 2022 |

# IMPROVEMENT DESCRIPTION

| | |
|---|---|
| BUILT: | 2017+/- |
| FOUNDATION | Poured concrete |
| CONSTRUCTION | Framed |
| EXTERIOR FAÇADE | Concrete/Glass/Wood |
| ROOF | Tar |
| WINDOWS | Thermopane |
| PARKING | 3 car asphalt driveway/3 car built in garage |
| AMENITIES | Patio (2) / Terrace (2) / Roof Terrace / Generator / Wine Cellar / Pond / Gym / Sauna / In Door In Ground Pool / Security Cameras / Home Theatre / Wet Bar (2) / Laundry / In Ground Sprinklers |

## MECHANICAL

| | |
|---|---|
| PLUMBING | Not observed |
| HEATING | Gas fired system |
| HOT WATER SUPPLY | Separate hot water heater |
| AIR CONDITIONING | Central |
| ELECTRIC | Not observed |

## LAYOUT

| | |
|---|---|
| FIRST FLOOR | Kitchen, living room, dining room, den, foyer, ½ bathroom, bathroom, bedroom, bedroom, bathroom, office, maid's room, bathroom, indoor inground pool, ½ bathroom, sauna, and walk in closets |
| SECOND FLOOR: | 3 bedrooms, and 2 bathrooms |
| BASEMENT: | Part basement finished |

## CONDITION

At our inspection conducted on June, 14 2022, the property was observed to be in very good condition; with renovated kitchen and bathrooms.

The appraiser has no knowledge of any hidden or unapparent conditions of the subject property that could make it valuable, and makes no guarantees or warranties, expressed or implied, regarding the condition of the subject. The term "inspection" as used in this report is not the same as required for a professional home inspector or engineer. The appraiser does not fully inspect electrical, plumbing, mechanical systems, foundation, floor structure, subflooring, etc. This appraisal is not to be considered a home inspection. The appraiser is not a home inspector or engineer. This appraisal report should not be relied upon to disclose negative conditions or defects within the subject property. Should a professional home inspector or engineer be consulted, additional defects, conditions, and necessary repairs may be identified. Upon identification of any of these factors, should a negative impact on value be evident, the appraiser reserves the right to amend, revise, or change this report accordingly.

**SEE ATTACHED PHOTOGRAPHS**

# HIGHEST AND BEST USE

Essential to the concept of value is the theory of Highest and Best Use or most profitable use. The Appraisal Institute defines Highest and Best use as follows:

> "The highest and best use is the most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable continuous use to which the property is adapted and needed or likely to be in demand in the reasonably near future. However, elements affecting value which while within the realm of possibility is not fairly shown to be reasonably probable should be excluded from consideration. In addition, if the intended use is dependent upon an uncertain act or another person the intention cannot be considered.
>
> The use of land which may reasonably be expected to produce the greatest net return to land over a given period: the legal use which will yield to land the highest present value sometimes called optimum use."

In estimating "Highest and Best Use" there are essentially four considerations:

Possible Use:
To what uses is it physically possible to put the site in question

Permissible Use:
What uses are permitted by zoning and deed restrictions on the site in question

Feasible Use:
Which possible and permissible uses will produce the highest net return or highest present worth?

Maximally Productive Use:
Among the feasible uses, which use will produce the highest net return or the highest present worth.

The Highest and Best Use of the land or site if vacant and available for use may be different from the Highest and Best Use of the improved property. This will be true when the improvement is not an appropriate use and yet contributes to total property value more than the value of the site.

Since the appraisal of the subject, property is based on a particular premise of use the highest and best use analysis determines just what this premise of use should be. A highest and best use analysis consists of considering the highest and best use of a property under two assumptions: with a vacant and available site and with the property as improved. These two assumptions on highest and best use are correlated into one final estimate of highest and best use.

**Land as if Vacant and Available**

The physical characteristics of the site impose few development restrictions. Because of its size and shape, the parcel has limited uses.

The legal restrictions applicable to the site consist of zoning regulations enforced by the local municipality. These regulations limit the site to residential use.

The immediate area consists of mostly residential land uses with supporting commercial overlays and some light industrial influences. In this sense, the subject property melds well with the other properties in the area.

If the site were vacant and available today, the highest and best use would be for residential development.

