CULLEN & DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.

Counsel for the Debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                     :
In re:                                               : Chapter 11
                                                     :
JOSEPH KLAYNBERG,                                    : Case No. 22-10165 (MG)
                                                     :
                                                     :
                 Debtor.                             :
                                                     :
-----------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR
## <u>CHAPTER 11 PLAN FILED BY THE DEBTOR</u>

### <u>IMPORTANT DATES</u>

- Date by which Ballots must be received: _____, 2022 at 5:00 p.m. Eastern Time.

- Date by which objections to Confirmation of the Plan must be filed and served: _____, 2022 at 5:00 p.m. Eastern Time.

- Hearing on Confirmation of the Plan: _____, 2022 at _:___.m. Eastern Time.

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................ 2

    A.    General ................................................................................................ 2

    B.    Voting ................................................................................................ 2

    C.    Confirmation Hearing ........................................................................ 4

    D.    Recommendations ............................................................................. 5

II. HISTORICAL INFORMATION .............................................................................. 5

    A.    The Debtor's History ........................................................................ 5

    B.    The Dispute Involving Nahla .......................................................... 6

III. THE REORGANIZATION CASE ......................................................................... 8

    A.    Overview ........................................................................................... 8

    B.    Employment of Professionals and Other Entities ........................... 8

    C.    Matters Pertaining to Disputes with Nahla ..................................... 8

    D.    Claims Administration .................................................................... 10

    E.    Exclusivity ...................................................................................... 11

IV. SUMMARY OF THE PLAN .................................................................................. 11

    A.    General ............................................................................................ 11

    B.    Plan Overview ................................................................................. 12

    C.    Treatment of Claims ....................................................................... 12

    D.    Treatment of Executory Contracts and Unexpired Leases ........... 17

    E.    Summary of Distributions and Claims Resolution Provisions ...... 18

V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION ...... 23

    A.    Funding of the Plan ........................................................................ 23

    B.    Injunction ........................................................................................ 28

    C.    Discharge ......................................................................................... 29

    D.    Exculpation ..................................................................................... 30

    E.    Indemnification ............................................................................... 31

22420.2000 20319893v2

**F.**      Provisions as to Governmental Units.................................................................32

**G.**      Post-Confirmation Jurisdiction of the Court.........................................................33

VI. CONFIRMATION OF THE PLAN.................................................................................37

A.     Introduction...............................................................................................................37

B.     Conditions to Confirmation.....................................................................................37

C.     Conditions to the Effective Date.............................................................................38

D.     Voting Procedures and Standards...........................................................................38

E.     Acceptance.................................................................................................................42

F.     Confirmation and Consummation..........................................................................42

VII. CERTAIN RISK FACTORS TO BE CONSIDERED....................................................48

A.     Risk That Distributions Will Be Less Than Estimated..........................................48

B.     Bankruptcy Risks......................................................................................................48

VIII. TAX CONSEQUENCES.............................................................................................49

IX. CONCLUSION................................................................................................................50

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN, AND IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN, BUT TO AID AND SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, AS APPLICABLE.  IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO CAREFULLY READ THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT THE PLAN. **THE AMOUNTS OF CLAIMS AND DISTRIBUTIONS CONTAINED HEREIN ARE ESTIMATES ONLY.**

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT

1

BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A
STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## I. INTRODUCTION

### A.      General

Joseph Klaynberg (the "Debtor") files this Disclosure Statement (the "Disclosure
Statement") with respect to the Chapter 11 Plan filed by him, dated July 15, 2022 (the "Plan").

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code
to all the known creditors of the Debtor. The purpose of this Disclosure Statement is to provide
sufficient information to enable creditors who are entitled to vote to make an informed decision
on whether to accept or reject the Plan.

Most words or phrases used in this Disclosure Statement shall have their usual and
customary meanings. Except as otherwise provided herein, capitalized terms not otherwise
defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.
FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE
DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

**THE DEBTOR URGES CREDITORS TO VOTE TO ACCEPT THE PLAN AS
THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS TO
OBTAIN ANY RECOVERIES IN RESPECT OF THEIR CLAIMS.**

### B.      Voting

With respect to Claims in Classes that are Impaired under the Plan, each holder of a
Claim in such Classes will receive a copy of this Disclosure Statement, a Ballot for the
acceptance or rejection of the Plan, and other related voting materials. Any holder of a Claim
whose legal, contractual or equitable rights are altered, modified or changed by the proposed

2

treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired.

Under the Plan, holders of Allowed Claims in Classes 2, 3, 4, 5, 6, 7 and 8 are or may be Impaired, and are therefore entitled to vote on the Plan (the "Voting Classes"). For a description of the Classes of Claims and their treatment under the Plan, see Section IV(C) below.

The date of entry of the Disclosure Statement Approval Order is fixed as the "Voting Record Date." Only Persons who hold Claims on the Voting Record Date are entitled to receive a copy of this Disclosure Statement and all of the related materials. Only Persons who hold Claims on that date that are Impaired under the Plan and are not deemed to reject the Plan are entitled to vote on the Plan.

In voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. Please complete and sign your Ballot and return it in the enclosed pre-addressed envelope to the Balloting Agent:

> Cullen and Dykman LLP
> Attn: Bonnie Pollack
> 100 Quentin Roosevelt Boulevard
> Garden City, NY 11530

ALL PROPERLY COMPLETED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO _____, 2022 AT 5:00 P.M. EASTERN TIME (THE "VOTING DEADLINE") WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. The Balloting Agent will prepare and file with the Court a certification of the results of the balloting with respect to the Plan.

3

Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired under a plan vote to accept such plan, unless the "cramdown" provisions of the Bankruptcy Code are employed. The Debtor reserves the right to seek to "cramdown" the Plan on non-accepting Classes of Claims. See Section VI below.

## C.  Confirmation Hearing

The Court will hold the Confirmation Hearing commencing at 10:00 a.m. (Eastern Time), on _____, 2022 at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, before the Honorable Martin Glenn, Chief United States Bankruptcy Judge. The Confirmation Hearing may be adjourned from time to time without further notice. At the Confirmation Hearing, the Court will (i) determine whether the requisite vote has been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously settled, withdrawn or overruled, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to confirm the Plan, and (v) grant such other and further relief as the Court deems reasonable and appropriate.

Any objection to Confirmation of the Plan must be in writing and filed with the Court and served in a manner so as to be received on or before _____, 2022 at 5:00 p.m. Eastern Time by: (1) counsel to the Debtor, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York 11530, Attn: Matthew G. Roseman, Esq. and Bonnie L. Pollack, Esq.; and (2) the Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Tara Tiantian, Esq.

4

**D.     Recommendations**

THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES VOTE TO ACCEPT THE PLAN AS THE PLAN REPRESENTS THE BEST OPPORTUNITY FOR CREDITORS TO OBTAIN RECOVERIES WITH RESPECT TO THEIR CLAIMS.

## II. HISTORICAL INFORMATION

**A.     The Debtor's History**

Prior to emigrating to the United States, the Debtor earned a degree in Civil Engineering. He came to this country in 1979 from Belarus (never having gone back) and was able to find work as a carpenter in the New York City. The Debtor continued to work in this trade for approximately 7 years. During this period he advanced from a laborer to a supervisor and was able to save enough money to start a small general contracting company, Wonder Works Construction Corp. in 1987. Wonder Works grew from a small carpentry contractor to a successful design and development builder that has completed 388 projects, developed 25 building and constructed thousands of residential units in New York City and the surrounding areas.

