Patrick L. Robson
Robert A. Rich
Silvia N. Ostrower
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
probson@huntonak.com
rrich2@huntonak.com
sostrower@huntonak.com

*Attorneys for Series 2020A of Nahla Capital LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------- x
In re:                                 :   Chapter 11
                                       :
JOSEPH KLAYNBERG,                      :   Case No. 22-10165 (MG)
                                       :
            Debtor.                    :
                                       :
-------------------------------------------------------- x
```

## MOTION OF SERIES 2020A OF NAHLA CAPITAL LLC
## <u>FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>

Patrick L. Robson
Robert A. Rich
Silvia N. Ostrower
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, New York 10166
(212) 309-1000
probson@huntonak.com
rrich2@huntonak.com
sostrower@huntonak.com

*Attorneys for Series 2020A of Nahla Capital LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

JURISDICTION, VENUE, AND PREDICATES FOR RELIEF ................................................. 2

BACKGROUND.................................................................................................................... 2

    I.      The Bankruptcy Case.................................................................................... 2

    II.     Nahla's Claim ............................................................................................... 2

          A.      The Loan Agreement and the Guaranties ................................ 2

          B.      The Mezz Borrower's Default, the Debtor's Default on
               the Guaranties, and the UCC Sale............................................ 3

          C.      The Guaranty Litigation and Resulting Judgment Against the Debtor..... 5

    III.    The Debtor's Asset Protection Scheme ......................................................... 6

          A.      The Debtor's Sham Separation and Divorce ........................... 6

          B.      Gifts and Other Transfers From the Debtor.............................. 14

    IV.    The Plan ....................................................................................................... 16

RELIEF REQUESTED ......................................................................................................... 17

BASIS FOR RELIEF REQUESTED ....................................................................................... 17

    I.      Legal Standard ............................................................................................. 17

    II.     Cause Exists for Appointment of a Chapter 11 Trustee Pursuant to Section
           1104(a)(1) of the Bankruptcy Code. .......................................................... 19

    III.    Appointment of a Chapter 11 Trustee Is in the Interests of Creditors and the
           Estate Pursuant to Section 1104(a)(2) of the Bankruptcy Code. ......................24


NOTICE ............................................................................................................................. 25

NO PRIOR REQUEST ......................................................................................................... 25

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chorches v. Chen (In re Xiao)*,
608 B.R. 126 (Bankr. D. Conn. 2019) ............................................................... 20, 21

*In re Ashley River Consulting, LLC*,
Case No. 14-13406 (MG), 2015 WL 1540941
(Bankr. S.D.N.Y. Mar. 31, 2015)..................................................................... 17, 18, 19

*In re Bellevue Place Assocs*.,
171 B.R. 615 (Bankr. N.D. Ill. 1994) ..................................................................... 20

*In re Emanuel*,
422 B.R. 443, 453 n.3 (Bankr. S.D.N.Y. 2009) ......................................................... 5

*In re Ionosphere Clubs, Inc*.,
113 B.R. 164 (Bankr. S.D.N.Y. 1990)...................................................................... 19

*In re Hill*,
342 B.R. 183 (Bankr. D.N.J. 2006) ......................................................................... 21

*In re McCorhill Pub., Inc*.,
73 B.R. 1013 (Bankr. S.D.N.Y. 1987)................................................................. 19, 20

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019).......................................................... 17, 18, 19, 20

*In re The 1031 Tax Grp., LLC*,
374 B.R. 78 (Bankr. S.D.N.Y. 2007)........................................................................ 24

*In re The 1031 Tax Group, LLC*,
Case No. 07-11448 (MG), 2007 BL 132191 (Bankr. S.D.N.Y. Oct. 23, 2007) ..................... 24

*In re V. Savino Oil & Heating Co., Inc*.,
99 B.R. 518 (Bankr. E.D.N.Y. 1989)................................................................... 19, 25

**Statutes**
11 U.S.C. § 1104.......................................................................................... passim
11 U.S.C. § 1107................................................................................................ 17

**Rules**
Fed. R. Bankr. P. 1017........................................................................................ 18
Fed. R. Bankr. P. 2007.1..................................................................................... 18

Series 2020A of Nahla Capital LLC ("Nahla"), by and through its undersigned counsel, files this motion (the "Motion") for entry of an order, the proposed form of which is annexed hereto as **Exhibit A** (the "Proposed Order"), directing the appointment of a chapter 11 trustee pursuant to section 1104(a) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 1017 and 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor has engaged in a blatant pre- and post-petition scheme to move assets out of his name and into the hands of insiders, including into the hands of his former spouse and three adult children, in an effort to hinder Nahla's ability to collect on its judgment against the Debtor for over $13 million.  The Debtor transferred the majority of his assets, including substantially all of his liquid assets, to his former spouse in a sham divorce conveniently entered only after the Debtor became exposed on Nahla's guaranty claims.  In all, the Debtor has transferred $15-20 million in value to his former spouse, sons, and other insiders through that sham divorce, direct cash transfers, and transfers made by entities that the Debtor controls.

2.      The Debtor's recently filed plan of liquidation makes clear he has no interest in fulfilling his fiduciary duties as a debtor-in-possession, but rather seeks to maintain control of the liquidation and claims reconciliation processes for purposes of ensuring the maximum benefit to insiders, and minimal recovery to creditors.

3.      For these reasons, and those set forth below, a chapter 11 trustee should be appointed as an independent fiduciary to manage the Debtor's estate both for cause under 11 U.S.C. § 1104(a)(1), and because such appointment is in the interests of creditors and the estate under 11 U.S.C. § 1104(a)(2).

4.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5.      The statutory predicates for the relief requested herein are section 1104(a) of the Bankruptcy Code and Bankruptcy Rules 1017 and 2007.1.

**BACKGROUND**

## I.      The Bankruptcy Case

6.      On February 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the Bankruptcy Code, commencing the above-captioned proceeding (the "Bankruptcy Case").  The Debtor remains in possession of his property and continues to manage his affairs as a debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Bankruptcy Case, and no official committee of unsecured creditors has been appointed.

