**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                        **FOR PUBLICATION**

                 JOSEPH KLAYNBERG,                    Chapter 11

                              Debtor.        Case No. 22-10165 (MG)

------------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER GRANTING SERIES 2020A NAHLA CAPITAL LLC'S MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

*A P P E A R A N C E S :*

HUNTON ANDREWS KURTH LLP
*Attorneys for Series 2020A of Nahla Capital LLC*
200 Park Avenue
New York, New York 10166

By:    Patrick L. Robson, Esq.
        Robert A. Rich, Esq.
        Silvia N. Ostrower, Esq.

CULLEN & DYKMAN LLP
*Attorneys for Joseph Klaynberg*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530

By:    Matthew G. Roseman, Esq.
        Bonnie L. Pollack, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       Pending before the Court is the motion of Series 2020A of Nahla Capital LLC ("Nahla"),

for entry of an order directing the appointment of a Chapter 11 trustee ("Motion," ECF Doc. #

189) pursuant to Section 1104(a) of the Bankruptcy Code and Rules 1017 and 2007.1 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in the Chapter 11 case filed

by Joseph Klaynberg ("Klaynberg" or the "Debtor").  The Debtor filed an opposition to the

Motion on September 7, 2022 ("Debtor Opposition," ECF Doc. # 214).

The thrust of the Motion is that shortly before Nahla obtained a $13+ million judgment

against Klaynberg, he transferred the bulk of his liquid assets to his wife Emily Klaynberg

("Emily") pursuant to a hastily agreed separation agreement that was quickly followed by an

uncontested divorce.  Nahla contends that the transfers to Emily and Klaynberg's adult children

are avoidable transfers that the Debtor has no intention to pursue.  Nahla alleges numerous other

financial irregularities intended to make it more difficult for Nahla and other credits to recover

on their claims.  This and more, in Nahla's view, require the appointment of a Chapter 11

Trustee.  The Court agrees.

For the reasons stated below, this Court **GRANTS** Nahla's Motion for the Appointment

of a Chapter 11 Trustee, pursuant to sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.

## I.    BACKGROUND

### A.  The Debtor and Bankruptcy Case

On February 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11.  (Motion ¶ 6.)  The Debtor remains in possession of his property and

continues to manage his affairs as a debtor-in-possession under Sections 1107 and 1108 of the

Bankruptcy Code.  (*Id*.)  No trustee or examiner has been appointed in the bankruptcy case, and

no official committee of unsecured creditors has been appointed.  (*Id.*)

### B.  Debtor Guaranteed a Loan Assigned to Nahla

Prior to the Petition Date, the Debtor was engaged in the residential construction

business.  (*Id.* ¶ 7.)  In January 2019, the Debtor and his business partner, Eric Brody ("Brody")

obtained just under $68 million in financing from Deutsche Bank AG, New York Branch ("DB")

to finance construction of a luxury condominium known as "The Vitre" located at 302-304 East

96th Street, New York, New York 10128 (the "Vitre Property"). (*Id.* ¶ 7.) The financing was provided in two loans—a Senior Loan and a Mezzazine Loan, from DB to two different entities ultimately owned by Debtor and Brody.[1] (*Id.*) The Debtor and Brody (together, the "Guarantors") guaranteed certain of the Mezz Borrower's obligations under the Mezz Loan Agreement (the "Guaranties"). (*Id.* ¶ 9.)

Nahla became the ultimate assignee of DB's rights under the Mezz Loan on September 29, 2020, after DB assigned it to Meadowbrooke Limited ("Meadowbrooke") and Meadowbrooke assigned it to Nahla. (*Id.* ¶ 10.) Prior to the assignment, however, Nahla alleges that the Mezz Borrower defaulted on the Mezz Loan. Nahla and its predecessor, Meadowbrooke, entered into a forbearance agreement dated January 31, 2020 (the "Forbearance Agreement"). (*Id.* ¶ 11.)

### C. Nahla's Actions Following Defaults

On April 1, 2020, the Mezz Borrower defaulted under the Mezz Loan Agreement and the Forbearance Agreement and the Mortgage Borrower simultaneously defaulted under the Senior Loan Agreement. (*Id.* ¶ 12.) Nahla alleges that the Borrowers have since failed to make any further interest payments or any other required payments under the Mezz Loan Agreement or the Senior Loan Agreement, and that neither the Mezz Borrower nor Guarantors cured the defaults or repaid Nahla or Meadowbrooke for the $1.4 million in protective advances they had made to cure the defaults. (*Id.* ¶¶ 12–13.) Nahla elected to sell collateral pledged under the Mezz Loan[2]

---

[1]    The Senior Loan was a $43 million mortgage loan (the "Senior Loan") under a Senior Loan Agreement (the "Senior Loan Agreement") between DB and WWML96 DE, LLC (the "Mortgage Borrower"), for approximately $24.9 million (the "Mezz Loan") under a Mezzanine Loan Agreement (the "Mezz Loan Agreement," together with the Senior Loan Agreement, the "Loan Agreements") between DB and WWML96 DE Mezz, LLC (the "Mezz Borrower," together with the Mortgage Borrower, the "Borrowers"). (*Id.* ¶ 7.)