**Property as Improved**

The subject site is improved with a 5840 square foot one family residence. The current use of the property is permissible under the existing zoning ordinance.

We considered all information pertaining to the physical characteristics of the site, including size, shape, access, topography, and the availability of utilities. Based on a consideration of all pertinent data we have concluded that the subject site is physically suited for its present use.

After estimating the value of the subject land under the present use, we considered whether any other uses, that are physically possible, legally permissible, or financially feasible, would support a higher land value.

We have concluded that the present use of the subject property is the use, which we considered maximally productive.

Given that the analysis meets the four criteria of Highest and Best Use, it is concluded that the use, which represents the Highest and Best Use of the subject property was that of its use on June 14, 2022.

# DEFINITION OF MARKET VALUE

Market Value is defined by The Appraisal Institute in their basic text; The Appraisal of Real Estate, 13th Ed, p. 23 as: " The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeable, and for self-interest, and assuming that neither is under duress."

Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to purchaser under conditions whereby:

1) Buyer and seller are typically motivated.

2) Both parties are well informed or well advised

3) A reasonable amount of time is allowed for exposure in the open market.

4) Payment is made in cash or its equivalent.

5) Financing is on terms generally available in the community as of a specified date in addition, typical for the property type in its locale.

6) The price represents an accepted consideration of the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or credits occurred in the transaction.

# THE APPRAISAL PROCESS

We employed the three tradition approaches in in establishing market value. These approaches generally referred to as the Sales Comparison Approach, the Cost Approach, and the Income Approach.

The Sales Comparison Approach: The Sales Comparison Approach is a set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, then applying appropriate units of comparison and adjusting the sales prices of the comparables based on the elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant; it is most common and preferred method of land valuation when an adequate supply of comparable sales is available.

The Cost Approach: The Cost Approach is a set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value. Adjustments are then being made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised. The cost approach is used for new construction and insurance purposes and therefore is not developed.

The Income Approach: The Income Capitalization Approach is a set of procedures through which as appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion is accomplished in two ways. First, one year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate, that reflects a specified income pattern, return on investment, and change in the value of the investment, alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate. Dwellings like the subject are usually not traded for their income potential. The Income Approach therefore was not considered a viable indicator of value and was not utilized

Reconciliation: Reconciliation is the last phase of any valuation assignment in which one or more value indications derived from market data are resolved into a final value opinion, which may be either a final range of value or a single point estimate.

# THE SALES COMPARISON APPROACH

The Sales Comparison Approach relies upon an analysis of recent sales of similar properties and proves an indication, in theory, of what the subject property itself would sell for as of the date of valuation. Sales comparisons are reduced to a common unit rate, such as the price per square foot. The sales utilized in my analysis are very similar in terms of physical and location characteristics as compared to the subject property and could be considered excellent indicators of market value. After adjusting for differences in time, location, size and utility, these sales provide a range of value in which the subject property will fall. The property rights conveyed are on a Fee Simple basis

In choosing comparable sales, the appraiser focused upon dwellings in the area as similar as possible to the subject. We then compared the comparables to the subject property for differences in location, condition, building size, physical characteristics, and amenities.

The following is a summary of the salient features for the comparable sales selected.

| COMPARABLE SALE # 1 | |
|---|---|
| **LOCATION :** | 6 Lillian Court<br>Sands Point, NY 11050 |
| **PROXIMITY:** | 0.03 miles |
| **LOT SIZE:** | 1.9 acres |
| **UNIT DESCRIPTION & SIZE:** | 5,267 square foot fully detached framed 1 family dwelling |
| **PARKING:** | 3 car driveway / garage |
| **SELLING PRICE:** | $3,795,000 |
| **TRANSFER DATE:** | 11/24/2021 |
| **SELLING PRICE PER SQUARE FOOT:** | $721 |
| **DATA SOURCE:**<br>**REFERENCES:**<br>**COMMENTS:** | **GEO-DATA- LIBOR MLS LISTING ID #3351205 .** Built on 1982. This is a sale of similar sized fully detached 1 family framed residence on similar parcel located in the immediate Sands Point area. This sale is estimated to be in inferior condition with inferior kitchen and bathrooms compared to the subject as per listing review. |