As Wonder Works grew, the Debtor started to look for larger development opportunities. As part of this strategy, he would finance individual development projects by finding investors to take equity interests in a project. Additional funds needed to complete a project would be borrowed from conventional lenders, both as secured debt and mezzanine financing.

As part of these transactions, Wonder Works would act as the general contractor and the Debtor would manage the project, earning fees for asset management and as managing member of the special purpose entity formed for the project. This hybrid method of development allowed

5

Wonder Works to grow, at its height in 2019, to a firm with approximately 120 employees and $125,000,000 in revenue. However, as the Debtor primarily built and developed residential housing, his business was severely impacted by the pandemic. Currently, Wonder Works employs 7 people and has less than $3,000,000 in work backlog with no development projects on the horizon. Neither the Debtor nor other officers of Wonder Works have been able to draw salaries from the company due to the financial constraints of Wonder Works.

The shutdown order by Governor Cuomo on March 22, 2020 severely impacted a condominium development project located on the upper east side of Manhattan at 302 East 96th Street known as the Vitre Condominium. This was a 21 story fully developed and completed 48 Unit residential building, with only twenty-eight residential units and six parking spaces left unsold at that time.

## B.     The Dispute Involving Nahla

The Vitre Condominium project was owned by single purpose entity WWML96 DE MEZZ, LLC ( "WWML96"). In addition to obtaining funds from its equity investors, WWML96 borrowed $43,000,000 from Deutsche Bank ("DB") as senior secured debt and an additional $24,939,394 as mezzanine debt on or about January 14, 2019. As part of these loan facilities, the Debtor and Eric Brody ("Brody") personally guaranteed the obligations to DB on account of the mezzanine debt obligations. Furthermore, the Debtor and Brody's equity interests in the WWML96 were posted as collateral (the "Mezz Loan").

On or about May 30, 2019, DB assigned the Mezz Loan to an entity known as Meadowbrooke. Thereafter, on or about September 29, 2020, Meadowbrooke assigned the Mezz Loan to Nahla. It should be observed that Nahla acquired the Mezz Loan well into the pandemic and at a time when the WWML96 was unable to sell remaining units and service the Mezz Loan.

On November 9, 2020, Nahla issued notices of default to both the WWML96, Debtor and Brody under the Mezz Loan and guaranty, respectively[1]. Ultimately, Nahla scheduled a public sale, pursuant to the UCC, of the Debtor and Brody's ownership interests in WWML96 for December 8, 2020 (the "UCC Sale"). In an attempt to prevent the UCC Sale from taking place, WWML96 filed an action against Nahla seeking to stay the sale (the "WWML96 Action"). The stay of the UCC Sale was denied and Nahla acquired the equity in WWML96 for $5 million. After the sale took place, the WWML96 Action transitioned to one seeking a determination as to whether the UCC Sale was commercially reasonable. Nahla filed a summary judgment motion asserting that the sale was reasonable, which was opposed by WWML96. The State Court ruled in Nahla's favor. In November 2021, WWML96 moved to renew its opposition to Nahla's summary judgment motion based on facts not offered on the prior motions, specifically, that Nahla lacked standing to conduct the UCC Sale (the "Motion to Renew"). The Motion to Renew was denied, which is on appeal to the First Department. The Appeal remains pending.

After the sale, Nahla commenced litigation against the Debtor and Brody, seeking the difference between the amount of the Mezz Loan and the $5 million purchase price (the "Guaranty Action"). This, despite the fact that the Debtor believes that the value of the remaining units and parking spaces at the WWML96 property at that time was $43,650,000. Notwithstanding the apparent windfall to Nahla, on or about November 14, 2021, a judgment was entered against the Debtor and Brody in the amount of $13,085,707.65 (the "Nahla Judgment") in the Guaranty Action (together with the WWML96 Action, the "State Court Actions"). The Nahla Judgment was appealed to the First Department and also remains pending.

---

[1] Meadowbrook had also issued notices of default during 2020.

Nahla commenced collection proceedings against the Debtor, including issuing restraining notices to various depository institutions thereby restraining approximately $1,300,000 in cash belonging to the Debtor and Emily, necessitating the bankruptcy filing.

## III. THE REORGANIZATION CASE

### A.    Overview

As of the Petition Date, all actions and proceedings against the Debtor and acts to obtain property from the Debtor were stayed under section 362 of the Bankruptcy Code.   During the administration of the Chapter 11 Case, the Debtor managed his affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, subject to the control and supervision of the Court.

### B.    Employment of Professionals and Other Entities

The Debtor retained the law firm of Cullen and Dykman LLP as his counsel in connection with the Chapter 11 Case.   The Debtor also retained Thaler Law Firm as special adversary proceeding counsel, Tysnjauz & Associates, P.C. as special appellate counsel and Lehman Flynn Vollaro CPAs PLLC as accountants.

### C.    Matters Pertaining to Disputes with Nahla

As set forth above, this filing was precipitated by the entry of the Nahla Judgment and the resultant execution upon the Debtor's assets.   Prior to the Petition Date, there was significant litigation between the Debtor and Nahla surrounding the Nahla Judgment, and the Nahla Judgment and a related state court matter were the subject of the Appeals.   Although the Debtor made several considerable offers to Nahla in order to resolve the issues between them prior to the Petition Date, such offers were either ignored or summarily rejected.

22420.2000 20319893v2

In addition to the Appeals, subsequent to the Petition Date, the Debtor commenced the Nahla Preference Action to determine that the entry of the Nahla Judgment and the execution on the Debtor's assets constituted preferential transfers. Also subsequent to the Petition Date, Nahla filed a motion in the Bankruptcy Court seeking standing to pursue an alleged fraudulent conveyance action to avoid a Separation Agreement entered into pre-petition in the Marital Action.

Because the Debtor believed that it was in the best interests of him, his creditors, and Nahla itself, he advised the Court at the initial case conference that perhaps the case could benefit by mediation, which the Court agreed with.

Thereafter, the Debtor, Nahla, the Debtor's former spouse, and Brody engaged in mediation. The Debtor spent considerable time formulating his mediation statements and a thoughtful settlement proposal. During that time, the Debtor did not focus on a proposed plan since it was unknown as to whether such a plan would be consensual and what it would entail.

The mediation ultimately occurred on May 24, 2022. Notwithstanding that the Debtor believed, and still does, that a resolution of the Nahla issues is beneficial to all involved, the mediation was not a success. The Debtor has now shifted gears from attempting to resolve the myriad issues involved with Nahla to litigating them, and to formulating a non-consensual plan. Thus, the Debtor filed the Plan which is the subject of this Disclosure Statement.

In addition, after the failed mediation, Nahla served upon the Debtor a voluminous document request that the Debtor has been responding to. To date, Nahla has been provided with nearly 30,000 pages of documents responsive to its request.

22420.2000 20319893v2

**D. Claims Administration**

**1. Filing of Schedules and Statements**

In accordance with the Bankruptcy Code, the Debtor's Schedules was originally filed on the Petition Date. Thereafter, the Debtor amended the Schedules on March 22, 2022, April 4, 2022 and May 27, 2022.

**2. Bar Dates for Pre-Petition Claims**

By Order dated March 8, 2022, the Court established April 20, 2022 as the Claims Bar Date by which proofs of Claims arising prior to the Petition Date must be filed with the Court. Claims of Governmental Units must be filed by August 10, 2022.