## II.     Nahla's Claim

### A.      The Loan Agreement and the Guaranties

7.      Prior to the Petition Date, the Debtor was engaged in the residential construction business.  In January 2019, the Debtor and his business partner, Eric Brody ("Brody") obtained just under $68 million in financing from Deutsche Bank AG, New York Branch ("DB") to finance construction of a luxury condominium known as "The Vitre" located at 302-304 East 96th Street, New York, New York 10128 (the "Vitre Property").  The loan was originated in two parts: (i) a $43 million mortgage loan (the "Senior Loan") under a Senior Loan Agreement (the "Senior Loan

Agreement") between DB and WWML96 DE, LLC (the "Mortgage Borrower"), an entity ultimately owned by the Debtor and Brody; and (ii) a mezzanine loan for approximately $24.9 million (the "Mezz Loan") under a Mezzanine Loan Agreement (the "Mezz Loan Agreement," together with the Senior Loan Agreement, the "Loan Agreements") between DB and WWML96 DE Mezz, LLC (the "Mezz Borrower," together with the Mortgage Borrower, the "Borrowers").

8.     As security for the Mezz Loan, the Mezz Borrower pledged its 100% equity interests in WWML96 DE Pledge, LLC and related collateral ("Pledged Collateral").  WWML96 DE Pledge, LLC owned 100% of the equity interests in the Mortgage Borrower.  The Mortgage Borrower owned the Vitre Property.

9.     The Debtor and Brody (together, the "Guarantors") guarantied certain of the Mezz Borrower's obligations under the Mezz Loan Agreement (the "Guaranties").

10.     On May 30, 2019, DB assigned the Mezz Loan to Meadowbrooke Limited ("Meadowbrooke"), an entity for which Nahla Capital Management, LLC ("Nahla Capital") is the investment manager.  Meadowbrooke subsequently assigned the Mezz Loan to Nahla, another entity managed by Nahla Capital, on September 29, 2020.

**B.     The Mezz Borrower's Default, the Debtor's
        Default on the Guaranties, and the UCC Sale**

11.     On January 1, 2020—two months before the onset of the COVID-19 pandemic— the Mezz Borrower defaulted on the Mezz Loan.  Over the next several months, Nahla (and its predecessor, Meadowbrooke) refrained from exercising remedies against the Pledged Collateral and engaged in extensive settlement discussions with the Mezz Borrower.  In connection with these settlement discussions, the parties entered into a forbearance agreement dated January 31, 2020 (the "Forbearance Agreement").

12.     On April 1, 2020, the Mezz Borrower defaulted under the Mezz Loan Agreement and the Forbearance Agreement.  The Mortgage Borrower simultaneously defaulted under the Senior Loan Agreement.  Since then, the Borrowers have failed to make any further interest payments or any other required payments under the Mezz Loan Agreement or the Senior Loan Agreement.

13.     Nahla made protective advances of over $1.4 million to cure the Borrowers' defaults and keep the Senior Loan and Vitre Property in good standing, and neither the Mezz Borrower nor Guarantors cured the defaults or repaid Nahla (or its predecessor) for the protective advances it had made to cure those defaults.

14.     When it became clear that the Mezz Borrower could not (or would not) pay the amounts owed, Nahla elected to sell the Pledged Collateral at a public sale under the New York Uniform Commercial Code (the "UCC").

15.     On October 1, 2020, Nahla sent a notification of disposition of collateral (the "UCC Sale Notice")[1] to the Borrowers and the Debtor, among other parties, notifying those parties that the Pledged Collateral would be sold at a public UCC sale on December 8, 2020.

16.     On October 2, 2020, Nahla sent a letter (the "October 2, 2020 Demand Letter") to the Guarantors demanding payment of the amount then due under the Guaranties.

17.     On December 8, 2020, the Pledged Collateral was sold at a public UCC sale (the "UCC Sale").  After several rounds of competitive bidding between Nahla and an independent, third party bidder, Nahla purchased the Pledged Collateral with a credit bid of $5 million.

---

[1] Nahla also served a slightly amended UCC Sale Notice on October 6, 2020, however the sale date remained December 8, 2020.

18. The Mezz Borrower unsuccessfully challenged the reasonableness of the UCC Sale in a declaratory judgment action filed in the New York Supreme Court, New York County (the "NY Court"), Index No. 656721/2020 (the "Borrower Litigation"). In that action, the NY Court found that the UCC sale was commercially reasonable, and it entered a decision granting Nahla's motion for summary judgment and dismissing the Mezz Borrower's complaint, with prejudice.[2] The NY Court also denied the Mezz Borrower's motion to renew defendants' motion for summary judgment. The Mezz Borrower has appealed the rulings, but no stay pending appeal has been granted.

**C.  The Guaranty Litigation and Resulting Judgment Against the Debtor**

19. On January 18, 2021, Nahla commenced an action against the Guarantors (the "Guaranty Litigation") for the outstanding amount owed on the Mezz Loan (net of amounts credit bid at the UCC Sale) by filing a motion for summary judgment in lieu of complaint pursuant to NY CPLR 3213 in the same court in which the Borrower Litigation was pending.[3]

20. On April 14, 2021, the NY Court granted Nahla's summary judgment motion as to liability, and held in abeyance the determination of the amount of damages pending resolution of the Borrower Litigation.[4] On November 10, 2021, the NY Court entered a decision awarding damages.[5]

21. On November 17, 2021, judgment was entered in the Guaranty Litigation in favor of Nahla and against the Guarantors, jointly and severally, for $13,196,612.65 (the "Nahla

---

[2] *See Notice of Filing of State Court Decisions*, Ex. A (DN 39-1). The Bankruptcy Court may take judicial notice of the contents of state court decisions and records. *See In re Emanuel*, 422 B.R. 443, 453 n.3 (Bankr. S.D.N.Y. 2009).

[3] *Series 2020A of Nahla Capital, LLC v. Klaynberg, et al.*, Index No. 650347/2021 (Sup. Ct. N.Y. Cnty.)