[2]    As security for the Mezz Loan, the Mezz Borrower pledged its 100% equity interests in WWML96 DE Pledge, LLC and related collateral ("Pledged Collateral"). (*Id.* ¶ 8.) WWML96 DE Pledge, LLC owned 100% of the equity interests in the Mortgage Borrower. (*Id.*) The Mortgage Borrower owned the Vitre Property. (*Id.*)

at a public sale under the New York Uniform Commercial Code (the "UCC"), and sent notice

(the "UCC Sale Notice") to the Borrowers and Debtor on October 1, 2020 that the Pledged

Collateral under the agreements would be sold at a public UCC auction on December 8, 2020.[3]

The next day on October 2, 2020, Nahla sent a letter (the "October 2, 2020 Demand

Letter") to the Guarantors demanding payment of the amount then due under the Guaranties.  (*Id.*

¶ 16.)  Following the UCC Sale, Nahla eventually commenced an action against the Guarantors

(the "Guaranty Litigation") for the outstanding amount owed on the Mezz Loan and obtained a

judgment in in favor of Nahla and against the Guarantors, jointly and severally, for

$13,196,612.65 (the "Nahla Judgment").  (*Id.* ¶¶ 19–21.)  All Judgment amounts remain due and

unpaid.  (*Id.* ¶ 21.)  The Guarantors (including the Debtor) appealed the Judgment, but no stay

pending appeal has been entered.  (*Id.*)  Nahla timely filed a proof of claim, designated as Claim

No. 6-1, with respect to its claims under the Mezz Loan Agreement and related Nahla Judgment.

(*Id.*)

### D.  The Asset Protection Scheme

Nahla alleges that Debtor began implementing a scheme to defraud Nahla before its

Bankruptcy filing, by hindering or delaying Nahla's ability to collect on its guaranty claims

against the Debtor around the time that the Mezz Borrower defaulted on the Mezz Loan.  (*Id.* ¶

22.)

---

[3]     On December 8, 2020, the Pledged Collateral was sold at a public UCC sale (the "UCC Sale"). After
several rounds of competitive bidding between Nahla and an independent, third-party bidder, Nahla, purchased the
Pledged Collateral with a credit bid of $5 million. (*Id.* ¶ 17.)  The Mezz Borrower unsuccessfully challenged the
reasonableness of the sale in New York State court, but summary judgment was granted dismissing its claims. (*Id.* ¶
18.)  The Mezz Borrower appealed the rulings, but no stay pending appeal has been granted.

1.      The Debtor's Divorce and Separation Agreement

The Debtor was married to his wife, Emily, on January 9, 1983.  (*Id.* ¶ 23.)  According to

the Debtor and Emily, their marriage had been strained since 2000 and ended (in a non-legal

sense) when the Debtor moved out of their residence in Sands Point, NY (the "Sands Point

Residence") shortly following an argument on New Year's Eve 2016/2017.  (*Id.*)  Debtor and

Emily did not seriously start discussing separation and divorce, however, until the Spring of

2020, right after the Vitre Property went into default.  (*Id.* ¶ 24.)  Debtor began pursuing a

separation and division of assets with Emily in earnest around the time he was served with the

UCC Sale Notice and October 2, 2020 Demand Letter.  (*Id.* ¶ 25.)

To that end, Debtor retained Dina DeGiorgio as matrimonial counsel around that time

and, on October 16, 2020, held a telephone conference with Ms. DeGiorgio and Scott Flynn

("Flynn"), the Debtor's accountant, to discuss a separation agreement.  (*Id.* ¶¶ 25–26.)  Emily

was not represented by counsel in the separation agreement negotiations, and was only advised

by her and the Debtor's son, Daniel Klaynberg ("Daniel"), who is not an attorney.  (*Id.* ¶ 26.)

Nahla claims that the separation was not heavily litigated.  (*Id.* ¶ 27.)  Both the Debtor

and Emily now recognize that they were "amicably divorcing."  (*Id.*)  Emily testified that there

was no negotiation between the parties.  (*Id.*)  According to Nahla, Debtor and Emily simply

agreed that Emily would retain the Sands Point Residence and the proceeds from the sale of her

and the Debtor's New York City apartment located at 5 East 16th Street in NYC (the "East 16th

Condo"), with Debtor retaining his equity investment interests in various businesses (the "Equity

Interests") and Emily allowing him to retain their financial investment accounts at Charles

Schwab.  (*Id.*)

Nahla claims that this understanding was memorialized in a spreadsheet sent from Flynn

to Debtor on November 11, 2021.  (*Id.* ¶ 26.)  Despite this understanding, Nahla claims that

spreadsheets detailing different scenarios were sent later that day, with a revised version of

"Scenario 3" in which Emily retained not only of the East 16th Condo and the vast majority of

the Charles Schwab accounts, but also a 50% interest in the Sands Point Residence, and

contained the following note:

> Note: in order to entice Emily to agree, a disproportionate amount
> of assets are being allocated to Emily so that she has control of the
> liquid assets and does not have to worry whether or not the
> businesses will provide sufficient cash flow to pay her
> maintenance in the future. This keeps things status quo for her given
> the fact that she is currently paying all the household living expenses
> from the Schwab accounts and she is uncomfortable giving up that
> access.

(*Id.* ¶ 28–31.)

Nahla claims that, in reality, Emily never expected or discussed maintenance payments or

expressed any concern regarding the Schwab accounts.  (*Id.* ¶¶ 30–31.)  Debtor and Emily

ultimately entered into a Separation Agreement (the "Separation Agreement") dated November

17, 2020 (the "Separation Date").  According to Nahla, Emily did not read the Separation

Agreement, except for maybe the first page, and she signed it at Debtor's direction.  (*Id.* ¶ 32.)