**PHOTOGRAPH OF COMPARABLE # 1**

| COMPARABLE SALE # 2 | |
|---|---|
| **LOCATION :** | 70 Old House Lane<br>Sands Point, NY 11050 |
| **PROXIMITY:** | 0.29 miles |
| **LOT SIZE:** | 1.99 acres |
| **UNIT DESCRIPTION & SIZE:** | 8,811 square ft fully detached framed one family residence |
| **PARKING:** | 3 car driveway / garage |
| **SELLING PRICE:** | $4,250,000 |
| **TRANSFER DATE:** | 05/04/2022 |
| **SELLING PRICE PER SQUARE FOOT:** | $482 |
| **DATA SOURCE:<br>REFERENCES:<br>COMMENTS:** | **GEO-DATA-** Built in 2004. This is a sale of a larger sized fully detached one family framed residence on a similar sized parcel located in the subject's neighborhood. This sale is estimated to be in similar condition per listing review. Mlsli #3379795 |



**PHOTOGRAPH OF COMPARABLE # 2**

| COMPARABLE SALE # 3 | |
|---|---|
| **LOCATION :** | 29 Hoffstot Lane<br>Sands Point, NY 11050 |
| **PROXIMITY:** | 2.1 miles |
| **LOT SIZE:** | 2.52 acres |
| **UNIT DESCRIPTION & SIZE:** | 7,244 square foot fully detached one family residence |
| **PARKING:** | 4 car concrete driveway / garage |
| **SELLING PRICE:** | $4,750,000 |
| **TRANSFER DATE:** | 05/12/2022 |
| **SELLING PRICE PER SQUARE FOOT:** | $656 |
| **DATA SOURCE:<br>REFERENCES:<br>COMMENTS:** | **GEO-DATA- LIBOR MLS LISTING ID #3166308.** Built in 1966. This is a sale of larger sized fully detached one family framed residence on largers sized parcel located in the subject's neighborhood. This sale is estimated to be in similar condition as the subject per listing review. |



**PHOTOGRAPH OF COMPARABLE # 3**



Comparable Sale 3
29 HOTTSTOT LANE
SANDS POINT, NY 11050
2.20 miles NW

Comparable Sale 2
70 OLD HOUSE LANE
SANDS POINT, NY 11050
0.37 miles NW

Subject
5 LILLIAN COURT
SANDS POINT, NY 11050

Comparable Sale 1
6 LILLIAN COURT
SANDS POINT, NY 11050
0.16 miles SW

Hempstead House

Hempstead Bay

Sands Point

Middle Neck Rd

Port
Washington
North

Manorhaven

Baxter Estates

Paul D. Schreiber
Senior High School

Port
Washington

Map data ©2022

14

## DIRECT SALE COMPARISON APPROACH SUMMARY

We analyzed the comparables and compared them to the subject property for differences in location, date of sale, condition, building size, physical characteristics, and amenities. We are placing equal weight to all three comparable sales for their similar location in the subject neighborhood.

## INDICATED VALUE VIA THE DIRECT SALES COMPARISON APPROACH:

**FOUR MILLION DOLLARS**
**$4,000,000**

# COST APPROACH

We did not consider the cost approach for this assignment, as there were insufficient land sales to select as a component. It is also difficult to estimate depreciation in older buildings such as the subject.

## INDICATED VALUE BY THE COST APPROACH

**Not Applicable**

# THE INCOME APPROACH

The underlying assumption of the Income Approach is that the typical, prudent purchaser will pay no more for a property than a similar investment offering a competing return. The value is derived through the capitalization process. This estimate is based upon an analysis of the property's potential net revenue flow:

The following is the methodology applicable in this approach:

1) The projection of the potential income from all sources which a competent owner or manager may legally generate from the realty over a specific or estimated period.

2) An estimate of vacancy and bad debts, as well as expenses incurred in the operation of the realty. These deductions, subtracted from the potential gross income, result in a stabilized net operating income.

3) The development of an overall rate. This includes the weighted effect of a percentage return to the equity position, the weighted effect of the debt service and the present worth of the future disposition or refinancing of the realty.