**3. Bar Dates for Post-Petition Claims**

*Administrative Claims*

**Under the Plan, all holders of Administrative Claims arising subsequent to February 11, 2022 and before the Effective Date (not including Professional Fee Claims (described below), and not paid prior to the Confirmation Date, must file with the Court proper requests for payment of such Administrative Claims, and serve copies upon the parties listed in Section XII(F) of the Plan, on or before the Administrative Claims Bar Date. Parties not complying with this deadline shall be forever barred from seeking payment of those Claims including, without limitation, against the Debtor, the Estate, or their property, or commencing or continuing any action, employment of process or act to collect, offset or recover any such Administrative Claim.** The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Administrative Claims Bar Date.

22420.2000 20319893v2

*Professional Fee Claims*

**All parties requesting compensation or reimbursement of Professional Fee Claims pursuant to section 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered or expenses incurred on behalf of the Debtor prior to the Effective Date must file applications with the Court, with copies to the parties listed in Section XII(F) of the Plan, on or before the Professional Compensation Claims Bar Date or shall be forever barred from seeking payment of those Professional Fee Claims.** The notice of Confirmation of the Plan to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will include notice of the Professional Fee Claims Bar Date.

### E. Exclusivity

The Debtor's exclusive period to file a Chapter 11 Plan in its case originally expired on June 13, 2022. By order dated June 16, 2022, it was extended to September 12, 2022. The Plan has been filed within the extended exclusive period.

## IV. SUMMARY OF THE PLAN

### A. General

**SET FORTH IN THIS SECTION IS A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTOR BASED ON**

**AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS.**

**B.     Plan Overview**

The Plan is a liquidating plan as all non-exempt assets of the Debtor will be liquidated to pay Allowed Claims against the Debtor. This will be accomplished by both the sale of various assets, and the litigation and monetization of Causes of Action. The Debtor believes that his ESOP, IRA and Life Insurance Policy are exempt from payment to creditors. Nahla's time to object to such exemptions has been extended to August 26, 2022. In the event any of such assets are found not to be exempt, they shall be included for Distribution to creditors under the Plan.

**C.     Treatment of Claims**

The Plan separates Claims into four (4) unclassified categories and eight (8) Classes. A Claim is placed in a particular unclassified category or Class only to the extent that the Claim falls within the description of that category or Class. A Claim is also placed in a particular category or Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that category or Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, U.S. Trustee Fees, Professional Fee Claims and Priority Tax Claims have not been classified and, subject to compliance with the Administrative Bar Date and Professional Fee Claims Bar Date, will be paid in full in Cash to the extent such Claims are Allowed. All other Claims have been classified. Each holder of a Claim should refer to Articles II and III of the Plan for a full description of the classification and treatment of Claims provided under the Plan.

## 1.     Administrative Claims – Not Classified

Administrative Claims include a Claim for costs and expenses of administration of the Debtor's Estate pursuant to Sections 503(b) or 507(a)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses of preserving the Estate incurred after the Petition Date and through the Effective Date.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor, or after the Effective Date each Holder of an Allowed Administrative Claim will receive in exchange for full and final satisfaction, settlement, release, and compromise of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) except as otherwise provided in the Confirmation Order, on the Effective Date or as soon as practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than five (5) business days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date, such Allowed Administrative Claims shall be assumed and paid by the applicable Purchaser and paid pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims and without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtor estimates that there will be no unpaid Administrative Claims.

22420.2000 20319893v2

## 2. U.S. Trustee Fees – Not Classified

The Debtor shall pay all U.S. Trustee Fees by the Effective Date. Thereafter, U.S. Trustee Fees shall be paid by the Debtor until entry of a final decree closing the Chapter 11 Case, or order of dismissal or conversion of the Chapter 11 Case.

## 3. Professional Fee Claims – Not Classified

Professional Fee Claims are defined under the Plan as all Claims for accrued fees and expenses for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to any order of the Bankruptcy Court or the Local Bankruptcy Rules and regardless of whether a fee application has been Filed for such fees and expenses.

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtor or the Plan Administrator, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court but subject to the terms of the Plan, pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Debtor or Plan Administrator on behalf of the Debtor from the Distribution Fund.

It is anticipated that this Class will include all retained Professionals identified above, and that as of the Effective Date of the Plan, fees to all Professionals will amount to approximately $500,000 (although not all unpaid).

## 4. Priority Tax Claims-Not Classified

Priority Tax Claims are defined under the Plan as Claim of a Governmental Unit of the kind specified in Section 507(a)(8) of the Bankruptcy Code. Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, Cash up to the full amount

of such Class from the Distribution Fund. The Debtor believes that there are no Priority Tax Claims.

5. **Allowed Other Priority Claims-Class 1**

Class 1 consists of Allowed Other Priority Claims against the Debtor's estate, which includes any Claim against the Debtor entitled to priority in right of payment under Section 507 of the Bankruptcy Code, other than: (a) an Administrative Claim or (b) a Priority Tax Claim. Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and compromise of each and every Allowed Other Priority Claim against the Debtor, each holder of an Allowed Other Priority Claim shall be paid the full amount of their allowed Claim from the Distribution Fund.

There are no Other Priority Claims.

6. **Allowed Chase Secured Claim – Class 2**

Class 2 consists of the Allowed Chase Secured Claim, estimated by the Debtor to amount to approximately $1,200,000. In accordance with the Separation Agreement, the Chase Secured Claim shall be paid solely from Emily's interest in the Sands Point Property and shall not be entitled to a Distribution from the Debtor or his estate.

7. **Allowed Investors Claim-Class 3**

Class 3 consists of the Allowed Investors Claim in the estimated amount of $317,000. The Allowed Investors Claim shall be paid its *Pro Rata* share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 4, 5 and 6 under the Plan.

22420.2000 20319893v2

### 8. Allowed Nahla Claim - Class 4

Class 4 under the Plan consists of the Nahla Claim, when, if and to the extent Allowed. The Nahla Claim is filed in the amount of $13,816,466. Nahla Filed it Claim as a Secured Claim. Through the Appeals, the Debtor is seeking to reverse the entry of the Nahla Judgment entirely. Also, the Debtor has sought, through the Nahla Preference Action, to avoid any Liens asserted by Nahla even if the Appeals are unsuccessful, thereby treating its Claim as wholly Unsecured. In the event that the Debtor is not successful in the Appeals or the Nahla Preference Action, Nahla shall have a Secured Claim as to the Net Proceeds of the sale of the Debtor's interest in the Sands Point Property. The Debtor does not believe that Nahla would have a Secured Claim in the Cash, Connecticut Interests, the Equity Interests or the proceeds of any Causes of Action even if Nahla is successful in the Preference Action. To whatever extent the Court finds Nahla to be Secured, Nahla shall be paid out of the assets in which it has a Lien prior to any other creditors receiving a distribution from such assets. The remaining unpaid portion of the Nahla Claim (or the entire Nahla Claim if the Debtor is successful in the Appeals and/or the Nahla Preference Action), shall be paid its *Pro Rata* share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 3, 5 and 6 under the Plan.

### 9. Allowed Guaranty Claims-Class 5

Class 5 consists of Allowed Guaranty Claims in the estimated amount of approximately $67,196,209. Allowed Guaranty Claims shall be paid their *Pro Rata* share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 3, 4 and 6 under the Plan.

22420.2000 20319893v2

10. **Allowed General Unsecured Claims-Class 6**

Class 6 of the Plan consists of Allowed General Unsecured Claims. Allowed General Unsecured Claims shall be paid their *Pro Rata* share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 3, 4 and 5 under the Plan. The Debtor anticipates that such Claims will amount to $13,760.