[4] *See Notice of Filing of State Court Decisions*, Ex. B (DN 39-2).

[5] *Id.*, Ex. C (DN 39-3).

Judgment")[6] All Judgment amounts remain due and unpaid. The Guarantors (including the Debtor) appealed the Judgment, but no stay pending appeal has been entered. Nahla timely filed a proof of claim, designated as Claim No. 6-1, with respect to its claims under the Mezz Loan Agreement and related Nahla Judgment.

## III.   The Debtor's Asset Protection Scheme

22.    Beginning around the time that the Mezz Borrower defaulted on the Mezz Loan, the Debtor began implementing a scheme to defraud Nahla by hindering or delaying Nahla's ability to collect on its guaranty claims against the Debtor. The cornerstone of this asset protection scheme involved a sham separation and divorce with his then wife, Emily Klaynberg ("Emily"). As described herein, the separation agreement provided for the transfer of a majority of the Debtor's assets, including without limitation substantially all of the Debtor's identified liquid assets, to Emily in an attempt to shield them from the reach of Nahla. The Debtor also transferred substantial cash and real estate-related investments to, and/or for the benefit of, his and Emily's three sons (Daniel, Edward, and Robert) and others.

### B.    The Debtor's Sham Separation and Divorce

#### i.    The Klaynbergs Enter into the Separation Agreement

23.    The Debtor and Emily married on January 9, 1983. According to the Debtor and Emily, their marriage had been strained since 2000 and ended (in a non-legal sense) when the

---

[6] A copy of the Nahla Judgment is annexed to the Proof of Claim. *See* Claim 6-1, Part 4. The Nahla Judgment was docketed in New York, Sullivan and Nassau counties. As a result, Nahla's claim arising from the Nahla Judgment is secured by the Sands Point Residence (defined below), and any other real property that may be held by the Debtor in those counties, but not disclosed in the Debtor's schedules. The Debtor has filed an action to avoid the attachment of Nahla's judgment liens as an allegedly preferential transfer. *See Klaynberg v. Series 2020A of Naha Capital LLC*, Adv. Pro. No. 22-01014 (the "Judgment Lien Avoidance Litigation").

Debtor moved out of their residence in Sands Point, NY (the "Sands Point Residence") shortly following an argument on New Year's Eve 2016/2017.[7]

24.     The Debtor and Emily did not legally separate or divorce after that New Year's Eve 2016/2017 argument. Rather, they only started seriously discussing separation and divorce years later, in Spring 2020, right after the Vitre Property went into default.[8]

25.     The Debtor only began pursuing a separation and division of assets with Emily in earnest around the time he was served with the UCC Sale Notice and October 2, 2020 Demand Letter. The Debtor retained Dina DeGiorgio as matrimonial counsel around that time[9] and, on October 16, 2020, held a telephone conference with Ms. DeGiorgio and Scott Flynn, the Debtor's accountant, to discuss a separation agreement.[10]

26.     Emily was not at any point represented by counsel in connection with the separation and subsequent divorce. Rather, she was advised only by her and the Debtor's son, Daniel Klaynberg.[11] Daniel Klaynberg is not an attorney. He is CFO of Wonder Works Construction Corp. ("Wonder Works"), the company founded by his father, the Debtor,[12] and is the son to whom the Debtor gifted one hundred thousand dollars in cash, plus interests in real estate investments, during the very period he allegedly advised Emily with respect to her separation from the Debtor.[13]

---

[7] *See* Joseph Klaynberg's *Affidavit in Opposition to Motion for Derivative Standing* (DN 116-1) at ¶ 5; *see also* Emily Klaynberg's August 4, 2022 Deposition Transcript (the "EK Depo. Tr.") at 30:23-25. The relevant pages from the EK Depo. Tr. are annexed to DN 171 as Exhibit 1.

[8] *See* Debtor's July 29, 2022 Deposition Transcript the ("JK Depo. Tr.") at 117:9-118:17. The relevant pages from the JK Depo. Tr. are annexed to DN 171 as Exhibit 2.

[9] JK Depo. Tr. at 118:18-119:10.

[10] *See* DN 171, Exhibit 3 (Bates number JK028190)

[11] EK Depo. Tr. at 26:25-27:16; JK Depo. Tr. at 120:9-121:12.

[12] JK Depo. Tr. at 93:14-24.

[13] *See* discussion in Section III.B, *infra.*

27.     Despite representations made to this Court that the separation was "heavily-litigated,"[14] it was anything but.  Both the Debtor and Emily now recognize that they were "amicably divorcing."[15]  Emily explains that there was no negotiation between the parties.[16]  They simply agreed that Emily would retain the Sands Point Residence and the proceeds from the sale of her and the Debtor's NYC apartment located at 5 East 16th Street in NYC (the "East 16th Condo"), and that the Debtor would retain his equity investment interests in various businesses (the "Equity Interests").  Emily was willing to allow the Debtor to retain their financial investment accounts.[17]

28.     On November 11, 2021 at 3:55 p.m., Scott Flynn (the Debtor's accountant) emailed to the Debtor a property settlement spreadsheet that reflected a proposed division of property.  That spreadsheet called for Emily to retain the Sands Point Residence and the East 16th Condo, with the Debtor retaining the Equity Interests, as well as the vast majority of the cash and securities contained in the Debtor's and Emily's investment accounts at Charles Schwab ("Schwab").[18]  This spreadsheet conforms in substantial part to the understanding regarding division of assets as described by Emily.

---

[14] March 9, 2022 Hrg. Tr. (DN 62) at 24:23-25:4 ("Ms. POLLACK: …This was an actual divorce. And an actual heavily-litigated settlement agreement that was approved by the state court. So I will only, for the record, disagree that this was an asset protection scheme …").

[15] See, e.g., Debtor's Object to Standing Motion (DN 116) at ¶ 18 ("Since he and Emily were amicably divorcing and splitting their assets, their financial consultants were participating in the discussions regarding the distribution of assets, and to keep legal fees to a minimum, Emily did not feel the need to hire her own counsel.")