The Separation Agreement addressed division of cash and securities in two accounts: a

Schwab Account (the "8488 Schwab Account"), and a Metropolitan Commercial Bank Account

("MCB Account" or "0346 Account").  (*Id.* ¶ 33.)  Between the two, Emily was to receive

$8,516,973 in cash and securities, while Debtor was to receive $369,853 in cash.  (*Id.*)  The

Separation Agreement also addressed ownership in three residences: (1) Debtor and Emily would

own the Sands Point Residence as tenants in common, with Emily entitled to occupancy; (2)

Emily would receive proceeds from the sale of the East 16th Condo (which she would use to

satisfy the Sands Point mortgage); and (3) the parties' interests in an apartment located at 150

Central Park South (the "Central Park South Apartment") would be gifted to Debtor and Emily's son, Robert Klaynberg ("Robert").  (*Id.*)

The Debtor filed a complaint for divorce on December 2, 2020, only six days before the scheduled UCC Sale.[4]  (*Id.* ¶ 35.)  The entire Divorce Proceeding took less than two months. (*Id.*)  A judgment of divorce (the "Divorce Judgment") was issued on January 22, 2021, and entered on February 5, 2021.  (*Id.* ¶ 36.)  Emily appeared in the Divorce Proceeding solely to consent to place the matter on the uncontested divorce calendar, thus allowing for the immediate review of the Debtor's divorce papers by the court.  (*Id.*)  Nahla alleges that Debtor and Emily still hold themselves out as married.  (*Id.* ¶ 66.)

The Debtor provides his own explanation of the events above.  Debtor claims that the timing of the divorce was explainable by a "[l]ack of support during health crises and COVID lockdown solidified desire to divorce after separation for years," and that the process began in the summer of 2020, before the October Default notice as Nahla alleges.  (Debtor Opposition ¶ 11.)  Debtor claims that the Separation Agreement was, in fact, negotiated, that Daniel (Emily and Debtor's son) represented Emily, it was Daniel's concern that prompted the change in the distribution of cash and securities that favors Emily, and Emily did not sign the agreement at Debtor's direction.  (*Id.*)  On the distribution of assets, Debtor adds that Emily was to pay carrying costs at the Sands Point Residence while living there, and that the 16th Street Condo was originally held in her name.  (*Id.*)  Debtor contests that he and Emily hold themselves out as married.  (*Id.*)

---

[4] *See Klaynberg v. Klaynberg*, Index No. 801965/2020 (Sup. Ct. Nassau Cnty.) (the "Divorce Proceeding").

2.    <u>Debtor and Emily's Failure to Adhere to the Agreement</u>

Nahla also alleges that Debtor and Emily did not adhere to the Separation Agreement. (*Id.* ¶ 37.) Specifically, Nahla alleges that Emily has not paid the mortgage for the Sands Point Residence, for which the Debtor scheduled an approximate $1.3 million balance, as contemplated by the Separation Agreement upon her retaining $3.7 million on a $5.8 million sale of the East 16th Condo. (*Id.* ¶ 38.) Debtor is aware of this and has not enforced his rights. (*Id.*) Nahla also claims that Debtor did not withdraw the $300,000 from the Schwab 8488 Account pursuant to the agreement and it was transferred to Emily in January 2021. (*Id.* ¶ 39.)

Debtor explains that Emily did not pay the mortgage because "advisors suggested that she invest the proceeds and continue to pay the Chase mortgage since the mortgage payments were cheaper than investment potential." (Debtor Opposition, ¶ 11.) Additionally, Debtor seems to claim that he withdrew $400,000 from an account pursuant to the Separation Agreement, but it is unclear that Debtor is referring to the correct Schwab Account (i.e., the 8488 Schwab Account), as Nahla observes. (*See* "Nahla Reply," ECF Doc. # 219, ¶ 10.)

3.    <u>Debtor and Emily Continue to Use Joint Accounts</u>

Nahla alleges that Debtor and Emily continued to jointly own, and use, two Schwab accounts not addressed in the Separation Agreement during the period following the Separation Date and subsequent Divorce Judgment. (Motion, ¶ 11.)

First, Nahla alleges that Debtor and Emily continued to hold Schwab account 8438 (the "8438 Account") as tenants in common, an account which contained approximately $2.5 million in securities and cash as of the Separation Date. (*Id.* ¶ 41.) The 8438 Account served as collateral for a loan from M&T Bank to Wonder Works Construction Corp,[5] which was

---

[5]      Wonder Works Construction Corp. ("Wonder Works") is a company founded by the Debtor. (*Id.* ¶ 26.) Daniel Klaynberg is the CFO of Wonder Works. (*Id.*)

guaranteed by the Debtor and Emily. (*Id.*) Nahla alleges that the account was disposed of as follows: (1) Debtor transferred $400,00 to his own account; (2) Debtor paid approximately $1.5 million on the outstanding balance of the loan from M&T Bank to Wonder Works on November 22, 2021 (five days after the Nahla Judgment was entered); and (3) on March 1, 2022, after the petition had been filed, the Debtor transferred to Emily the entire balance of the 8438 Account, comprised of over $937,000 in cash. (*Id.* ¶¶ 42–43.) The Debtor also amended his schedules, which initially identified the 8438 Account as property of the estate, to provide that the 8438 Account belongs to Emily, even though the Separation Agreement does not address the treatment of this account. (*Id.*)