4) The overall rate, when divided into the net operating income, produces the final estimates of value

**Properties like the subject are typically not traded for their income potential. The "Income Approach" is not considered a statistically viable indicator of value and is not used in this report.**

# RECONCILIATION OF VALUE

In the previous sections of this appraisal report, the three approaches to estimate value have been considered, utilized, and emphasized as they apply to the fee simple of the ownership of the subject property and these indicated values are:

| | |
|---|---|
| Market Data/Direct Sales Comparison | $4,000,000 |
| Cost Approach | Not Applicable |
| Income Approach | Not Applicable |

We are placing greatest emphasis on Direct Sales Comparison Approach, as the subject is a typical one family dwelling with supporting sales comparable to the subject property. We applied adjustments to this market supporting comparable sales for any differences between them and the subject property. Once reconciled, these comparables provided reliable insight as to the subject's market value.

We are not considering the cost approach as there is ample supporting sales data consequently making it irrelevant.

We are also disqualifying the income approach, as these types of properties are not purchased for their rent potential to an investor.

Assumptions made in the comparable market analysis were both reasonable and consistent. It is our opinion that the analysis yielded an estimate which best represents the Market Value of the subject property as previously defined in this report.

It is our judgement and opinion that the Market Value of the subject property as of June 14, 2022 was

## FOUR MILLION DOLLARS

### $4,000,000

For the subject property appraised in this assignment the exposure/marketing time necessary to realize our concluded value is estimated to be between three to six months.

Respectfully,

Appraiser
New York State Certified Appraiser
NYS Certification # 45000039905    Exp. 03/16/2023

Lloyd Flett

# ADDENDUM SECTION

[all photos taken June 14th, 2022]



FRONT



REAR



STREET PHOTO



KITCHEN



LIVING ROOM



DINING ROOM



DEN



FOYER



½ BATHROOM



BATHROOM



BEDROOM



BEDROOM



BATHROOM



OFFICE



MAID'S ROOM



BATHROOM



INDOOR INGROUND POOL



½ BATHROOM



SAUNA



GYM



BEDROOM



BATHROOM



BEDROOM



TERRACE



BATHROOM



TERRACE



LIVING ROOM WALL PICTURE



LAUNDRY ROOM



HOT WATER HEATERS



BASEMENT BATHROOM



WINE CELLAR



BASEMENT DINING ROOM



HOME THEATRE / MEDIA ROOM



PATIO



GARAGE



GOLF COURSE VIEW

# STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser is not responsible for matters of a legal nature that affect either the property being appraised or the title to do it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised based on it being under responsible ownership.
2. The appraiser may have provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.
3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.
4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in questions unless specific arrangements to do so have been made beforehand.
5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.
6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property valuable. It is assumed that there are no such conditions, and the appraiser makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing, which might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must NOT be considered as any type of environmental assessment or property inspection of the property.
7. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.
8. The appraiser may have based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption of the improvements will be performed in a competent manner.
9. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraisers identify and professional designations, and references to any professional appraisal organizations of the firm with which the appraiser is associated) to anyone other than the borrower, the mortgage of its successors and assigns. This also includes the mortgage insurer, consultants, & professional appraisal organizations. This includes any state or federally approved financial institution, any department agency, or instrumentality of the United States or any state of the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service (s) without having to obtain the appraiser's prior written consent.
The appraiser's written consent and approval must also be obtained before the appraisal can be

conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

## **APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have researched the subject market area, have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis, and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a NEGATIVE adjustment is made to reduce the adjusted sales price of the comparable. If a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a POSITIVE, adjustment is made to increase the adjusted sales price of the comparable.
2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report, and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.
3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.
4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property. This includes the present owners or occupants of the properties near the subject property.
5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.
6. I was not required to report predetermined value or direction in value that favors the cause of the client or any related party, the amount of value estimate, the attainment of a specific result, or the occurrence of a subsequent event to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.
7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, except for the departure provision of those Standards, which does not apply (unless specifically stated so). I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise state in the reconciliation section.
8. I have personally inspected the subject property. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property. We have adjusted for these conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.
9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or

individuals in the performance of the appraisal of the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I take no responsibility for it.

10. We are conducting this appraisal that there are no health or environmental issues, and the property is a legal 1 family.

Respectfully,

Lloyd Flett
Appraiser
New York State Certified Appraiser
NYS Certification # 45000039905