11. **Allowed Penalty Claims-Class 7**

Class 7 under the Plan consists of Allowed Penalty Claims, who shall receive their *Pro Rata* share of the Distribution Fund remaining after payment of all other Claimants in this case. It is anticipated that there will be no Allowed Penalty Claims to be paid under the Plan.

12. **Debtor – Class 8**

Class 8 consists of the Debtor. The Debtor shall retain any assets and property remaining after payment of all other Claims against the Debtor in full.

D. **Treatment of Executory Contracts and Unexpired Leases**

1. As of the Confirmation Date, but subject to the occurrence of the Effective Date, any prepetition Executory Contracts or Unexpired Leases not previously assumed or rejected shall be deemed rejected under sections 365 and 1123 of the Bankruptcy Code, except (a) the Debtor's lease of his residence at 114 Mulberry Street, New York, New York shall be deemed assumed as of the Confirmation Date (but subject to the occurrence of the Plan Effective Date); (b) any Executory Contract or Unexpired Lease that is the subject of a separate motion to assume, assume and assign or reject filed pursuant to section 365 of the Bankruptcy Code before the entry of the Confirmation Order; or (c) any Executory Contract or Unexpired Lease which shall have expired or terminated pursuant to its terms; provided, however, that rejection pursuant hereto shall not constitute an admission that any such Executory Contracts or Unexpired Leases

22420.2000 20319893v2

are in fact Executory Contracts or Unexpired Leases or that the Debtor had any liability thereunder.

2.      The Confirmation Order shall constitute an order of the Court approving the rejections or assumptions described herein, pursuant to section 365 of the Bankruptcy Code, as of the Confirmation Date, but subject to the occurrence of the Effective Date. Notwithstanding anything in this Plan to the contrary, no executory contract or unexpired lease shall be deemed assumed or rejected pursuant to the terms of Article V of the Plan if the Effective Date fails to occur for any reason.

3.      **Bar Date for Rejection Damages**

**Any Claim for damages arising by reason of the rejection of any pre-petition Executory Contract or Unexpired Lease hereunder must be filed on or before thirty (30) days following the Confirmation Date, and upon the failure of any entity to file such claim on or before such date, such entity shall be forever barred from asserting a claim on account of the rejection of such Executory Contract or Unexpired Lease, but shall nevertheless be bound by the provisions of the Plan. Nothing in Article V(C) of the Plan will extend any prior Bar Date set by prior order of the Court.**

E.      **Summary of Distributions and Claims Resolution Provisions**

1.      **Objections to Claims**

After the Effective Date, the Debtor shall have the exclusive authority to File objections to Claims against the Debtor, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims against the Debtor, regardless of whether such Claims are in a Class or otherwise. From and after the Effective Date, the Debtor may settle or compromise any Disputed Claim against the Debtor without any further notice to or action, order, or approval of

the Bankruptcy Court; provided, however, that settlement of Disputed Claims against the Debtor which will amount to $25,000 or more shall require an Order of the Bankruptcy Court. From and after the Effective Date, the Debtor shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises of Claims against the Debtor without any further notice to or action, order, or approval of the Bankruptcy Court.

2.     **Estimation of Claims**

The Debtor may, at any time, and shall have the exclusive authority to, request that the Bankruptcy Court estimate (a) any Disputed Claim against the Debtor pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim against the Debtor, contingent Claim against the Debtor or unliquidated Claim against the Debtor, including during the litigation concerning any objection to any Claim against the Debtor or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan, a Claim against the Debtor that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed Claim against the Debtor, contingent Claim against the Debtor, or unliquidated Claim against the Debtor, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions, and the Debtor may elect to pursue additional objections to the ultimate distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any

19

supplemental proceedings to object to any ultimate distribution on account of such Claim. Notwithstanding Section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim against the Debtor that has been estimated pursuant to Section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

3. **Claims Filed After Bar Date.**

Any Claim filed after any applicable Bar Date shall, unless such Claim amends a Claim filed before the Bar Date or unless the Court otherwise directs, be deemed Disallowed in full and expunged without further order of the Court. Filed or Scheduled Claims may not be amended without prior authorization of the Bankruptcy Court or the Debtor, and any such unauthorized new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to, or action, order or approval of the Bankruptcy Court.

4. **Disallowance of Claims**

All Claims against the Debtor held by any Entity from which property is sought by the Debtor or Plan Administrator under Section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtor or Plan Administrator alleges is a transferee of a transfer that is avoidable under Section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (1) the Entity, on the one hand, and the Debtor or Plan Administrator on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee

20

is liable to turnover any property or monies under any of the aforementioned Sections of the Bankruptcy Code and (2) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

### 5. Disputed Claims Reserve

On each Distribution Date (or as soon thereafter as is reasonably practicable), the Debtor shall deposit in the Disputed Claims Reserve the amount of Cash that would have been distributed to the Holders of all Disputed Claims against the Debtor as if such Disputed Claims had been Allowed on each Distribution Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be the lesser of (a) the asserted amount of the Disputed Claim filed with the Bankruptcy Court, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to Section 502(c) of the Bankruptcy Code, or (c) amount otherwise agreed by the Debtor and the Holder of such Disputed Claim for reserve purposes. To the extent the amount of Cash deposited in the Disputed Claims Reserve on account of Disputed Claims against the Debtor exceeds the amount of Disputed Claims against the Debtor (as of the funding of the Disputed Claims Reserve) that later become Allowed, the excess shall be distributed in accordance with the Plan.

### 6. Withholding Taxes and Expenses of Distribution

In connection with the Plan, to the extent applicable, the Debtor or Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtor or Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, withholding distributions pending receipt of

22420.2000 20319893v2

information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 7. Disputed Payment

Notwithstanding anything to the contrary in the Plan, no distribution shall be made to the holder of any Claim, including by way of setoff or recoupment by any such claimant, if at any time before an otherwise applicable distribution is issued, the Debtor or the Plan Administrator has taken action to recover on any causes of action or defenses against or with regard to the holder of such Claim (or the direct or indirect transferor to, or transferee of, such holder), until such cause of action or defense is resolved by Final Order or agreement of the Debtor or Plan Administrator.

Additionally, if any dispute arises as to the identity of a holder of an Allowed Claim who is entitled to receive any distribution, the Plan Administrator may, in lieu of making such distribution to such Person, reserve for such distribution until the disposition thereof shall be determined by Court order or by written agreement among the interested parties to such dispute.

### 8. Setoffs and Recoupment

Except as otherwise provided herein, the Debtor or Plan Administrator, pursuant to the Bankruptcy Code (including Section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off or recoup against any Allowed Claim or the distributions to be made pursuant to the Plan on account of such Allowed Claim

(before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtor of any such Claims, rights, and Causes of Action that the Debtor may possess against such Holder.

### 9. Interest on Claims.

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, post-petition and post-confirmation interest shall <u>not</u> accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim against the Sands Point Property shall remain a lien against such Property and shall be paid solely by Emily.

## V. MEANS OF IMPLEMENTATION OF THE PLAN; EFFECT OF CONFIRMATION

### A. Funding of the Plan

The distribution to Claimants under the Plan is being funded from several sources, including the sale of various assets and the litigation and monetization of Causes of Action.

### 1. Sale of Interest in Sands Point Property

The Debtor shall file or will have already filed a motion to sell his 50% interest in the Sands Point Property to Emily under Section 363(b) and (f) of the Bankruptcy Code for the sum of $1,900,000 (the "Sands Point Sale"). The Sands Point Sale shall be free and clear of all Liens, claims and encumbrances with such Liens, claims and encumbrances to attach only to the net proceeds of the Sands Point Sale, except that the mortgage against the Sands Point Property shall

remain a lien against such Property and shall be paid solely by Emily. "Net Proceeds" shall mean the gross sales price less traditional closing costs, title charges and taxes resulting from the sale, if any.