[16] EK Depo. Tr. at 26:2-27:5 ("[Emily]: We were not negotiating.  Basically, we said that you know, I can keep my house.  He can keep his business.").

[17] EK Depo. Tr. at 48:15-20.

[18] See DN 171, Exhibit 4 (11-11-20 3:55pm email from S. Flynn to J. Klaynberg, Bates numbered JK028276-77).

29. The Debtor responded to Mr. Flynn that the proposed property settlement spreadsheet was "All perfect!"[19]

30. Despite the Debtor's response, Mr. Flynn thereafter sent the Debtor a number of alternative proposals, each of which provided for the transfer of more assets to Emily. The first, labeled "Scenario 2" provided for the Debtor and Emily to split the Sands Point Residence and East 16th Condo, with the Debtor retaining the Equity Interests and Emily retaining the vast majority of the Schwab accounts.[20] The second, labeled "Scenario 3" called for the Debtor to retain the Sands Point Residence and the Business Interests, with Emily retaining the East 16th Condo and the vast majority of the Schwab accounts.[21]

31. Finally, Mr. Flynn revised "Scenario 3" to provide for Emily's retention not only of the East 16th Condo and the vast majority of the Schwab accounts, but also a 50% interest in the Sands Point Residence.[22] This version of the property settlement, however, contained a curious note regarding Emily's alleged unwillingness to part with the Schwab accounts and concern regarding the Debtor's ability to make maintenance payments, as follows:

> Note: in order to entice Emily to agree, a disproportionate amount of assets are being allocated to Emily so that she has control of the liquid assets and does not have to worry whether or not the businesses will provide sufficient cash flow to pay her the maintenance in the future. This keeps things status quo for her given the fact that she is currently paying all the household living expenses from the Schwab accounts and she is uncomfortable giving up that access.[23]

---

[19] *See* DN 171, <u>Exhibit 5</u> (11-11-20 email chain between J. Klaynberg and S. Flynn, Bates numbered JK028278-80).

[20] *Id.* at JK028280.

[21] *See* DN 171, <u>Exhibit 6</u> (11-11-20 4:53pm email from S. Flynn to J. Klaynberg, Bates numbered JK028281-83).

[22] *See* DN 171, <u>Exhibit 7</u> (11-11-20 5:45pm email from S. Flynn to J. Klaynberg, Bates numbered JK028284-92).

[23] *Id.* at JK028286.

In reality, Emily never expected or discussed maintenance payments or expressed any concern regarding the Schwab accounts, as made clear in her deposition testimony.[24]

32.     The Debtor and Emily ultimately entered into a Separation Agreement (the "Separation Agreement")[25] dated November 17, 2020 (the "Separation Date").  Emily did not read the Separation Agreement, except for maybe the first page.[26]  The Debtor told her to sign it, and so she signed it.[27]

33.     The following is a summary of the key aspects of the Separation Agreement with respect to distribution of marital assets:

- Cash & Securities.

    o   Schwab **8488 Account (the "8488 Account").  Debtor to transfer $300,000 to a separate account designated by Debtor.  Emily to transfer $1,065,343 plus all of the securities and/or investments (balance of $7,451,630 as of 11/1/2020) to a separate account designated by Emily.

    o   MCB Account. Debtor to retain his Metropolitan Commercial Bank Account ending in **0346, having a cash balance of $69,853 as of 11/1/2020.

---

[24] EK Depo. Tr. at 48:15-20; 30:11-22:

> Q.     Did you ever tell Joseph you were uncomfortable giving up the investment accounts?
> A:     No.
> Q.     Did you ever tell anyone you were uncomfortable giving up the investment accounts?
> A:     No.
>
> …
>
> Q.     …did you discuss whether you or Joseph would make any maintenance payments to each other?
> A:     No.

[25] A copy of the Separation Agreement is annexed to DN 171 as Exhibit 8, and also filed at DN 116.

[26] EK Depo. Tr. at 51:5-52:13.

[27] EK Depo. Tr. at 52:25-54:2.

> Q.     Joseph gave it to you?
> A.     Yes.
> …
> Q.     …did you sign it the same day he have it to you?
> A.     I don't remember exact date.  Probably did.
> Q.     And did you discuss this agreement with anyone besides [the Debtor] before signing it?
> A.     No.

- <u>Sands Point Residence</u>. Emily and the Debtor to retain ownership of the Sands Point Residence as tenants in common, but with Emily entitled to sole and exclusive occupancy unless and until certain conditions occur.

- <u>East 16th Condo</u>. Emily to retain net proceeds (after payment of mortgage & sale expenses) from the anticipated sale of the East 16th Condo, provided Emily satisfies the outstanding mortgage on Sands Point Residence.

- <u>Central Park South Apartment</u>. The Debtor's and Emily's co-op shares for an apartment located at 150 Central Park South (the "<u>Central Park South Apartment</u>") gifted to their son, Robert Klaynberg.

34.     Joseph and Emily Klaynberg were married for over 37 years (since January 9, 1983), but they happened to enter into the Separation Agreement just 46 days following Nahla's October 2, 2020 Demand Letter, and 47 days after the Debtor was informed that the Pledged Collateral would be sold at the UCC Sale given the defaults under the Mezz Loan Agreement.

35.     The Debtor filed a complaint for divorce on December 2, 2020, only six days before the scheduled UCC Sale. *See Klaynberg v. Klaynberg*, Index No. 801965/2020 (Sup. Ct. Nassau Cnty.) (the "<u>Divorce Proceeding</u>").

36.     Emily Klaynberg appeared in the Divorce Proceeding solely to consent to place the matter on the uncontested divorce calendar, thus allowing for the immediate review of the Debtor's divorce papers by the court. The entire Divorce Proceeding took less than two months. A judgment of divorce (the "<u>Divorce Judgment</u>") was issued on January 22, 2021, and entered on February 5, 2021.[28]

### ii.     *The Klaynbergs Fail to Adhere to the Separation Agreement*

37.     Although the Separation Agreement on paper called for the treatment of a significant portion of the Debtor's and Emily's assets, the Debtor and Emily disregarded that agreement when convenient.