Nahla also alleges that Debtor and Emily continued to maintain a Schwab account ending in 5497 (the "5497 Account") as joint tenants following the Separation Date. On March 1, 2022, the Debtor transferred approximately half of the cash in the 5497 Account, approximately $71,000, to his debtor in possession account, and the other half to Emily without seeking authority to do so from the bankruptcy court. (*Id.* ¶ 44.) Finally, Nahla alleges that the Debtor even used his Wonder Works corporate credit card to purchase airline tickets for Emily and her friends on February 22, 2022, just eleven days after filing the bankruptcy case, despite knowing that his estate was owed money from Wonder Works. (*Id.* ¶ 45.)

### 4.   Other Transfers

Nahla also alleges that the Debtor perpetuated his asset protection scheme through transfers of cash and securities to family members and affiliated entities, using both his own accounts and business entities that he controlled. (*Id.* ¶ 46.) These include transfers to a family trust, three of his sons, and a significant other.

First, Nahla alleges that Debtor transferred his interests in WW Spectra Corp ("WW Spectra"), which had equity interest in certain real properties in Connecticut, to Klaynberg

Family Group, LLC ("KFG"), ostensibly for "bona fide estate planning purposes." (*Id.* ¶ 47.)

The Debtor holds only a 10% interest in KFG, with the other 90%, at least at the time, held by a

Joseph Klaynberg 2015 Irrevocable Trust. (*Id.*)

Next, Nahla alleges that the Debtor made transfers to his sons as follows: (1) he

transferred his interest in WW Spectra and a check for $100,000 to his son Daniel at the time

Daniel was allegedly advising Emily in the separation negotiations; (*id.* ¶ 48–50); (2) he

transferred the Central Park South Apartment to his son Robert as part of the Separation

Agreement; (*id.* ¶ 51); and (3) he made a gift of $12,000 to his son Edward Klaynberg

("Edward") on April 27, 2021. (*Id.*) Finally, Nahla alleges that Debtor transferred at least

$12,200 to Alena Diploti, who he describes as his significant other, during the period between

November 2020 and June 2021. (*Id.*)

### E.  The Debtor's Bankruptcy Plan

On August 8, 2022, the Debtor filed his amended chapter 11 plan ("Plan," ECF Doc. #

165). In relevant part, Nahla points to the following "key elements" of the Plan (as they are

defined therein): (1) A liquidating plan with all non-exempt assets placed into a Distribution

Fund for benefit of creditors; (2) the Debtor maintains control of sale process for his assets,

comprised principally of his Equity Interests and one half interest in the Sands Point Residence

(*see* Plan, Art. IV.C-D); (3) the Debtor maintains controls of claim reconciliation process and

Judgment Lien Avoidance Litigation, with all administrative costs paid by the Distribution Fund;

(4) a Plan Administrator, chosen by an Oversight Committee comprised of Nahla and two other

creditors, will be appointed to pursue causes of action, including avoidance claims against Emily.

(Motion ¶ 54.)

## II.  <u>LEGAL STANDARD</u>

Chapter 11 of the Bankruptcy Code allows a debtor in possession to continue to retain

management and control of property of his estate.  11 U.S.C. § 1107.  As such, a debtor in

possession owes fiduciary duties to the bankruptcy estate and must, among other things, "protect

and . . . conserve property in [its] possession for the benefit of creditors" and "refrain[] from

acting in a manner which could damage the estate, or hinder a successful reorganization of the

business."  *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8 (Bankr.S.D.N.Y. Mar.

31, 2015) (citations omitted).

"While there is a presumption that a debtor should be permitted to remain in possession

of its business, that presumption is not absolute." *In re Sillerman*, 605 B.R. 631, 640 (Bankr.

S.D.N.Y. 2019). "The willingness to allow a [d]ebtor to remain in possession of its assets is

predicated upon the assumption that the [d]ebtor will carryout its fiduciary obligations."  *Id.*

"[I]f a debtor-in-possession defaults in its responsibilities, the debtor may be dispossessed of

control of its business and a chapter 11 trustee appointed." *Ashley River Consulting*, 2015 WL

1540941, at *8.

The appointment of a Chapter 11 trustee is governed by Section 1104(a) of the

Bankruptcy Code, which provides that, at any time after the commencement of the case but

before confirmation of a plan, on request of a party in interest or the United States Trustee, the

court shall order the appointment of a trustee –

> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management,
> either before or after the commencement of the case, or similar cause,
> but not including the number of holders of securities of the debtor
> or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard to

the number of holders of securities of the debtor or the amount of
assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

The Court may order the appointment of a chapter 11 trustee for "cause" under
Subsection 1104(a)(1) or "in the interests of creditors" under Subsection 1104(a)(2), which
constitute "two distinct and independent provisions." *Sillerman*, 605 B.R. at 641. Although the
burden of proof under Section 1104(a) is by clear and convincing evidence, courts have "wide
discretion in considering the relevant facts" and are "not required to conduct a full evidentiary
hearing in considering a motion for the appointment of a chapter 11 trustee." *Id.* (finding that the
record evidence, including the undisputed facts, provided clear and convincing evidence to
support a finding of cause for appointment of a Chapter 11 trustee).