There will be no transfer or similar taxes owed on any transaction in connection with or in contemplation of the Plan, including the Sands Point Sale, to the fullest extent permitted by Section 1146 of the Bankruptcy Code. For the avoidance of doubt, the sale of the Debtor's interest in the Sands Point Property shall be deemed a transfer under, pursuant to, in connection with and in furtherance of this Plan, and such sale, transfer and delivery of any and all instruments of transfer, including without limitation, the deed for his interest in such Property in connection therewith shall not be taxed under any transfer tax provisions of law as permitted by Section 1146(a) of the Bankruptcy Code as interpreted by the Supreme Court in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008). The Debtor shall, however, be liable for any capital gains tax due in connection with the sale of his interest in the Sands Point Property.

The Net Proceeds of the Sands Point Sale shall be deposited by the Debtor into the Distribution Fund and shall be used for payments under this Plan.

**2. Sale of Connecticut Interests**

The Debtor shall retain [TBD] (The "Connecticut Broker") to market the Connecticut Interests for sale in accordance with bid procedures to be approved by the Bankruptcy Court pursuant to an appropriate motion under Section 363(b) and (f) of the Bankruptcy Code (the "Connecticut Interest Sale Motion"). The retention of the Connecticut Broker may, at the Debtor's election, be sought in the Connecticut Interest Sale Motion or in a separate retention application. The Connecticut Interests may be sold in lots or in their entirety and may be with or

without a stalking horse bidder. The sale shall be free and clear of Liens, claims and encumbrances, with such Liens, claims and encumbrances to attach only to the net proceeds of the sale. "Net Proceeds" shall mean the gross sales price less traditional closing costs, title charges and taxes resulting from the sale, if any.

**As will be set forth in the Connecticut Interest Sale Motion, the sale or sales thereunder shall be subject to any restrictions or approvals required under the respective entities' operating or shareholder agreements, or any lending agreements to which such entities may be a party.**

There will be no transfer or similar taxes owed on any transaction in connection with or in contemplation of the Plan, including the sale of the Connecticut Interests, to the fullest extent permitted by Section 1146 of the Bankruptcy Code. For the avoidance of doubt, the sale of the Connecticut Interests shall be deemed a transfer under, pursuant to, in connection with and in furtherance of this Plan, and such sale, transfer and delivery of any and all instruments of transfer shall not be taxed under any transfer tax provisions of law as permitted by Section 1146(a) of the Bankruptcy Code as interpreted by the Supreme Court in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008). The Debtor shall, however, be liable for any capital gains tax due in connection with the sale of the Connecticut Interests.

3. **Sale of Equity Interests**

The Debtor shall retain [TBD] (the "Equity Interest Broker") to market the Equity Interests for sale in accordance with bid procedures to be approved by the Bankruptcy Court pursuant to an appropriate motion under Section 363(b) and (f) of the Bankruptcy Code (the "Equity Interest Sale Motion"). The retention of the Equity Interest Broker may, at the Debtor's election, be sought in the Equity Interest Sale Motion or in a separate retention application. The

22420.2000 20319893v2

Equity Interests may be sold in lots or in their entirety and may be with or without a stalking horse bidder. The sale shall be free and clear of Liens, claims and encumbrances, with such Liens, claims and encumbrances to attach only to the net proceeds of the sale. "Net Proceeds" shall mean the gross sales price less traditional closing costs, title charges and taxes resulting from the sale, if any.

**As will be set forth in the Equity Interest Sale Motion, the sale or sales thereunder shall be subject to any restrictions or approvals required under the respective entities' operating or shareholder agreements, or any lending agreements to which such entities may be a party.**

There will be no transfer or similar taxes owed on any transaction in connection with or in contemplation of the Plan, including the sale of the Equity Interests, to the fullest extent permitted by Section 1146 of the Bankruptcy Code. For the avoidance of doubt, the sale of the Equity Interests shall be deemed a transfer under, pursuant to, in connection with and in furtherance of this Plan, and such sale, transfer and delivery of any and all instruments of transfer shall not be taxed under any transfer tax provisions of law as permitted by Section 1146(a) of the Bankruptcy Code as interpreted by the Supreme Court in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S.Ct. 2326 (2008). The Debtor shall, however, be liable for any capital gains tax due in connection with the sale of the Equity Interests.

The Net Proceeds of the sale of the Equity Interests shall be deposited into the Distribution Fund and shall be used for payments under this Plan.

4.     **Appeals**

On and after the Confirmation Date, the Debtor shall have the option to either continue the Appeals or dismiss same. If the Debtor determines to continue the Appeals, the Appeals shall

22420.2000 20319893v2

be perfected by no later than thirty (30) days after the Effective Date. The Nahla Claims shall be considered Disputed Claims until either dismissal of the Appeals by the Debtor or, in the event that the Appeals shall continue, entry of a Final Order in each of the Appeals, or in any ensuing appeal or motion to reconsider or reargue made with respect to the subject matter of the Appeals. Notwithstanding this, the Debtor agrees that Nahla shall **not** be prohibited from voting on the Plan by virtue of the objection to its Claim through the Appeals.

The costs and legal fees associated with the Appeals shall be paid from the Distribution Fund. Although the Debtor is not a party to the Appeal with respect to the UCC Sale, the Debtor's Appeal of the Nahla Judgment is contingent in large part on the outcome of that Appeal, and the prosecution of the UCC Sale Appeal by the Debtor therefore benefits the estate and shall be borne by the Debtor.

### 5.    Plan Administrator

The Plan Administrator shall be appointed as of the Confirmation Date to investigate and litigate or monetize all Causes of Action, except the Nahla Preference Action which will be continued to be pursued by Debtor's special adversary proceeding counsel and the Appeals which will continue to be pursued by the Debtor's special appellate counsel. The Plan Administrator shall also act as Disbursing Agent under the Plan. The Plan Administrator shall have the right to retain and pay such law firms and professionals to assist in his duties under the Plan without Bankruptcy Court approval. The Plan Administrator shall not be required to post a bond.

In addition to the Marital Litigation, the Nahla Preference Action and the Appeals, Causes of Action which may be pursued include actions for monies owed to the Debtor by

27

Chabad of Gramercy Park in the sum of $650,000, Wonder Works Construction Corp.in the sum of $357,161 and Valentina Petchorina in the sum of $33,470.

### 6. Liquidation Analysis

Annexed hereto as Exhibit "A" is a chart estimating the liquidation value of the Debtor's assets. In accordance therewith, assuming no recovery on the Marital Litigation and on debts owed to the Debtor, the gross recoveries to the Estate amount to approximately $3,569,348. Of course, that will increase to the extent of success in any of the Causes of Action. The Debtor anticipates that the net recoveries will amount to approximately $3,033,945.

It is anticipated that the amount of Claims (including **for this purpose only** the Nahla Claim) will total approximately $81,343,435. If there are no recoveries other than as set forth on Exhibit "A", and if the Debtor is successful in the Nahla Preference Action, Claimants in Classes 3 through 6 would recover a dividend of approximately 4% of their Claims, and neither Holders of Penalty Claims nor the Debtor would receive a distribution in this case.

If the Debtor is not successful in either the Appeals or the Nahla Preference Action, Nahla would receive the Net Proceeds of the Sands Point Sale. The remaining liquidation value of approximately $1,133,945 would be distributed to all Claimants Pro Rata, for a dividend of approximately 1.4% for Claimants in Classes 3 through 6.