---

[28] A copy of Divorce Judgment is annexed to DN 171 as <u>Exhibit 9</u>, and also is filed at DN 116.

38.     For example, Emily never paid the mortgage on the Sands Point Residence, for which the Debtor scheduled a ~$1.3 million balance as of the Petition Date,[29] even though the Separation Agreement required that Emily satisfy, in full, the outstanding mortgage on the Sands Point Residence as a condition to retaining the net proceeds from the sale of the East 16th Condo.[30] The East 16th Condo was sold in May 2021, with Emily retaining net sale proceeds of over $3.7 million on a $5.8 million sale.  The Debtor was well aware of Emily's obligation to pay the mortgage on the Sands Point Residence, but chose not to enforce that obligation.[31]

39.     Further, although the Separation Agreement specifically provided that the Debtor was to transfer $300,000 from the 8488 Account to his own account, he never did so.  All of the cash and securities contained in the 8488 Account were transferred to Emily in January 2021.

### iii.    The Klaynbergs Continue to Use Joint Accounts, and the Debtor's Unauthorized Post-Petition Transfers to Emily

40.     The Debtor and Emily continued to jointly own, and use, a number of Schwab accounts not addressed in the Separation Agreement during the period following the Separation Date and subsequent Divorce Judgment.

41.     For example, the Debtor and Emily continued to hold Schwab account **8438 (the "8438 Account") as tenants in common, an account which contained approximately $96k in cash and $2.4 million in securities as of the Separation Date.  The 8438 Account served as collateral for a loan from M&T Bank to Wonder Works which was guaranteed by the Debtor and Emily.

42.     In August 2021, more than nine months after the Separation Date, the Debtor transferred $400,000 from the 8438 Account to his own personal account at Schwab.[32]   On

---

[29] *See* Amended Schedule D (DN 51), Item 2.1.

[30] Separation Agreement, § 7.4.

[31] JK Depo. Tr. at 151:5-154:23.

[32] JK Depo. Tr. at 163:7-164:12.

November 22, 2021, just five days after the Nahla Judgment was entered against the Debtor, the Debtor paid, from the 8438 Account, the approximate $1.5 million[33] outstanding balance of a loan from M&T Bank to Wonder Works.[34]

43.     On March 1, 2022, following the Petition Date, the Debtor transferred to Emily the entire balance of the 8438 Account, comprised of over $937,000 in cash.  The Debtor also amended his schedules, which initially identified the 8438 Account as property of the estate,[35] to provide that the 8438 Account belongs to Emily, even though the Separation Agreement does not address the treatment of this account.[36]  At no point did the Debtor seek or obtain Bankruptcy Court authority for this post-petition transfer.

44.     The Debtor and Emily also continued to maintain a Schwab account ending in **5497 (the "5497 Account") as joint tenants following the Separation Date.  On March 1, 2022, the Debtor transferred approximately half of the cash in the 5497 Account, approximately $71k, to his DIP account, and the other half to Emily.  Apparently the Debtor is taking the position that he and Emily each owned half of the 5497 Account.  At no point did the Debtor seek or obtain Bankruptcy Court authority for this post-petition transfer.  Notably, the 8438 Account, which the Debtor transferred entirely to Emily, was used in substantial part to fund transfers into the 5497 Account prior to the Petition Date.

45.     Brazenly, the Debtor even used his Wonder Works corporate credit card to purchase airline tickets for Emily and her friends on February 22, 2022, just eleven days after filing the

---

[33] *See* Amended SOFAs (DN 52), Item 8 ("Payment to M&T Bank to pay off [] loan to Wonder Works Construction Corp. guaranteed by Debtor").

[34] As of the Petition Date, Wonder Works was owned 42% by the Debtor, 18% by Brody, and 40% by an employee stock ownership plan (the "ESOP").  Daniel Klaynberg is the CFO of Wonder Works and presumably a beneficiary of the ESOP.

[35] *See* Original Schedules A/B (DN 1), Item 17.3.

[36] *See* Amended Schedules A/B (DN 86), Item 17.4.

Bankruptcy Case.[37] He did this even while recognizing that his estate is owed money from Wonder Works.[38]

**B.    Gifts and Other Transfers From the Debtor**

46.    In addition to the Separation Agreement, the Debtor perpetuated his asset protection scheme through transfers of cash and securities to family members and others, using both his own accounts and business entities that he controlled.

47.    On January 1, 2020, the same time as the Mezz Borrower defaulted on the Mezz Loan, the Debtor transferred, to a family trust, the vast majority of his equity interests in properties located at 101 Pearl Street and 111 Pearl Street, in Hartford, Connecticut.  At the time, the Debtor owned 100% of the equity interests in WW Spectra Corp ("WW Spectra").  WW Spectra owned (i) a 24.18% equity interest in Spectra 101, LLC ("Spectra 101"), the entity which owns the property located at 101 Pearl Street, and (ii) a 27.47% equity interest in Spectra 111, LLC ("Spectra 111"), the entity which owns the property located at 111 Pearl Street.  Through assignment agreements entered into as of January 1, 2020 (and signed by the Debtor on behalf of WW Spectra),[39] WW Spectra assigned its equity interests in Spectra 101 and Spectra 111 to Klaynberg Family Group, LLC ("KFG"), ostensibly for "bona fide estate planning purposes."[40]  The Debtor holds only a 10% interest in KFG,[41] with the other 90%, at least at the time, held by a Joseph Klaynberg 2015 Irrevocable Trust.

---

[37] EK Depo. Tr. at 65:22-67:7; JK Depo. Tr. at 174:12-177:21.

[38] *See* Amended Schedules A/B (DN 86), Item 30.

[39] *See* DN 171, Exhibit 10 (Assignment re Spectra 101, Bates numbered JK002523-26) and Exhibit 11 (Assignment re Spectra 111, Bates numbered JK002607-10).

[40] *Id.* at Recital B.

[41] Amended Schedules A/B (DN 86) at item 19.