### F. Section 1104(a)(1)

Section 1104(a)(1) enumerates four examples of cause that warrant appointment of a
trustee: fraud, dishonesty, incompetence, or gross mismanagement. 11 U.S.C. § 1104(a). The
four types of cause identified in Section 1104(a)(1) are not exclusive. *See Ashley River
Consulting*, 2015 WL 1540941, at *9. Other factors relevant to the appointment of a trustee
under Section 1104(a)(1) include "conflicts of interest, including inappropriate relations between
corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and
reporting; various instances of conduct found to establish fraud or dishonesty; and lack of
credibility and creditor confidence." *Id.* A court may consider "both the pre- and post-petition
misconduct" when making the determination that "cause" exists for the appointment of a trustee.
*Id.* at *10.

### G.  Section 1104(a)(2)

Section 1104(a)(2) also provides an independent basis for appointing a trustee when it is in the interests of creditors, even if there is no cause under Section 1104(a)(1).  *Id.* at *11 ("Even if the Court does not find that 'cause' exists to appoint a chapter 11 trustee under section 1104(a)(1), the Court may still appoint a trustee if it is in the 'interest of the creditors ... and other interests of the estate.'").  Although the "interest of creditors" standard necessarily involves a great deal of judicial discretion, courts have considered several factors including: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence—or lack thereof—of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment."  *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y. 2007) (citations omitted).

## III.  DISCUSSION

### A.  Cause Exists to Appoint a Chapter 11 Trustee

Cause exists here to appoint a trustee under Section 1104(a)(1) of the Code.  This finding is based on the existence of fraud, conflicts, and mismanagement with respect to three overall issues raised by Nahla: (1) the Debtor's divorce Separation Agreement; (2) the Debtor's other transfers to family and affiliated entities; and (3) the Debtor's conflicts in executing his duties as a debtor in possession.  The Court addresses each of these issues alongside Debtor's own factual contentions in turn below, before making an overall determination that clear and convincing evidence of cause exists based on the sum of Nahla's allegations.

#### 1.    The Debtor's Divorce Separation Agreement

First, the Separation Agreement entered into by Debtor and Emily bears many aspects of a "sham" divorce, such that the transfers made pursuant to the agreement may be fraudulent.

*Chorches v. Chen (In re Xiao)*, 608 B.R. 126, 158–59 (Bankr. D. Conn. 2019). Courts recognize

that there are certain relevant factors when determining if a divorce is a "sham" for the purposes

of disputed transfers, including:

> The quickly agreed upon split of property, the completion of the
> divorce proceeding on a "fast-track," the fact that one of the spouses
> was not represented by counsel in the divorce proceeding, the
> existence of a short interval between the entry of the divorce decree
> and the bankruptcy filing, the fact that spouses continue to live
> together after the divorce in the very house that was transferred to
> one of the spouses, the fact that the transferor spouse continues to
> pay the mortgage, taxes, and other costs on the transferred house,
> the inequitable distribution of debts and assets in the divorce, and
> the fact that the couple holds themselves out in the public as still
> being married.

*Id.* (citations omitted).

Even setting aside the context of the marriage and divorce, appointment of a trustee is

warranted where a debtor engages in "inappropriate dealings with an entity in which the debtor

has an interest." *Sillerman*, 605 B.R. at 647; *see also In re McCorhill Pub., Inc.*, 73 B.R. 1013,

1017 (Bankr.S.D.N.Y. 1987) ("[W]here there are questionable inter-company financial transfers

and the principals of the debtor occupy conflicting positions in the transferee companies, a

trustee should be appointed in the best interests of creditors and all parties in interest in order to

investigate the financial affairs of the debtor."). Many of the sham divorce factors are implicated

here, and considering them all together, Debtor and Emily's divorce strongly resembles a sham

divorce. Even more generally, these factual issues reflect serious conflicts of interest and

mismanagement that weigh in favor of appointing a trustee.

First, the timing of the divorce is suspect. As Nahla points out, despite being married for

37 years, Debtor and Emily entered into the Separation Agreement in November 2020, just 46

days following Nahla's October 2, 2020 Demand Letter. (Motion ¶ 34.) This fact alone is not

inherently fraudulent, but the timing is curious against the backdrop of the 37-year marriage and

Debtor's claim that the parties had been physically separated since New Year's Eve 2016/2017. (*Id.* ¶ 34.)  Relatedly, Nahla also claims that Debtor and Emily still hold themselves out as married.  (*Id.* ¶ 66.)

Next, the divorce process here largely resembled how a sham divorce would be carried out.  The Debtor and Emily quickly agreed upon a division of their property, with Emily not represented by counsel.  (*Id.*)  The divorce proceeding was completed on a "fast track," with the entire case taking less than two months.  (*Id.*)  Additionally, Emily testified that there was no real negotiation, and it is unclear that she contended for the final distribution of assets in the Separation Agreement.  (*Id.* ¶¶ 27, 31.)