### B. Injunction

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, CAUSES OF ACTION, OR LIABILITIES THAT: (1) ARE SUBJECT TO COMPROMISE AND SETTLEMENT PURSUANT TO THE TERMS OF THE PLAN; (2) ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.C; OR**

22420.2000 20319893v2

(3) ARE OTHERWISE STAYED OR TERMINATED PURSUANT TO THE TERMS OF THE PLAN, ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN, CLAIM, OR ENCUMBRANCE OF ANY KIND; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER.  ALL PARTIES ARE ENJOINED FROM INTERFERRING IN ANY MANNER WITH ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.

C.     Discharge

Pursuant to Section 1141(d) of the Bankruptcy Code, Confirmation of the Plan discharges the Debtor from any debt that arose before the Confirmation Date and any debt of a kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code whether or not a proof of Claim based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, such Claim is Allowed or the Holder of such Claim has accepted the Plan, except to the extent that the Debtor is denied a discharge under Section 727(a) of the Bankruptcy Code by Final Order.

22420.2000 20319893v2

## D.     Exculpation

To the extent permitted under section 1125(e) of the Bankruptcy Code, the Debtor, the Plan Administrator and their professionals, consultants, representatives, employees, officers, directors, managers and agents, and their successors and assigns, shall neither have, nor incur, any liability to any person or entity for any postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the consummation of the Plan, including but not limited to the marketing of and sales process relating to any sale of assets, the Disclosure Statement, and Causes of Action, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or limit the liability of any professional to its client pursuant to DR 6-102 of the Code of Professional Responsibility; provided, further, that each of the foregoing Entities shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.  Notwithstanding the foregoing, nothing set forth above shall operate to limit or excuse compliance by any Entity with any of their respective obligations under the Plan or otherwise or to modify the effect or consequence of any such failure to comply with such obligations.

22420.2000 20319893v2

## E.    Indemnification

The Debtor's professionals, the Plan Administrator, and their professionals, consultants, representatives, employees, principals, officers, directors, managers and agents, and their successors and assigns shall be indemnified and held harmless by Debtor and the Estate, to the fullest extent permitted by law, solely from the Estate and the assets of the Estate, and any proceeds thereof, for any losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses which such indemnified parties may incur or to which such indemnified parties may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against one or more of such indemnified parties on account of the acts or omissions in connection with any Exculpated matter; provided, however, that the Debtor and the Estate shall not be liable to indemnify any such indemnified party for any act or omission that has been determined by a Final Order as constituting gross negligence or willful misconduct.    Notwithstanding any provision herein to the contrary, such indemnified parties shall be entitled to obtain advances from the Estate to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of any such indemnified party in its capacity as such; provided, however, that the Entities indemnified pursuant to the Plan receiving such advances shall repay the amounts so advanced upon the entry of a Final Order finding that such indemnified parties were not entitled to any indemnity under the provisions of the Plan.

22420.2000 20319893v2

### F.   Provisions as to Governmental Units

As to any Governmental Unit, nothing in the Plan or Confirmation Order shall limit or expand the scope of the injunction to which the Debtor or Plan Administrator are entitled to under the Bankruptcy Code, if any. Nothing in the Plan or Confirmation Order provides a discharge to the Debtor or the Plan Administrator from any liability to a Governmental Unit. The injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the Confirmation Order, pursuing any police or regulatory action.

Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtor; or (4) any liability of the Debtor or Plan Administrator under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Confirmation Date. Nor shall anything in the Confirmation Order or the Plan: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan, or the Bankruptcy Code.

Moreover, nothing in the Confirmation Order or the Plan shall exculpate any non-debtor, including any exculpated parties, from any liability to any Governmental Unit, including but not

limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the exculpated parties, nor shall anything in the Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against any non-debtor for any liability whatsoever.

Nothing contained in the Plan or Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtor, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

Nothing herein shall constitute a waiver of the necessity of a Governmental Unit to file a Claim by the Claims Bar Date or Administrative Claims Bar Date, or the rights of any party as a result of the failure of a Governmental Unit to do so.

## G.  Post-Confirmation Jurisdiction of the Court

Notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Court will retain such jurisdiction as is legally permissible, including, without limitation, for the following purposes:

1.  Except as otherwise provided in the Plan, Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.     Resolve any matters related to:  (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Obligations pursuant to Section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.     Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.     Adjudicate, decide, or resolve any and all matters related to Causes of Action or any conflicting claims or demands made or asserted with respect to Allowed Claims;

7.     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts,

instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. Enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. Resolve any case, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation or enforcement of the Plan;

11. Resolve any case, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such injunctions, and other provisions;

12. Resolve any case, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI of the Plan;

13. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument,

22420.2000 20319893v2

release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    Adjudicate any and all disputes arising from or relating to Distributions under the Plan or any transactions contemplated therein;

16.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

17.    Determine requests for the payment of Claims entitled to priority pursuant to Section 507 of the Bankruptcy Code;

18.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

19.    Hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

20.    Hear and determine matters concerning Section 1145 of the Bankruptcy Code;

21.    Hear and determine all disputes involving the existence, nature, or scope of the Exculpations, the Indemnifications and the Injunctions;

22.    Enforce all orders previously entered by the Bankruptcy Court;

23.    Enter an order concluding or closing the Chapter 11 Case; and

24.    Enforce the Exculpations, the Indemnifications and the Injunctions, as set forth in Article VIII of the Plan.

22420.2000 20319893v2

## VI. CONFIRMATION OF THE PLAN

### A. Introduction

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It further requires that a plan proponent's disclosures concerning such plan have been adequate and have included information concerning all payments made or promised in connection with the plan.

To confirm the Plan, the Court must find that all of these and certain other requirements have been met. Thus, even if the requisite vote is achieved for each Class of impaired Claims, the Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

### B. Conditions to Confirmation

It shall be a condition precedent to Confirmation of the Plan that the following conditions shall have been satisfied or waived by the Debtor in its sole and absolute discretion:

1. The Bankruptcy Court shall have entered the Disclosure Statement Approval Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules 3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Disclosure Statement Approval Order shall not be stayed and shall be effective immediately upon their respective entry; and

2. The Bankruptcy Court shall have entered the Confirmation Order and it shall have become a Final Order; provided that in accordance with Bankruptcy Rules

3020(e), 6004(h), and 6006(d) (and notwithstanding any other provision of the Bankruptcy Code or the Bankruptcy Rules), the Confirmation Order shall not be stayed and shall be effective immediately upon its entry.

## C.    Conditions to the Effective Date

It shall be a condition precedent to the occurrence of the Effective Date of the Plan that the following conditions shall have been satisfied or waived by the Debtor in its sole and absolute discretion:

1.    The Confirmation Date shall have occurred; and

2.    The Confirmation Order shall not be subject to any stay.

## D.    Voting Procedures and Standards

Holders of Claims in Classes that are "impaired" under the Plan (but not deemed to reject the Plan by virtue of receiving no distributions thereunder) will receive a Ballot with this Disclosure Statement for the acceptance or rejection of the Plan. Any Claim whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired." Instructions on how to complete a Ballot and the deadline for voting on the Plan are contained in the solicitation materials accompanying this Disclosure Statement and the Plan.