48.     On or about September 30, 2020, the Debtor transferred 50% of his equity interests in WW Spectra to Daniel Klaynberg.[42]  WW Spectra owned a 2.5% interest in Spectra Top, LLC, which in turn own property located at 100 Trumball Street, Hartford Connecticut.

49.     In addition, on or about August 27, 2020, the Debtor wrote Daniel Klaynberg a $100,000 check as a gift.[43]

50.     These transfers of cash and equity interests to Daniel Klaynberg occurred at the very same time that the Debtor and Emily contend that Daniel Klaynberg was advising Emily in connection with the proposed separation and asset division.

51.     The Debtor also provided gifts during this time to his other children, Edward and Robert, as well as to Alena Diploti, who he described as a "significant other."  On April 27, 2021, the Debtor made a gift of $12,000 to Edward Klaynberg.[44]  The Debtor transferred at least $12,200 to Alena Diploti during the period between November 2020 and June 2021.[45]  As set forth above, the Debtor gifted the Central Park South Apartment to Robert Klaynberg as part of the Separation Agreement.

52.     The timing of the Debtor's various transfers in relation to the status of Nahla's claims against the Debtor makes clear that the Debtor engaged in a fraudulent scheme to move assets out of his name.  Below is a timeline of certain key events described above:

---

[42] *See* DN 171, <u>Exhibit 12</u> (Bates numbered JK003071-73).

[43] *See* DN 171, <u>Exhibit 13</u> (Bates numbered JK008788).

[44] Amended SOFA (DN 52), item 13.

[45] *Id.*

| Date | Event | Asset Disposition |
|------|-------|-------------------|
| Jan 2017 | Debtor moves out of Sands Point Residence; marriage "ended" | |
| Jan 1, 2020 | Mezz Borrower default re Nahla debt | Debtor assigns interests in Spectra 101 and Spectra 111 to KFG |
| Apr 1, 2020 | Mezz Borrower forbearance default | |
| Aug 27, 2020 | | Debtor gifts $100k to Daniel Klaynberg |
| Sept 30, 2020 | | Debtor assigns shares in WW Spectra to Daniel Klaynberg |
| Sept/Oct 2020 | | Debtor retains matrimonial counsel |
| Oct 1, 2020 | Notification of UCC sale | |
| Oct 2, 2020 | Demand Letter to Debtor re Guaranty | |
| Oct 16, 2020 | | Call between Debtor, matrimonial counsel and Scott Flynn re asset division |
| Nov 17, 2020 | | Separation Agreement executed |
| Dec 2, 2020 | | Debtor files complaint for divorce |
| Dec 8, 2020 | UCC Sale of Pledged Collateral | |
| Apr 14, 2021 | NY Court enters decision in Nahla's favor in Guaranty Action | |
| Apr 26, 2021 | | Debtor gifts $12k to Edward Klaynberg |
| Nov 17, 2021 | Judgment entered in Guaranty Action | |
| Nov 22, 2021 | | Debtor pays off $1.5mm loan from M&T to Wonder Works |
| Feb 11, 2022 | Petition Date | |
| Mar 1, 2022 | | Debtor transfers entire 8438 Account ($937k) and half of 5497 Account ($69k) to Emily |

## IV.    **The Plan**

53.    On August 8, 2022, the Debtor filed his amended chapter 11 plan (DN 165) (the

"Plan").

54.    The key elements of the Plan can be summarized as follows:[46]

- Liquidating plan with all non-exempt assets placed into a Distribution Fund for benefit of creditors.

---

[46] Except as otherwise provided herein, defined terms shall have the meanings ascribed to such terms in the Plan.

- Debtor maintains control of sale process for his assets, comprised principally of his Equity Interests and one half interest in the Sands Point Residence (Plan, Art. IV.C-D).

- Debtor maintains controls of claim reconciliation process and Judgment Lien Avoidance Litigation, with all administrative costs paid by the Distribution Fund.

- Plan Administrator, chosen by an Oversight Committee comprised of Nahla and two other creditors, appointed to pursue causes of action, including avoidance claims against Emily.[47]

**RELIEF REQUESTED**

55.     By this Motion, Nahla respectfully requests entry of an order pursuant to section 1104(a) of the Bankruptcy Code, in substantially the form of the Proposed Order annexed hereto as **Exhibit A**, directing the appointment of a chapter 11 trustee to manage the Debtor's estate.

**BASIS FOR RELIEF REQUESTED**

## I.     Legal Standard

56.     Chapter 11 of the Bankruptcy Code allows a debtor-in-possession to continue to retain management and control of property of his estate.  11 U.S.C. § 1107.  As such, a debtor-in-possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect and . . . conserve property in [its] possession for the benefit of creditors" and "refrain[] from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *In re Ashley River Consulting, LLC*, Case No. 14-13406 (MG), 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015) (citations omitted).

57.     "While there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute."  *In re Sillerman*, 605 B.R. 631, 640 (Bankr. S.D.N.Y. 2019).  "The willingness to allow a [d]ebtor to remain in possession of its assets

---

[47] In the initial plan, the Debtor proposed to hand-pick the Plan Administrator.  At a hearing held on July 20, 2022, after concerns raised by Nahla, the U.S. Trustee and other parties, the Bankruptcy Court indicated that the Debtor should not be permitted to choose his own plaintiff to pursue causes of action against Emily and others.

is predicated upon the assumption that the [d]ebtor will carryout its fiduciary obligations." *Id.* "[I]f a debtor-in-possession defaults in its responsibilities, the debtor may be dispossessed of control of its business and a chapter 11 trustee appointed." *Ashley River Consulting*, 2015 WL 1540941, at *8.

58.     The appointment of a chapter 11 trustee is governed by section 1104(a) of the Bankruptcy Code, which provides that, at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States Trustee, the court *shall* order the appointment of a trustee –

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).[48]

59.     The court may order the appointment of a chapter 11 trustee for "cause" under subsection 1104(a)(1) or "in the interests of creditors" under subsection 1104(a)(2), which constitute "two distinct and independent provisions." *Sillerman*, 605 B.R. at 641.