Finally, the distribution of assets in the Separation Agreement appears to be extremely lopsided in favor of Emily, particularly with respect to liquid assets.  Looking at the agreement on the whole, Emily received 23 times the liquid cash and securities received by Debtor, and the proceeds from the sale of one of the properties. (*Id.* ¶¶ 33, 38.)  The agreement's treatment is relatively neutral on the remaining two properties, one of which Emily and Debtor split, and the other they gifted to their son.  (*Id.*)

Debtor provides a series of responses and explanations of these events in its objection, which relies entirely on a declaration from the Debtor himself.  (*See* Debtor Opposition at ¶ 11) (tabulating the "Klaynberg Affidavit," Att. 1 to Debtor Opposition, ECF Doc. # 214-2).  First, the Debtor claims that the divorce timing is explainable by a "[l]ack of support during health crises and COVID lockdown solidified desire to divorce after separation for years," and that the process began in the summer of 2020 before the October Default notice.  (Debtor Opposition at ¶ 11.)  With respect to the negotiation of the Separation Agreement, Debtor claims that Daniel Klaynberg represented Emily, it was Daniel's concern that prompted the change in the

distribution of cash and securities that favors Emily, and that Emily did not simply sign the agreement at Debtor's direction. (*Id.*) Debtor does not contest the overall distribution of assets, but clarifies that Emily was to pay carrying costs at the Sands Point Residence while living there, and that the 16th Street Condo was originally held in her name. (*Id.*)

The Debtor's factual contentions do not alter the conclusion that the divorce and Separation Agreement appear to be a sham. Regardless of the explanation for the timing, it is still coincidentally close in time to the defaults, and remarkably far in time from both the beginning of their marriage and when they were allegedly separated. The Separation Agreement also does not appear to have been thoroughly negotiated, based on the series of pro-Emily revisions that occurred over the course of a single day, and Emily's lack of having requested them. (*See* Motion ¶ 27–31.) Daniel Klaynberg's alleged advisement and negotiation on Emily's behalf does not fix the impression that the negotiations were effectively uncontested, as he is not an attorney, he was the recipient of allegedly fraudulent transfers around the same time, (*see id.* ¶ 48–49), and the occurrence of legitimate negotiations are disputed and negated by Emily's testimony. (*Id.* ¶¶ 27, 31.)

Moreover, neither the note in the spreadsheet for the final distribution of assets nor the fact that Daniel allegedly raised the concern stated in that note actually provide a reasonable explanation for the division of the assets. (*Id.* ¶ 30–31.) As Nahla explains, the executed version of the Separation Agreement appears to be more favorable than any of the prior iterations, under which Emily was either not receiving the majority of the liquid assets, or if she was, was making considerable concessions on the real property ownership. (*See id.* ¶¶ 27–33.) There is no explanation for the drastic pro-Emily shift—leaving her with over $8.5 million dollars, and 23 times more than what Debtor received—other than the fact that Daniel allegedly lobbied for it

based on a "worry" about "whether or not the businesses will provide sufficient cash flow to pay her the maintenance in the future . . . given the fact that she is currently paying all the household living expenses." (*Id.* ¶¶ 30–31.)

Additionally, Nahla observes that Debtor and Emily failed to adhere to or enforce their rights under the separation agreement, as one would expect parties to do following the negotiation of an agreement that legitimately represents their interests. In particular, Emily did not pay the mortgage for the Sands Point Residence despite retaining the proceeds of the sale of the East 16th Condo, and Debtor did not withdraw the $300,000 from the joint account pursuant to the agreement and it was transferred to Emily. (*Id.* ¶¶ 38–39.) The Debtor does not provide any reason why he did not seek to enforce the terms of the agreement or withdraw the money he was entitled to.[6]

Taking into account the timing, negotiations, and terms of the Separation Agreement, the divorce appears to clearly serve as a fraudulent means of transferring the Debtor's assets. This conclusion is buttressed by the Debtor and Emily's conduct in failing to adhere to or enforce the terms of the agreement after it was executed.

2.    The Debtor's Other Transfers to Family and Affiliated Entities

Nahla also alleges that Debtor's continued use of joint accounts with Emily following the Separation Agreement, and other transfers to family members and affiliated entities show that cause exists to appoint a trustee. The Court keeps in mind that while "fraud, dishonesty, incompetence, or gross mismanagement" are explicit grounds for cause under 11 U.S.C. §

---

[6]    Instead, Debtor explains that Emily did not pay the mortgage because "advisors suggested that she invest the proceeds and continue to pay the Chase mortgage since the mortgage payments were cheaper than investment potential," (*see* Debtor Opposition at 7, ¶ 11) which says nothing about his acquiescence to her decision. Additionally, Debtor seems to claim that he withdrew $400,000 from an account pursuant to the separation agreement, but it is unclear that Debtor is referring to the correct account as Nahla observes. (*See* Nahla Reply, ¶ 10).

1104(a), it is also reminded other factors such as "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries" and "misuse of assets and funds" are relevant to the inquiry. *Ashley River Consulting*, 2015 WL 1540941, at \*9.

Here, Nahla alleges that Debtor and Emily continued to use joint accounts not addressed by the Separation Agreement, not only after the Divorce Judgment, but after the Petition Date, with Emily ultimately withdrawing approximately $1 million from such accounts. (*Id.* ¶¶ 40–44.) As Nahla explains, Debtor only offers conclusory and contradictory explanations that do not clear up the issue—on one hand, they allege that the 8438 Account was Emily's, likely to mitigate the appearance of a transfer, while on the other they also recognize that they were pledged to M&T Bank and that Debtor withdrew $400,000 from them following the Separation Agreement. (Nahla Reply ¶ 10.) Nahla also makes a series of allegations regarding substantial transfers of assets to a family trust, three of Debtor's sons, and a significant other, during a time when Debtor was on notice of the defaults for which he was responsible as a guarantor. (*See* Motion ¶¶ 46–52.)