The following procedures for allowance of Claims for purposes of voting on the Plan shall apply to votes upon the Plan:

(a)    <u>Disputed Filed Claims</u>.  With regard to a Claim that is the subject of an objection filed at least twenty (20) days prior to the Ballot Deadline, such Claim will be disallowed provisionally for voting purposes, except to the extent and in the manner that (i) the Debtor agrees that the Claim should be allowed for voting purposes in its objection to such

38

Claim; or (ii) such Claim is allowed temporarily for voting purposes in accordance with Bankruptcy Rule 3018.   Notwithstanding this, the Debtor agrees that Nahla shall be entitled to vote on the Plan despite the objection to its Claim.

(b)     <u>Claims Estimated for Voting Purposes.</u>  With respect to a Claim that has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the amount and classification of such Claim will be that set by the Bankruptcy Court.

(c)     <u>Wholly Unliquidated Claims</u>.  A Claim recorded in the Schedules or in the Clerk's records as wholly unliquidated, contingent and/or undetermined will be accorded one vote, valued at $10.00, for the purposes of section 1126(c) of the Bankruptcy Code, unless the Claim is disputed as set forth in (a) above.

(d)     <u>Late Claims</u>.  With respect to a Claim as to which a proof of claim has not been timely filed (i.e., was filed after the Bar Date), the voting amount of such Claim (subject to any applicable limitations set forth below) will be equal to the amount listed, if any, in respect of such Claim in the Schedules, to the extent such Claim is not listed as contingent, unliquidated, or disputed, unless the Claim is disputed as set forth in (a) above.  If such Claim is either not listed in the Schedules, or is listed as contingent, unliquidated or disputed, then the Claim respecting such proof of claim will be disallowed provisionally for voting purposes.

(e)     <u>Duplicate Claim</u>.  A creditor will not be entitled to vote its Claim to the extent such Claim duplicates or has been superseded by another Claim of such creditor.

(f)     <u>Undisputed Scheduled Claims</u>.  With respect to a Claim that appears on the Schedules as undisputed, noncontingent and liquidated, and as to which no objection has been filed at least twenty (20) days prior to the Ballot Deadline, the amount and classification of

22420.2000 20319893v2

such Claim shall be that specified in the Schedules unless superseded by an undisputed proof of claim.

(g)     Court Determined Claims.  With respect to a Claim for which an order has been entered reducing, reclassifying or allowing, the amount and classification of the Claim shall be that specified in such order.

The Ballots of creditors will be tabulated in accordance with the following procedures:

(i)     For the purpose of voting on the Plan, the Balloting Agent will be deemed to be in constructive receipt of any Ballot timely delivered to the address set forth above as designated for the receipt of Ballots cast on the Plan;

(ii)     Any Ballot received by the Balloting Agent after the Ballot Deadline shall not be counted;

(iii)     Pursuant to Bankruptcy Rule 3018(a), whenever a holder of a Claim submits more than one Ballot voting the same Claim prior to the Ballot Deadline, the last such Ballot sent and received shall count unless such holder has sufficient cause within the meaning of Bankruptcy Rule 3018(a) to submit, or the Debtor consents to the submission of, a superseding Ballot;

(iv)     If a Ballot does not include a Claim amount, the Ballot shall be deemed filed in the amount of a filed Claim, and if no Claim has been filed, in the amount of the Claim as specified in the Schedules, as long as the Claim is listed in the Schedules as undisputed, non-contingent or liquidated; otherwise, the Ballot shall not be counted.

(v)     If a holder of a Claim casts simultaneous duplicative Ballots voted inconsistently, then such Ballots shall not be counted;

40

(vi)     The authority of the signatory of each Ballot to complete and execute the Ballot shall be presumed;

(vii)    Any Ballot that is not signed shall not be counted;

(viii)   Any Ballot received by the Balloting Agent by electronic communication (i.e. email) shall not be counted but signed Ballots received timely by the Balloting Agent by facsimile will be counted;

(ix)     A holder of a Claim must vote all of its Claims within a particular Class under the Plan either to accept or reject the Plan and may not split its vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan, or that indicates both a vote for and against the Plan, will not be counted; and

(x)      Any Ballot that is timely received and executed but does not indicate whether the holder of the relevant Claim is voting for or against the Plan will be deemed a vote in favor of the Plan.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE BALLOTING AGENT.

A VOTE MAY BE DISREGARDED IF THE COURT DETERMINES, AFTER NOTICE AND A HEARING, THAT SUCH ACCEPTANCE OR REJECTION WAS NOT MADE OR SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

Any impaired Class of Claims that fails to achieve the requisite "accepted" vote will be deemed to have rejected the Plan.

22420.2000 20319893v2

## E. Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired Class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of Claims of that Class that actually vote. Acceptance of the Plan need only be solicited from holders of Claims whose Claims are "impaired" and not deemed to have rejected the Plan. Except in the context of a "cram down" (i.e., confirmation of a plan that has not been accepted by all impaired classes), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Class of impaired Claims accepts the Plan.

The Plan is predicated on the Voting Classes voting to accept the Plan. In the event the requisite vote is not obtained, the Debtor has the right, assuming that at least one Class of impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more Classes of impaired Claims if the Bankruptcy Court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down." If the Voting Classes vote to reject the Plan, the Debtor will seek a cram down of any such Class at the Confirmation Hearing.

## F. Confirmation and Consummation

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

22420.2000 20319893v2

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

- The proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims, either each holder of a claim of such class has accepted the plan, or will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief in a case, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless, as here, such liquidation or reorganization is proposed in the plan).

- The debtor shall have satisfied any post-petition domestic support obligations for which the debtor is obligated.

- If a holder of an unsecured claim objects to confirmation, such claim holder shall either be paid in full or the value of property to be distributed under the plan must

22420.2000 20319893v2

be at least the amount of projected disposable income of the debtor for a 5 year period.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Classes not receiving any distribution under the Plan, the Plan Proponents believe that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Plan Proponents have complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

## 1. Best Interests of Holders of Claims

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

This is a liquidating Plan, which is expressly permitted by the Bankruptcy Code. Creditors should also understand that the best interests tests is hypothetical in part, that is, a Court must conclude that there is a reasonable likelihood that if the case were converted to Chapter 7, creditors would receive less than under this Plan.

If this case was converted to Chapter 7, although creditors would presumably receive the same assets in a Distribution, it would be diluted by additional administrative expenses. A Chapter 7 trustee would be appointed who would be entitled to commissions on all monies disbursed by or turned over to him. A trustee would also likely hire his own professionals who

44

would engage in due diligence on the trustee's behalf. These added costs would result in less of a Distribution in Chapter 7 than proposed by the Plan.

### 2.    Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the plan. The Plan is a liquidating plan of reorganization. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

### 3.    Acceptance by Impaired Classes

A class is "impaired" under a plan unless, with respect to each claim in such class, the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim. A class that is not impaired under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

### 4.    Disposable Income

Pursuant to the Bankruptcy Code, since the Debtor is an individual, the Plan must pay creditors at least as much as the Debtor's projected disposable income for a period of five (5) years. As set forth in Exhibit "B" hereto, the total projected disposable income for such five (5) year period amounts to $8,905.81.

22420.2000 20319893v2

Since the Plan anticipates a Distribution to creditors of at least approximately $3 million, creditors will receive more than the Debtor's projected disposable income, thus satisfying this requirement of the Bankruptcy Code for Confirmation.