60.     Although the burden of proof under section 1104(a) is by clear and convincing evidence, courts have "wide discretion in considering the relevant facts" and are "not required to conduct a full evidentiary hearing in considering a motion for the appointment of a chapter 11 trustee." *Sillerman*, 605 B.R. at 641 (finding that the record evidence, including the undisputed

---

[48] A request to convert a chapter 11 case pursuant to section 1104(a) of the Bankruptcy Code may be made by motion. *See* Fed R. Bankr. P. 1017(f) and 2007.1(a).

facts, provided clear and convincing evidence to support a finding of cause for appointment of a chapter 11 trustee); *see also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) ("[I]n considering a motion for the appointment of a trustee, a bankruptcy court is not required to conduct a full evidentiary hearing."); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("Section 1104 represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession.").

## II.    Cause Exists for Appointment of a Chapter 11 Trustee Pursuant to Section 1104(a)(1) of the Bankruptcy Code.

61.     Section 1104(a)(1) enumerates four examples of cause that warrant appointment of a trustee – fraud, dishonesty, incompetence, or gross mismanagement.  11 U.S.C. § 1104(a).  A court may consider "both the pre- and post-petition misconduct" when making the determination that "cause" exists for the appointment of a trustee.  *Ashley River Consulting*, 2015 WL 1540941, at *10.

62.     The four types of cause identified in section 1104(a)(1) are not exclusive.  *Ashley River Consulting,* 2015 WL 1540941, at *9.   Other factors relevant to the appointment of a trustee under section 1104(a)(1) include "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence."  *Id.*

63.     Appointment of a trustee is warranted where a debtor engages in "inappropriate dealings with an entity in which the debtor has an interest."  *Sillerman*, 605 B.R. at 647; *see also In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) ("[W]here there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting

positions in the transferee companies, a trustee should be appointed in the best interests of creditors and all parties in interest in order to investigate the financial affairs of the debtor.").

64.     In a case such as this, "where an individual chapter 11 debtor remains in possession as a fiduciary of his estate and his creditors," there is a "heightened concern for an inherent conflict of interest that may not exist in the case of a corporate chapter 11 debtor." *In re Sillerman*, 605 B.R at 647 ("[T]he temptation for self-dealing may be heighted in the case of an individual debtor whose natural instinct is to protect his own self-interest."); *see also In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994) ("[A] fiduciary—the debtor-in-possession—is proscribed from acting solely in its self-interest to the exclusion of the other interests which the debtor-in-possession has the fiduciary obligation to protect.").

65.     Here, cause exists to appoint a trustee because the Debtor engaged in deliberate fraud both prior to and during this bankruptcy proceeding, and remains hopelessly conflicted with respect to managing his assets which include causes of action against insiders, and business interests in which the Debtor's insiders hold interests.

66.     The Debtor engaged in a blatant scheme to transfer value to insiders, including without limitation by transferring assets to his former spouse, Emily, as part of a prepetition separation and divorce that bears all the badges of a fraudulent scheme. When a disputed transfer results from a divorce settlement, courts have considered specific badges of fraud relevant to assess allegations of a "sham" divorce, including:

> The quickly agreed upon split of property, the completion of the divorce proceeding on a "fast-track," the fact that one of the spouses was not represented by counsel in the divorce proceeding, the existence of a short interval between the entry of the divorce decree and the bankruptcy filing, the fact that spouses continue to live together after the divorce in the very house that was transferred to one of the spouses, the fact that the transferor spouse continues to pay the mortgage, taxes, and other costs on the transferred house, the inequitable distribution of debts and

assets in the divorce, and the fact that the couple holds themselves out in the public as still being married.

*Chorches v. Chen (In re Xiao),* 608 B.R. 126, 158–59 (Bankr. D. Conn. 2019) (citations omitted); *In re Hill*, 342 B.R. 183, 196 (Bankr. D.N.J. 2006) ("Where a transfer of property is made to a spouse by means of a 'fast-track' divorce on the eve of bankruptcy, this is often evidence of a fraudulent scheme to keep property from creditors.") (citation omitted). The Debtor and Emily quickly agreed upon a division of their property, with Emily not represented by counsel. The divorce proceeding was completed on a fast track, with the entire case taking less than two months. Despite being married for 37 years, and allegedly having been physically separated since New Year's Eve 2016/2017, the Debtor and Emily entered into the Separation Agreement in November 2020, just 46 days following Nahla's October 2, 2020 Demand Letter. Emily received the majority of assets in the divorce, including substantially all of the Debtor's liquid assets. *See Xiao*, 608 at 163 ("[T]he relevant inquiry is not simply whether [the debtor] received consideration, but whether that consideration was in a form available for execution by creditors, i.e, an assessment of the extent to which such creditors were deprived of the value of the diverted property."). The Debtor and Emily hold themselves out in the public as still being married except with respect to a few of their closest friends. The Debtor and Emily also failed to adhere to the terms of the Separation Agreement, and continued to use joint bank accounts until the Petition Date.

67.    In addition to the sham divorce, and as set forth in detail above, the Debtor transferred substantial value to his three sons and others through direct cash transfers, and through the transfer of equity interests held by businesses that he controls, all during the period following his exposure on Nahla's guaranty.

68.    The Debtor's scheme continued after the Petition Date with the unauthorized post-petition transfer of over $1 million to Emily.

69. The Debtor's recently filed Plan only confirms that he has failed to fulfill the fiduciary role required of a debtor-in-possession. Though the Plan is a liquidating plan, the Debtor fervently seeks to retain control of the liquidation and claims reconciliation processes. One must ask, why does the Debtor, who will not receive property under the Plan, care so much about retaining control over the sale and claims reconciliation processes, as opposed to appointing an independent fiduciary? The terms of the Plan make that answer clear – he is seeking to minimize distribution to creditors and maximize benefit to insiders.