The Court agrees with Nahla that these facts strongly support the conclusion that Debtor was making significant transfers of assets in order to put them out of creditors' reach. This is particularly so in light of the Debtor's Separation Agreement, and the lack of any explanation by Debtor that resolves the series of coincidental payments to family members and affiliated entities. Even if not rising to the level of fraud, the Debtor has shown no caution for managing conflicts of interest, and will likely continue to be faced with them throughout the case if he continues as debtor in possession, as discussed *infra*. Finally, even setting aside Debtor's intent in reaching the Separation Agreement and making the challenged transfers, there is very little explanation why these gratuitous transfers were made. At a minimum, this reflects,

18

"incompetence, or gross mismanagement" and a "misuse of assets and funds" that is unacceptable now that the Debtor has the obligations of a debtor in possession. *See Ashley River Consulting*, 2015 WL 1540941, at *9.

Debtor makes no compelling legal arguments to show a lack of cause here. First, Debtor attempts to argue that he disclosed the existence of (and distribution of assets under) the separation agreement from the beginning of the case, as well as all other transfers within two years of the petition date, and that he has made timely disclosures since the case began. (*See* Debtor Opposition ¶ 18.) Thus, the Debtor argues, his circumstances are not the same as the debtors in the cases cited by Nahla, where debtors actively concealed facts about *transactions* from the court and the creditors.[7] The Debtor misses the argument made by Nahla, as Nahla does in fact argue that Debtor is concealing information, and that information is the underlying legitimacy and purpose of the Separation Agreement. *See In re Jie Xiao*, 608 B.R. 126 (Bankr. D. Conn. 2019) (explaining the purpose of a "sham" divorce to shield assets).

Debtor also argues that the appointment of a trustee is not warranted based on the possible existence of preferential transfers, particularly where a plan administrator may be charged with investigating and pursuing any appropriate actions. In support, Debtor cites to one case that does not seemingly address any concrete allegations regarding transfers, *see In re Daily*, 2009 WL 3415204 (Bankr. M.D. Tenn. Oct. 19, 2009), and another case where the debtor defended that the transfers "were made in the ordinary course of business under 'pay when paid' agreements with suppliers and lenders," and only chose not to pursue them based on expert opinion, on which the court remarked that it "was satisfied that the debtor has thoroughly

---

[7]        (*See id.* ¶ 16) (citing *Ashley River Consulting, LLC*, 2015 WL 1540941 at *10 (Bankr. S.D.N.Y. Mar. 31, 2015); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518 (Bankr. E.D.N.Y. 1989); *In re Sillerman*, 605 B.R. 631 (Bankr. S.D.N.Y. 2019); *In re McCorhill Publ'g., Inc.*, 73 B.R. 1013 (Bankr. S.D.N.Y. 1987); *In re Jie Xiao*, 608 B.R. 126 (Bankr. D. Conn. 2019)).

investigated the matter, given the thoroughness of [the expert's] report." *In re Skytec, Inc.*, 610

B.R. 14 (Bankr. D.P.R. 2019).  In comparison here, there are specific allegations regarding

substantial transfers made by Debtor to multiple family members with no ostensible business

purpose, which occurred both in the months leading up to the bankruptcy and after filing of the

petition.

3.      <u>Debtor's Role under the Plan and Conflicts</u>

Nahla also claims that the Plan shows that the Debtor will fail to fulfill his fiduciary

duties as a debtor in possession.  First, Nahla claims that Debtor seeks to liquidate his equity

interests, which under the relevant entity organizational documents will give his sons Daniel,

Edward, and Robert, and other co-investors with Debtor approval rights that allow them to

choose the investor and decrease the purchase price of the interests by withholding consent.  (*Id.*

¶¶ 69–70.)  Second, Nahla claims that the Debtor seeks to control the claims reconciliation

process to reconcile hundreds of millions of dollars in contingent unliquidated guaranty claims

that would operate as a paydown of debt incurred by companies the Debtor controls, and in

which his three sons and other partners hold equity interests, increasing the value of those equity

interests.  (*Id.* ¶ 72.)  Nahla argues that, in contrast, an independent fiduciary would not

necessarily seek to liquidate the equity assets if holding the claims would increase value to

creditors and would object to proofs of claim and/or seek estimation where appropriate.  (*Id.* ¶¶

69–72.)

The Debtor does not provide a direct response to these concerns.  He does not contest the

notion that a liquidation may decrease the value of the equity interests or that he will reconcile

the guaranty claims to the benefit of insiders.  He also does not explain if a Plan Administrator

would ameliorate either of these concerns, and it is unclear how he or she would.  The Debtor

simply argues that a Chapter 11 trustee would be doing "the very same thing" that the Debtor is

20

proposing at added cost, (*see* Debtor Opposition at 2), and states that "[p]otential conflicts alone

do not justify the appointment of a trustee." (*Id.* ¶ 22) (citing to *In re Royster*, 145 B.R. 88, 90-91

(Bankr. M.D. Fla. 1992)).  Given the described connection between the Debtor's involvement in

liquidation and reconciliation and the benefits to insiders, coupled with the Debtor's complete

lack of a response on these issues, the Court finds that on their own, these potential conflicts also

weigh in favor of finding that there is cause to appoint a trustee.