### 5.    Cram Down

**THE DEBTOR RESERVES THE RIGHT TO CRAM DOWN THIS PLAN AGAINST NON-ACCEPTING CLASSES OF HOLDERS OF CLAIMS.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the Plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cram down" provisions, upon the request of a plan proponent the Bankruptcy Court will confirm a plan despite the lack of acceptance by an impaired class or classes if the Bankruptcy Court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

46

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan. In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

With respect to a class of unsecured claims that does not accept the Plan, either (i) each holder of an unsecured claim in the dissenting class receives or retains under such plan property of a value equal to the allowed amount of its unsecured claim, or (ii) the holders of claims that are junior to the claims of the holders of such unsecured claims will not receive or retain any property under the plan. Additionally, the holders of claims that are senior to the claims of the dissenting class of unsecured claims receive no more than payment in full on their claims under the plan. The Plan is designed to satisfy these standards.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (16) of the Bankruptcy Code, except that one or more of Classes of impaired Claims have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Debtor will request that the Bankruptcy Court confirm the Plan over the dissenting votes of such Classes in accordance with section 1129(b) of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. The Debtor may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual holders of Claims who are members of an accepting Class.

22420.2000 20319893v2

### 6. Classification of Claims

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim into a class with other claims which are "substantially similar."

## VII. CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A. Risk That Distributions Will Be Less Than Estimated

The projected distributions and recoveries set forth in this Disclosure Statement are based on the Debtor's estimate of Allowed Claims and Cash available for distribution. There can be no assurance that the estimates will prove accurate.

### B. Bankruptcy Risks

#### a. Objection to Classifications

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims or interests of such class. The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Court would reach the same conclusion.

22420.2000 20319893v2

### b. Risk of Non-Confirmation of the Plan

Even if the Voting Classes accept the Plan, the Plan might not be confirmed by the Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies all the requirements for confirmation of a liquidating plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Court would also conclude that the requirements for confirmation of the Plan have been satisfied.

## VIII. TAX CONSEQUENCES

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTOR WITH RESPECT THERETO.

NOTHING HEREIN CONSTITUTES TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED HEREIN. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

22420.2000 20319893v2

## IX. CONCLUSION

The Debtor believes that confirmation and implementation of the Plan will provide each creditor with a greater recovery than it would receive if the Debtor were to liquidate and distribute its assets under chapter 7, in which case there would likely be a delay in making distributions to creditors and creditors would likely receive a far less distribution. Thus, the Debtor recommends confirmation and implementation of the Plan as the best possible outcome for creditors.

The Debtor urges holders of impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Ballot Deadline.

DATED: July 15, 2022

By: /s/ Joseph Klaynberg
    Joseph Klaynberg


CULLEN AND DYKMAN LLP
Attorneys for the Debtor

By: /s/ Bonnie Pollack
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700

22420.2000 20319893v2

EXHIBIT A

LIQUIDATION ANALSIS

EXHIBIT A

<u>Assets (Liquidation Value)</u>[1]

Cash (as of Effective Date)                                    $50,000

Sands Point Property Interest                                  $1,900,000

Connecticut Interests

    5CP LLC (5 Constitution Plaza)                  $282,752
      (ownership through Debtor, JEDR, KS Equities)
    Spectra TOP (100 Trumbull)                     $130,617
      (ownership through WW Spectra,
      JEDR (through HSK Mulberry), JKIG)
    Spectra 111 (111 Trumbull)                     $0
      (ownership through Klaynberg Family Group,
      JKIG, KS Equities)
    Spectra 101 (101 Trumbull)                     $0
      (ownership through Klaynberg Family Group,
      JKIG, KS Equities)

Equity Interests

    318 Investors                                  $223,720
    114 MS Member LLC                              $554,190
      (ownership through Debtor, JEDR, AM Club,
      KS Equities)
    Wonder Works                                   $0
    WWIG III (Greenpoint Partners)                 $47,420
    WW1834                                         $247,328
    Mark Paragon                                   $4,664
    International Design Direct                     $81,487
    WW Eastern                                     $47,170
    Durdom                                         $0

Matrimonial Litigation                                         $unknown

---

[1] The Debtor believes that his ESOP, IRA and Life Insurance Policy are exempt from payment to creditors. Nahla's time to object to such exemptions has been extended to August 26, 2022. In the event any of such assets are found not to be exempt, they shall be included for distribution to creditors under the Plan.

| Recoveries of Monies Owed | $unknown[2] |
| --- | --- |

     Chabad of Grammercy Park ($650,000)
     Wonder Works Corp. ($357,161)
     Valentina Petchorina ($33,470)

---

[2] Collectability of these debts owed to Debtor is questionable if not unlikely.

EXHIBIT B

DISPOSABLE INCOME PROJECTIONS

22420.2000 20319893v2

**Joseph Klavberg**
**Projected Income**

| Entity | Type | Note | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | |
|---|---|---|---|---|---|---|---|---|---|
| Spectra 111 LLC* | Distributions | 10% of amount paid to Klavberg Family Group | $13,241.17 | $13,903.23 | $7,299.19 | | | | Increasing by 5% each year through Q2 2023 |
| Spectra TOP LLC* | Distributions | 10% of amount paid to Klavberg Family Group | $1,065.70 | $1,118.99 | $587.47 | | | | Increasing by 5% each year through Q2 2023 |
| 114 MS Member LLC* | Distributions | | $10,617.31 | $11,358.18 | $5,963.04 | | | | Increasing by 5% each year through Q2 2023 |
| KS Equities LLC* | Distributions | | $8,232.09 | $8,643.69 | $4,537.94 | | | | Increasing by 5% each year through Q2 2023 |
| JKG LLC* | Distributions | Interest in various other entities | $80.17 | $84.18 | $44.19 | | | | Increasing by 5% each year through Q2 2023 |
| WW Eastern LLC* | Distributions | | $1,067.00 | $1,120.35 | $588.18 | | | | Increasing by 5% each year through Q2 2023 |
| Social Security Income | | | | $35,245.20 | $37,007.46 | $38,857.83 | $40,800.72 | $42,840.76 | Increasing by 5% each year |
| | | | | | | | | | |
| Total | | | $34,503.44 | $71,473.81 | $56,027.48 | $38,857.83 | $40,800.72 | $42,840.76 | |
| | | | | | | | | | |
| Monthly Income | | | | $5,956.15 | $4,668.96 | $3,238.15 | $3,400.06 | $3,570.06 | |

| | 2022 | 2023 | 2024 | 2025 | 2026 | Source |
|---|---|---|---|---|---|---|
| Monthly expenses | | | | | | |
| Food, Clothing and Other Items | $(785.00) | $(785.00) | $(785.00) | $(785.00) | $(785.00) | https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items |
| Housing and Utilities | $(3,282.00) | $(3,282.00) | $(3,282.00) | $(3,282.00) | $(3,282.00) | https://www.irs.gov/businesses/small-businesses-self-employed/new-york-local-standards-housing-and-utilities |
| Out of Pocket Health Care | $(153.00) | $(153.00) | $(153.00) | $(153.00) | $(153.00) | https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-out-of-pocket-health-care |
| Transportation: Ownership Costs | $(588.00) | $(588.00) | $(588.00) | $(588.00) | $(588.00) | https://www.irs.gov/businesses/small-businesses-self-employed/local-standards-transportation |
| Transportation: Operating Costs | $(406.00) | $(406.00) | $(406.00) | $(406.00) | $(406.00) | https://www.irs.gov/businesses/small-businesses-self-employed/local-standards-transportation |
| | | | | | | |
| Net disposable per month | $742.15 | $(139.04) | $(1,569.85) | $(1,407.94) | $(1,237.94) | |
| | | | | | | |
| Disposable income total | $8,905.81 | | | | | |

*Assuming interest will be sold by Q2 2023 and thus no distributions beyond that date