70. First, through the Plan, the Debtor seeks to require the immediate sale of his Equity Interests, expressly subject to approval rights under the applicable organizational documents which will negatively impact the value recovered on account of those Equity Interests.[49] What the Debtor does not explain is that the members/shareholders that would have approval rights under the organizational documents include the Debtor's three sons, Daniel, Edward and Robert, as well as other individuals with that are co-investors with the Debtor and his sons on multiple projects. The Debtor's proposal for liquidation of the Equity Interests would permit these insiders both to choose the desired purchaser and artificially reduce the purchase price for the Equity Interests by withholding consent.

71. A true fiduciary acting in the interests of creditors would seek to preserve the full economic value of the Equity Interests for the benefit of creditors. Notably, the Equity Interests were valued at approximately $4.8 million during the Debtor's and Emily's separation discussions (in November 2020),[50] yet the Debtor estimates that liquidation of the Equity Interests as proposed

---

[49] *See* Plan, Art. IV.C ("**As will be set forth in the Equity Interest Sale Motion, the sale or sales thereunder shall be subject to any restrictions or approvals required under the respective entities' operating or shareholder agreements, or any lending agreements to which such entities may be a party.)**

[50] *See* DN 171, Exhibit 7 (Bates numbered JK028286).

in the Plan will result in net proceeds of less than $1.2 million.[51]  If there is value in holding the

Equity Interests in the Debtor's name, a fiduciary acting in the interests of creditors would provide

for the economic interests to be preserved for the benefit of creditors even if the Debtor retains

legal title.

72.     Second, the Debtor proposes, through the Plan, to place himself in charge of

reconciling hundreds of millions of dollars in guaranty claims scheduled as contingent and

unliquidated,[52] while insiders (including his three sons) benefit to the extent of any payment on

those guaranty claims.  According to the Debtor, the respective corporate borrowers are current on

the debt underlying each of the guaranty claims.  The creditors holding these guaranty claims have

recourse to primary obligors and collateral owned by non-debtors.  The liquidation of guaranty

claims for which the underlying debt is performing, and distributions on account of those claims

from a common fund with other unsecured creditors, effectively would operate as a paydown of

debt incurred by companies the Debtor controls, and in which his three sons and other partners

hold equity interests, increasing the value of those equity interests.  An independent fiduciary

acting in the interests of the estate would object to proofs of claims and/or seek estimation where

appropriate.  The Debtor, on the other hand, would be incentivized to inflate the allowed amount

of guaranty claims so as to ensure value flows to insiders, and not Nahla or other creditors.  The

terms of the Plan reveal that this is exactly what the Debtor intends to do. He estimates that there

will be over $81 million in allowed claims (resulting in a paltry 1-4% distribution to general

---

[51] Disclosure Statement (DN 166) at p. 28.

[52] *See* Amended Schedules (DN 64), Item 4.

unsecured creditors),[53] even though many if not all of the guaranty obligations are contingent[54] and, at least in one case, subject to potential avoidance as incurred without consideration.[55]

73.     Accordingly, Nahla respectfully submits that "cause" exists for the immediate appointment of a chapter 11 trustee to manage the Debtor's estate, including without limitation by taking over the chapter 11 plan process.

## III.   Appointment of a Chapter 11 Trustee Is in the Interests of Creditors and the Estate Pursuant to Section 1104(a)(2) of the Bankruptcy Code.

74.     The appointment of a Chapter 11 trustee also is in the interest of the Debtor's estate and creditors pursuant to section 1104(a)(2) of the Bankruptcy Code. *See In re The 1031 Tax Group, LLC*, Case No. 07-11448 (MG), 2007 BL 132191, at *4 (Bankr. S.D.N.Y. Oct. 23, 2007) ("Even when no 'cause' exists for appointing a chapter 11 trustee pursuant to § 1104(a)(1), a court may still appoint a trustee if the appointment is in 'the interests of creditors' pursuant to § 1104(a)(2)").

75.     Although the "interest of creditors" standard necessarily involves a great deal of judicial discretion, courts have considered several factors including: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment." *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr.

---

[53] Disclosure Statement (DN 166) at p.27.

[54] *See*, *e.g.*, Proof of Claim No. 15 filed by Wilmington Trust, National Association at p. 2 ("The entire amount of the Loan may become recourse to the Debtor upon the occurrence of certain trigger events … This amount is liquidated but contingent.")

[55] *See* Amended Schedules (DN 64), Item 4.10; Proof of Claim No. 9 (guaranty of debt incurred by Chabad of Gramercy Park).

S.D.N.Y. 2007) (citations omitted). In essence, section 1104(a)(2) of the Bankruptcy Code reflects "the practical reality that a trustee is needed." *V. Savino Oil & Heating Co.,* 99 B.R. at 527 n.11.

76.     Applying these factors, it is apparent that the facts set forth above also provide the basis for the appointment of a trustee pursuant to section 1104(a)(2) of the Bankruptcy Code as being in the best interest of the Debtor's estate. Furthermore, the cost of the appointment of a trustee is outweighed by the benefits a trustee will provide to the Debtor's estate, particularly given that there is no official committee of unsecured creditors appointed in this case to counterbalance the Debtor's clear conflicts of interest.

NOTICE

77.     Notice of this Motion is being provided to counsel for the Debtor, counsel for the United States Trustee, and all parties who have filed a notice of appearance or have requested service in this case.

NO PRIOR REQUEST

78.     No prior motion for the relief requested herein has been made to this or any other court.

CONCLUSION

WHEREFORE, Nahla respectfully requests that the Court (i) grant the Motion, (ii) direct the appointment of a chapter 11 trustee, and (iii) grant such other and further relief in favor of Nahla as the Court may deem just or proper.

Dated: August 17, 2022
      New York, New York

                              */s/ Robert A. Rich*
                              Patrick L. Robson
                              Robert A. Rich
                              Silvia N. Ostrower
                              **HUNTON ANDREWS KURTH LLP**
                              200 Park Avenue
                              New York, New York 10166

(212) 309-1000
probson@huntonak.com
rrich2@huntonak.com
sostrower@huntonak.com

*Attorneys for Series 2020A of Nahla Capital LLC*