But more than that, it is not just "potential conflicts alone" at issue here, contrary to

Debtor's assertions.  In fact, Debtor's citation to *Skytec*, 610 B.R. 14 (discussed above)

illuminates an overarching basis for distinction here showing why "potential conflicts" are not

the issue—here, it has already been shown that Debtor was directly involved in a series of

suspect transactions with family members or related entities before and during the bankruptcy

proceedings, and wishes to remain in charge.  And unlike in *Skytec*, these transfers were not the

kind that were made as a result of decentralized decisions in the ordinary course of business that

require nuanced expert opinion to resolve.  610 B.R. at 25.  Instead, the Separation Agreement

and transfers pointed to by Nahla directly implicate Debtor's suitability to continue as a debtor in

possession.

The caselaw recognizes the peculiar issues posed by individual debtors wishing to remain

in possession, and courts have held that "where an individual chapter 11 debtor remains in

possession as a fiduciary of his estate and his creditors," there is a "heightened concern for an

inherent conflict of interest that may not exist in the case of a corporate chapter 11 debtor." *In re

Sillerman*, 605 B.R at 647 ("[T]he temptation for self-dealing may be heighted in the case of an

individual debtor whose natural instinct is to protect his own self-interest."); *see also In re

Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr. N.D. Ill. 1994) ("[A] fiduciary—the debtor-

in-possession—is proscribed from acting solely in its self-interest to the exclusion of the other

interests which the debtor-in-possession has the fiduciary obligation to protect.").

4.    Cause Exists Based on the Entirety of Nahla's Allegations

And so here, the Court must consider these potential conflicts through the lens of

Debtor's other alleged fraud and/or mismanagement leading up to and during the bankruptcy

case.  To summarize, the Debtor: (1) entered into an agreement that, with very little explanation,

diverted a large majority of his liquid assets to his spouse and has many hallmarks of a

fraudulent transfer; (2) continued to make substantial transfers of assets to family members with

notice of potential claims against himself as a guarantor; and (3) now seeks to participate in

liquidation and reconciliation processes that stands to substantially benefit those same family

members.  Debtor's theme in opposition is to argue that the possibility of preferential transfers

*alone* does not warrant appointment, or that the possibility of conflicts *alone* does not warrant

appointment.  And on certain facts, Debtor may be correct.  But here the Court must consider the

entirety of the situation, and Nahla has put forth clear and convincing facts showing that there

have been what appear to be actual, substantial, repeated fraudulent transfers to insiders (or at a

minimum, gross incompetence and misuse of assets) and conflicts with those same insiders that

will persist in the case, absent appointment of a trustee.  On these facts, there is cause to appoint

a trustee under Section 1104(a)(1) of the Bankruptcy Code.

**B.  The Appointment of a Chapter 11 Trustee is in the Interest of Creditors**

Even if the Court does not find that "cause" exists to appoint a Chapter 11 trustee under

Section 1104(a)(1), the Court may still appoint a trustee if it is in the "interest of the creditors . . .

and other interests of the estate." 11 U.S.C. § 1104(a)(2).  Factors to be considered by courts in

assessing whether to appoint a trustee pursuant to Section 1104(a)(2) include: (1) the

trustworthiness of the debtor, (2) the debtor's past and present performance and prospects for

rehabilitation, (3) the confidence—or lack thereof—of the business community and of creditors in present management, and (4) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment. *See In re 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr.S.D.N.Y.2007). At the outset, there is already a lack of trustworthiness and/or an attendant lack of confidence in the Debtor, considering that his history of transfers either leads to the conclusion that he has been fraudulently shielding assets from creditors, or has been inexplicably improvident in transferring away assets.

With respect to benefits derived, Debtor's arguments that a Trustee "would necessarily add such an additional cost layer" is not persuasive, considering that Debtor has been silent in response to Nahla's arguments that the proposed liquidation and reconciliation processes are in fact minimizing the available recovery of creditors by millions of dollars, based on Debtor's motivations to maximize value for certain insiders. (*See* Motion ¶¶ 70–72.) Nahla also observes that it is the largest non-contingent creditor in this case based on the Debtor's own schedules, and in its view the benefit of having an independent fiduciary manage the estate far outweighs any additional costs, and no creditors have opposed the Motion. (*See* Motion ¶ 17.) Only the Debtor opposes, but the Debtor's opinion as to what is in the best interests of the estate should be discounted, according to Nahla, given that he has proposed a Plan pursuant to which he would retain no estate property. (*Id.*) Nahla also points out that the Debtor's monetization of his interest in the Sands Point Residence, there should be at least $1.9 million available to a chapter 11 trustee to manage the estate. (*Id.* at ¶ 18.) Finally, it is important that even under Debtor's proposed liquidation plan, "rehabilitation" is not what the Debtor proposes. In short, the Debtor has no economic interest in the estate. The interests of creditors in a liquidation case, such as this one, with the questionable conduct of the Debtor pre- and post-petition, are furthered by

assuring that the liquidation process and any avoidance claims are overseen by a Chapter 11

Trustee.

The Court finds that there is also clear and convincing evidence that appointment of a

trustee is in the interests of creditors under Section 1104(a)(2) of the Bankruptcy Code.

### IV.    <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** Nahla's Motion to Appoint a

Chapter 11 Trustee.  The U.S. Trustee, after consulting with the parties in interest, should

promptly appoint a Chapter 11 Trustee.

**IT IS SO ORDERED.**

Dated:    September 19, 2022
          New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge