**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:                                                                    **NOT FOR PUBLICATION**

                  JOSEPH KLAYNBERG,                    Chapter 11

                              Debtor.       Case No. 22-10165 (MG)

------------------------------------------------------------------------x

**MEMORANDUM OPINION CONFIRMING CHAPTER 11 TRUSTEE'S FIRST**
**AMENDED CHAPTER 11**
**PLAN OF LIQUIDATION FOR JOSEPH KLAYNBERG**


*A P P E A R A N C E S :*

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP
*Counsel to Jonathan L. Flaxer, chapter 11 trustee for Joseph Klaynberg*
711 Third Avenue
New York, New York 10017
By:    Michael S. Weinstein, Esq.
       Moshie Solomon, Esq.

CULLEN & DYKMAN LLP
*Counsel for Joseph Klaynberg*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
By:    Matthew G. Roseman, Esq.
       Bonnie L. Pollack, Esq.

HUNTON ANDREWS KURTH LLP
*Counsel for Series 2020A of Nahla Capital L*
200 Park Avenue
New York, NY 10166
By:    Patrick L. Robson, Esq.
       Robert A. Rich, Esq.
       Silvia N. Ostrower, Esq.

LAW OFFICES OF AVRUM J. ROSEN, PLLC
*Counsel for Daniel Klaynberg, Edward Klaynberg and Robert Klaynberg*
38 New Street
Huntington, New York 11743
By: Avrum J. Rosen, Esq.

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
*Counsel to Emily Klaynberg*
200 West 41st Street, 17th Floor
New York, New York 10036
By:    Fred Stevens, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
By:    Tara Tiantian, Esq.

TABLE OF CONTENTS

I.      BACKGROUND ............................................................................................................5
    A.      The Debtor's Organizational Structure & Causes of Bankruptcy ...........................5
    B.      Procedural History of the Case/Plan .......................................................................7
        1.      Appointment of the Trustee ...........................................................................7
        2.      Sale of Interests ............................................................................................8
        3.      Nahla Developments ......................................................................................9
    C.      Summary of Plan .....................................................................................................9
    D.      The Proposed Plan: Classes ..................................................................................10
        1.      Class 1 – Other Priority Claims ..................................................................12
        2.      Class 2 – Nahla Claim .................................................................................13
        3.      Class 3 – Contingent Guaranty Claims .......................................................13
        4.      Class 4 – Non-Contingent Guaranty Claims ...............................................14
        5.      Class 5 – General Unsecured Claims ..........................................................14
        6.      Class 6 – Penalty Claims .............................................................................15
        7.      Class 7 – Debtor ..........................................................................................15
    E.      Voting & Results ...................................................................................................15
    F.      Objections .............................................................................................................15
II.     ANALYSIS ................................................................................................................17
    A.      The Plan Satisfies All Applicable Section 1129(a) Subsections ...........................17
        1.      Section 1129(a)(1): Meets Requirements Subject to Inquiry ......................17
        2.      Section 1129(a)(2): Meets Requirements ....................................................22
        3.      Section 1129(a)(3): Meets Requirements ....................................................24
        4.      Section 1129(a)(4): Meets Requirements ....................................................25
        5.      Section 1129(a)(5): Meets Requirements ....................................................26
        6.      Section 1129(a)(6): Not Applicable .............................................................27
        7.      Section 1129(a)(7): Meets Requirements ....................................................27
        8.      Section 1129(a)(8): Not Met (But see Section 1129(b)) ..............................28
        9.      Section 1129(a)(9): Meets Requirements ....................................................29
        10.     Section 1129(a)(10): Meets Requirements ..................................................30
        11.     Section 1129(a)(11): Meets Requirements ..................................................30
        12.     Section 1129(a)(12): Meets Requirements ..................................................31
        13.     Section 1129(a)(13)–(16): Not Applicable/One Inquiry ..............................32
    B.      The Plan Satisfies All Remaining Section 1129 Subsections ...............................33
        1.      Section 1129(b): Meets Requirements .........................................................33
        2.      Section 1129(c): Meets Requirements .........................................................35
        3.      Section 1129(d): Meets Requirements .........................................................35
        4.      Section 1129(e): Not Applicable ..................................................................35
    C.      Other Aspects of the Plan Are Permissible ..........................................................36
        1.      Exculpation Provisions ................................................................................36
        2.      Settlement via the Plan ................................................................................38
    D.      The Daniel Klaynberg Objection Should be Overruled ........................................39
        1.      Daniel Klaynberg's Guarantor Status Has No Effect on Plan .....................39
        2.      The Plan is Feasible .....................................................................................41
        3.      Daniel Klaynberg's Other Arguments Should be Overruled .......................42
III.    CONCLUSION ..........................................................................................................43

Pending before the Court is the confirmation hearing on the Chapter 11 Trustee's First Amended Plan of Liquidation of Joseph Klaynberg (the "Proposed Plan" or "Plan," ECF Doc. # 352) filed by Jonathan L. Flaxer, the Chapter 11 Trustee ("Trustee") for Joseph Klaynberg, the debtor in this case (the "Debtor"). The Proposed Plan is the third version of the Plan of Liquidation filed by the Trustee. (*See* "First Plan," ECF Doc. # 300; "First Amended Plan," ECF Doc. # 322.)[1] A revised disclosure statement was filed contemporaneously with the First Amended Plan, and approved by the Court shortly thereafter. ("Disclosure Statement," ECF Doc. # 321; "Disclosure Statement Order," ECF Doc. # 324.)

After the Disclosure Statement was approved, two objections were filed to the First Amended Plan. Daniel Klaynberg, Edward Klaynberg and Robert Klaynberg filed an objection to plan confirmation. ("Daniel Klaynberg Objection," ECF Doc. # 333.) Emily Klaynberg filed a limited objection. ("Emily Klaynberg Objection," ECF Doc. # 332.) In response, the Trustee amended the First Amended Plan and filed the Proposed Plan. The Trustee also filed the following materials in support of plan confirmation: (1) a legal memorandum ("Confirmation Brief," ECF Doc. # 351); (2) the Declaration of Jonathan Flaxer (ECF Doc. # 351-2); (3) the Declaration of Michael Weinstein (ECF Doc. # 351-2); and (4) a proposed order confirming the Proposed Plan (ECF Doc. # 351-3). The Weinstein Declaration contains the voting results. No new disclosure statement was filed and no new voting was solicited after the First Amended Plan was filed. The Trustee is still relying on the Disclosure Statement filed with, and the ballots received in solicitation of, the First Amended Plan. A redline was also filed showing the changes between the First Amended Plan and the Proposed Plan. (*See* "Plan Redline," ECF Doc. # 353.)

---

[1] The Trustee erroneously retained the label of "First Amended Plan" when filing the of the Proposed Plan. It is actually the Second Amended Plan. In any event, it will be referred to as the Proposed Plan for present purposes.

I recommend that the Court: (1) **CONFIRM** the Proposed Plan, subject to two **INQUIRIES** (*see infra* at 19, 30); and (2) **OVERRULE** the Objection.

## I.     BACKGROUND

The following background is taken from the Proposed Plan and Disclosure Statement.

### A.  The Debtor's Organizational Structure & Causes of Bankruptcy

In 1987, the Debtor started Wonder Works Construction Corp. ("Wonder Works"), a general contracting company.  (Confirmation Brief ¶ 4.)  Wonder Works grew from a small contractor to a successful design and development builder that has completed 388 projects, developed 25 buildings and constructed thousands of residential units in New York City and the surrounding areas.  (*Id.*)  As Wonder Works grew, the Debtor started to look for larger development opportunities.  (*Id.*)  As part of this strategy, the Debtor would finance individual development projects by finding investors to take equity interests in a project.  (*Id.*)  Additional funds needed to complete a project would be borrowed from conventional lenders, both as secured debt and mezzanine financing.  (*Id.*)  As part of these transactions, Wonder Works would act as the general contractor and the Debtor would manage the project, earning fees for asset management and as managing member of the special purpose entity formed for the project.  (*Id.*)  This hybrid method of development allowed Wonder Works to grow and prosper.  (*Id.*)

Both the pandemic and litigation commenced against the Debtor by an allegedly secured creditor on the Debtor's guaranty of one his projects have been cited as causes of the bankruptcy case.

The latter cause arose from the Debtor's development project at 302 East 96th Street known as the Vitre Condominium.  (Disclosure Statement at 12.)  This was a 21 story fully developed and completed 48 Unit residential building, with twenty-eight residential units and six

5

parking spaces left unsold at that time of the initial COVID-related shutdown. (*Id.*)  The Vitre

Condominium project was owned by single purpose entity WWML96 DE, LLC ("Vitre

Owner"), an entity in which the Debtor held an indirect ownership interest. In addition to

obtaining funds from its equity investors, the Vitre Owner borrowed $43,000,000 from Deutsche

Bank ("DB") as senior secured debt and WWML96 DE Mezz, LLC ("WWML96"), which is the

sole member of the Vitre Owner, borrowed an additional $24,939,394 as mezzanine debt on or

about January 14, 2019 (the "Mezz Loan").  (*Id.*)  As part of these loan facilities, the Debtor and

Eric Brody ("Brody") personally guaranteed the obligations to DB on account of the Mezz Loan.

Furthermore, WWML96's equity interests in Vitre Owner were pledged as collateral for the

Mezz Loan.  (*Id.*)

On or about May 30, 2019, DB assigned the Mezz Loan to Meadowbrooke Limited

("Meadowbrooke").  (*Id.*)  Thereafter, on or about September 29, 2020, Meadowbrooke assigned

the Mezz Loan to Nahla.  (*Id.*)

WWML96 first defaulted on the Mezz Loan in January 2020.  On November 9, 2020, at a

time when Vitre Owner and WWML96 assert that, due the pandemic, they were unable to sell

the remaining units in the Vitre Condominium and service the Mezz Loan, Nahla issued

additional notices of default to WWML96, the Debtor and Brody under the Mezz Loan and their

guaranty thereof, respectively.  (*Id.*)  Ultimately, Nahla scheduled a public sale, pursuant to the

Uniform Commercial Code ("UCC"), of the Debtor and Brody's ownership interests in

WWML96 for December 8, 2020 (the "UCC Sale").  (*Id.*)  In an attempt to prevent the UCC

Sale from taking place, WWML96 filed an action in New York Supreme Court (the "State

Court") against Nahla seeking to stay the sale (the "WWML96 Action").  (*Id.* at 12–13.)  The

State Court denied WWML96's attempts to stay the UCC Sale, and thus Nahla proceeded with

the UCC Sale and acquired the equity in WWML96 for $5 million pursuant to the UCC Sale.
(*Id.* at 13.)  After the sale took place, the WWML96 Action sought a determination whether the
UCC Sale was commercially reasonable.  (*Id.*)  Nahla filed a summary judgment motion
asserting that the sale was reasonable, which was opposed by WWML96.  (*Id.*)  The State Court
ruled in Nahla's favor.  (*Id.*)  In November 2021, WWML96 moved to renew its opposition to
Nahla's summary judgment motion based on facts not offered on the prior motions, specifically,
that Nahla lacked standing to conduct the UCC Sale (the "Motion to Renew").  (*Id.*)  The Motion
to Renew was denied, which (along with the decision granting summary judgment in favor of
Nahla) is on appeal to the First Department.  (*Id.*)  This appeal remains pending (the "WWML
Appeal").

### B.  Procedural History of the Case/Plan

On February 11, 2022, (the "Petition Date"), the Debtor filed a voluntary Chapter 11 case
in this Court.  At the beginning of the case, the Debtor was authorized to operate its business and
manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the
Bankruptcy Code.

### 1.  Appointment of the Trustee

On August 17, 2022, the Series 2020A of Nahla Capital LLC filed a motion for the
appointment of a chapter 11 trustee (ECF Doc. # 189).  Nahla alleged that that the Debtor
engaged in a scheme to move his assets out of his name, and that the Debtor could not be a
fiduciary for his own bankruptcy estate to investigate and pursue such claims.  Despite the
Debtor's opposition to the motion, on September 19, 2022, the Court entered a Memorandum
Opinion and Order granting the Trustee Motion.  (ECF Doc. # 230).

On September 20, 2022, the United States Trustee (the "United States Trustee")
appointed Jonathan L. Flaxer as the chapter 11 trustee (ECF Doc. # 231, 232). His appointment
was approved on September 23, 2022 (ECF Doc. # 233).

2.    Sale of Interests

Both the Debtor and the Trustee have pursued selling certain real property and business
equity interests owned by Klaynberg ("Equity Interests") during the course of this case.

On July 15, 2022, the Debtor filed a motion to sell his 50% interest in the Sands Point
Property to Emily under Section 363(b) and (f) of the Bankruptcy Code for the sum of
$1,900,273.96 (the "Sands Point Sale"), free and clear of all Liens, claims and encumbrances
with such Liens, claims and encumbrances to attach only to the net proceeds of the Sands Point
Sale, except that the mortgage against the Sands Point Property held by JP Morgan Chase Bank
(i.e., the Chase Secured Claim) shall be paid in full by Emily pursuant to the Separation
Agreement. "Net Proceeds" means the gross sales price less traditional closing costs, title
charges and taxes resulting from the sale, if any. On August 26, 2022, the Bankruptcy Court
approved the Sands Point Sale, and the Sands Point Sale closed on September 19, 2022. As a
result, the Chase Secured Claim has now been paid in full.

On September 2, 2022, the Debtor filed a motion to retain A&G Real Estate Partners to
market the Equity Interests for sale in accordance with bid procedures to be approved by the
Bankruptcy Court pursuant to an appropriate motion under Section 363(b) and (f) of the
Bankruptcy Code. That was withdrawn. On February 21, 2023, the Trustee filed a motion to
retain Keen-Summit Capital Partners LLC as broker to market the Equity Interests for sale. Such
retention was approved by order dated March 13, 2023 (ECF Doc. # 302).

3. <u>Nahla Developments</u>

In addition to the Appeal and the WWML Appeal, after the Petition Date, the Debtor

commenced the Nahla Preference Action to determine whether entry of the Nahla Judgment, and

the execution on the Debtor's assets thereafter, constituted preferential transfers. (Disclosure

Statement at 14.) After the Petition Date, Nahla filed a motion in the Bankruptcy Court seeking

standing to pursue an alleged fraudulent conveyance action against Emily and Robert Klaynberg

to avoid a Separation Agreement entered into in connection with the Marital Action, and to avoid

certain transfers made pursuant thereto. (*Id.*)

Due to the multitude of issues with Nahla, the Debtor believed that the parties could

benefit from mediation. (*Id.*) At the initial case conference, the Debtor suggested mediation,

and the Bankruptcy Court agreed. (*Id.*) Thereafter, the Debtor, Nahla, Emily, and Brody

engaged in mediation. The mediation occurred on May 24, 2022, however, the mediation was

unsuccessful. (*Id.*) Following the unsuccessful mediation, Nahla served upon the Debtor a

document request that the Debtor has been responding to. To date, Nahla has been provided with

nearly 30,000 pages of documents. (*Id.*)

**C. Summary of Plan**

The Plan is a liquidating plan as all non-exempt assets of the Debtor will be liquidated to

pay Allowed Claims against the Estate. (Disclosure Statement at 5.) This will be accomplished

by both the sale of various assets, and the litigation and monetization of Causes of Action

(including potential claims against Emily and other members of the Debtor's family). (*Id.*) Such

assets may include assets that the Debtor has asserted are exempt if such assets are determined

(or otherwise agreed by the Debtor) to not be exempt. (*Id.*) In addition to the Marital Litigation,

Causes of Action which may be pursued by the Plan Administrator include actions for monies

owed to the Debtor by Chabad of Gramercy Park in the alleged sum of $650,000, Wonder Works

Construction Corp. in the alleged sum of $357,161 and Valentina Petchorina in the alleged sum

of $33,470. (*Id.*)  Causes of Action may also include any action, if appropriate and recoverable

under statute or case law, to recover pre- petition gifts (including to his sons and significant

other) and other transfers made by the Debtor.  (*Id.*)

### D.  The Proposed Plan: Classes

The Disclosure Statement provides the following overview of unclassified and classified

claims, and treatment under the plan including anticipated recovery and voting eligibility.  (*See*

Disclosure Statement § II.A.)

| Unclassified Claims | |
|---|---|
| **Description & Claims Amount Estimates** | **Estimated/Recovery & Plan Treatment** |
| Administrative Claims (Besides Professionals or Trustee)<br><br>**Est. Claims**: $0 | 100% |
| Professional Fees (Trustee-Retained)<br><br>**Est. Claims**: $105,000 | 100% |
| Professional Fees (Debtor-Retained)<br><br>**Est. Claims**: $303,000 | 100% |
| Trustee's Commission<br><br>**Est. Claims**: $125,000 | 100% |
| Priority Tax Claims<br><br>**Est. Claims**: $38,105.50 | *100% (Each Holder of an Allowed Priority Tax Claim shall receive, in exchange for full and final satisfaction, settlement, release, and compromise of such Claim, Cash up to the full amount of such Claim from the Distribution Fund.) |

| Classified Claims | | |
|---|---|---|
| **Cl. #** | **Description & Claims Estimates** | **Estimated Recovery & Plan Treatment** |
| 1 | **Other Priority Claims**<br><br>Est. Claims: $0 | **Estimated Recovery**: 100%<br><br>Unimpaired and Not Entitled to Vote.<br><br>Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final |

| Classified Claims | | |
|---|---|---|
| Cl. # | Description & Claims Estimates | Estimated Recovery & Plan Treatment |
| | | satisfaction, settlement, release and compromise of each and every Other Priority Claim against the Debtor, each Holder of an Other Priority Claim, when, if and to the extent Allowed, shall be paid 100% of their Allowed Other Priority Claim on the Effective Date. |
| 2 | **Nahla Claim** <br><br> Est. Claims: $13,816,466 | **Estimated Recovery**: 15% to 30% <br><br> Impaired and Entitled to Vote. <br><br> The Nahla Claim is filed in the amount of $13,816,466, plus any Allowed unliquidated amounts, and in part as a Secured Claim. In the Appeal, the Trustee (as successor to the Debtor) seeks to reverse the entry of the Nahla Judgment underlying the Nahla Claim in its entirety. In the Nahla Preference Action, the Trustee (as successor to the Debtor) seeks to avoid the Nahla Judgment Lien, which would render the entire Nahla Claim unsecured. To the extent that Nahla's asserted Lien survives the Nahla Preference Action and the Appeal, Nahla shall have the Nahla Secured Claim. The Nahla Secured Claim, when, if and to the extent Allowed as a Secured Claim, shall be paid up to $1,900,273.96 from the Nahla Claim Reserve. The remaining unpaid portion of the Nahla Claim (or the entire Nahla Claim if the Nahla Judgment Lien is avoided), when, if and to the extent Allowed, shall be paid its Pro Rata share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 4 and 5 under the Plan |
| 3 | **Contingent Guaranty Claims** <br><br> Est. Claims: $67,000,000 | **Estimated Recovery**: N/A. Any Allowed Claim would be paid in Class 4. <br><br> Impaired and Entitled to Vote. <br><br> Contingent Guaranty Claims, when, if and to the extent Allowed, shall be estimated and Allowed in an amount to be determined by the Bankruptcy Court pursuant to section 502(c)(1) of the Bankruptcy Code, which amount, once determined, shall be treated as an Allowed Non-Contingent Guaranty Claim in Class 5 hereunder. <br><br> The Citizens Claim is included as a Contingent Guaranty Claim upon consent. |
| 4 | **Non-Contingent Guaranty Claims** <br><br> Est. Claims: $0 - $67,000,000 | **Estimated Recovery**: 1% to 30% <br><br> Impaired and Entitled to Vote. <br><br> Non-Contingent Guaranty Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 2 (excluding the Nahla Secured Claim, if any) and 5 hereunder; provided that, notwithstanding anything to the contrary contained in the underlying guaranty or any other agreement between the Debtor and the Holder of such Claim, the Plan Administrator shall have an immediate right of subrogation with respect to the Holder's claims against the underlying borrower and lien on the underlying collateral, to the extent of amounts |

| Classified Claims | | |
|---|---|---|
| Cl. # | Description & Claims Estimates | Estimated Recovery & Plan Treatment |
| | | distributed on account of such Allowed Non-Contingent Guaranty Claim, and any contractual waiver of subrogation, contribution, exoneration, reimbursement or similar rights between the Debtor and the Holder of such Allowed Non- Contingent Guaranty Claim, whether in the underlying guaranty agreement or any other agreement between the Debtor and the Holder of such Claim, shall be of no force or effect. Notwithstanding the foregoing, such subrogated claim shall be subordinate to such Non-Contingent Guaranty Claim to the extent that such Non-Contingent Guaranty Claim is not paid in full from third party sources |
| 5 | **General Unsecured Claims**<br><br>Est. Claims: $13,761.46 | **Estimated Recovery**: 1% to 30%<br><br>Impaired and Entitled to Vote.<br><br>General Unsecured Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 2 excluding the Nahla Secured Claim, if any) and 4 hereunder. |
| 6 | **Penalty Claims**<br><br>Est. Claims: $0 | **Estimated Recovery**: N/A<br><br>Impaired and Entitled to Vote.<br><br>Holders of Penalty Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of any funds remaining in the Distribution Fund after payment in full of all other Claims in Classes 1, 2, 4, and 5 against the Debtor. |
| 7 | **Debtor**<br><br>Est. Claims: N/A | **Estimated Recovery**: N/A<br><br>The Debtor shall retain any assets and property remaining after payment of all other Claims against the Debtor in full. |

The disclosure statement gives the following definitions regarding the classes and claims contained therein.  (*See* Disclosure Statement § VI.A.)

       1.   Class 1 – Other Priority Claims

Class 1 consists of Other Priority Claims against Estate, which includes any Claim against the Estate entitled to priority in right of payment under Section 507 of the Bankruptcy Code, other than: (a) an Administrative Claim or (b) a Priority Tax Claim. Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment to such Holder, in exchange for full and final satisfaction, settlement, release and compromise of each and every

Other Priority Claim against the Debtor, each Holder of an Other Priority Claim, when, if and to the extent Allowed, shall be paid 100% of their Allowed Other Priority Claim on the Effective Date.

2.    <u>Class 2 – Nahla Claim</u>

Class 2 under the Plan consists of the Nahla Claim, when, if and to the extent Allowed. The Nahla Claim is filed in the amount of $13,816,466, plus any Allowed unliquidated amounts, and in part as a Secured Claim. In the Appeal, the Trustee (as successor to the Debtor) seeks to reverse the entry of the Nahla Judgment underlying the Nahla Claim in its entirety.  In the Nahla Preference Action, the Trustee (as successor to the Debtor) seeks to avoid the Nahla Judgment Lien, which would render the entire Nahla Claim unsecured.  To the extent that Nahla's asserted Lien survives the Nahla Preference Action and the Appeal, Nahla shall have the Nahla Secured Claim.  The Nahla Secured Claim, when, if and to the extent Allowed as a Secured Claim, shall be paid up to $1,900,273.96 from the Nahla Claim Reserve.  The remaining unpaid portion of the Nahla Claim (or the entire Nahla Claim if the Nahla Judgment Lien is avoided), when, if and to the extent Allowed, shall be paid its Pro Rata share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 5 and 6 under the Plan.

3.    <u>Class 3 – Contingent Guaranty Claims</u>

Class 3 consists of Contingent Guaranty Claims, which Guaranty Claims are contingent claims based upon the Debtor's guaranty of indebtedness owed to lenders who financed various real estate projects. Contingent Guaranty Claims, when, if and to the extent Allowed, shall be estimated and Allowed in an amount to be determined by the Bankruptcy Court pursuant to section 502(c)(1) of the Bankruptcy Code, which amount, once determined, shall be treated as an

Allowed Non-Contingent Guaranty Claim in Class 4 hereunder.  By consent, the Citizens Claim shall be treated as a Contingent Guaranty Claim.

> 4.   <u>Class 4 – Non-Contingent Guaranty Claims</u>

Class 4 consists of Non-Contingent Guaranty Claims. Non-Contingent Guaranty Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of the Distribution Fund on each Distribution Date, pari passu with holders of Allowed Claims in Classes 2 (excluding the Nahla Secured Claim, if any) and 5 hereunder; provided that, notwithstanding anything to the contrary contained in the underlying guaranty or any other agreement between the Debtor and the Holder of such Claim, the Plan Administrator shall have an immediate right of subrogation with respect to the Holder's claims against the underlying borrower and lien on the underlying collateral, to the extent of amounts distributed on account of such Allowed Non- Contingent Guaranty Claim, and any contractual waiver of subrogation, contribution, exoneration, reimbursement or similar rights between the Debtor and the Holder of such Allowed Non-Contingent Guaranty Claim, whether in the underlying guaranty agreement or any other agreement between the Debtor and the Holder of such Claim, shall be of no force or effect.

Notwithstanding the foregoing, such subrogated claim shall be subordinate to such Non-Contingent Guaranty Claim to the extent that such Non-Contingent Guaranty Claim is not paid in full from third party sources.

> 5.   <u>Class 5 – General Unsecured Claims</u>

Class 5 of the Plan consists of General Unsecured Claims. General Unsecured Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of the Distribution Fund on each Distribution Date, *pari passu* with holders of Allowed Claims in Classes 2 (excluding the Nahla Secured Claim, if any) and 4 hereunder

14

6. Class 6 – Penalty Claims

Class 6 under the Plan consists of Penalty Claims. Holders of Penalty Claims, when, if and to the extent Allowed, shall be paid their Pro Rata share of any funds remaining in the Distribution Fund after payment in full of all other Claims in Classes 1, 2, 4, and 5 against the Debtor.

7. Class 7 – Debtor

Class 7 consists of the Debtor. The Debtor shall retain any assets and property remaining after payment of all other Claims against the Debtor in full.

E. Voting & Results

Classes 2 through 7 may be impaired, and were entitled to vote as a result. According to the Weinstein Declaration, the following votes were received by holders of Claims in the Classes entitled to vote on the Plan:

| Class | Votes to Accept | Vote Amount for Accepting Claims | Votes to Reject | Vote Amount for Rejecting Claims |
|-------|-----------------|----------------------------------|-----------------|----------------------------------|
| 2 | 1 | $1,226,610.94 | 0 | $0.00 |
| 3 & 4 | 0 | $0.00 | 0 | $0.00 |
| 5 | 0 | $0.00 | 0 | $0.00 |
| 7 | 0 | $0.00 | 0 | $0.00 |

These voting results were obtained with respect to the First Amended Plan. The Trustee did not seek to obtain new votes following the filing of the Proposed Plan.

F. Objections

Two objections were filed to the First Amended Plan: (1) the Emily Klaynberg Objection; and (2) the Daniel Klaynberg Objection. The Trustee thereafter filed the Proposed

Plan, which purports to resolve the Emily Klaynberg Objection.  The Proposed Plan does not

purport to resolve the Daniel Klaynberg Objection; because the Daniel Klaynberg Objection is

the only unresolved objection it will simply be referred to as the "Objection."

      The Objection lists a number of concerns about the plan.  Importantly, the Objection does

not cite the provisions of the Code that it contends the Plan does not comply with.  The legal

argument that it makes is extremely unclear.

      Factually, the Objection centers around the fact that Daniel Klaynberg has become a

guarantor (or is proposed to become one) while the Trustee has reserved rights to recover certain

of his interests as fraudulent conveyances.  The Objection observes that principal assets of the

estate include claims against the Klaynbergs for alleged fraudulent conveyances.  Among those

claims are the claim against Daniel for receiving a 50% interest in WW Spectra, Corp., which in

turn is a managing member or a member in several other entities that own real estate in

Connecticut and other locations.  The Plan also lists multiple guarantees that the Debtor gave on

millions of dollars of real estate loans on those properties (and others) in Classes 3 & 4.  The

Objection complains that the Amended Disclosure Statement or the Plan do not disclose that the

Debtor's filing constituted an event of default in almost all of those loans.

      The DK Objection also observes that over the last year, Daniel was requested to, and did,

become the successor guarantor on multiple loans to avoid those loans going into default.  The

Objection claims that the Trustee signed off on these events without seeking Court approval of

same.  In the last set of transfers of the guarantees, the Objection claims that the Trustee,

expressly reserved his rights to seek to recover these interests as fraudulent conveyances, while

accepting Daniel as a substitute guarantor.  One of those agreements is annexed to the Objection

as Exhibit "A."  The Objection has multiple "concerns" that flow from these events:

- (1) The guarantee by Daniel, for the benefit of the estate, gives him a right of indemnity which is an administrative claim pursuant to 11 U.S.C. § 507.

- (2) Daniel also has an administrative claim for all of the distributions that have and will flow to the estate from these holdings.

- (3) If the fraudulent conveyances were successfully recovered, those transfers would spark a new default under those loans, which would destroy, or severely diminish the value of those assets. In addition, the section on "Disallowance of Claims" on page 34 of the Plan must be modified the state that if the Plan Administrator recovers any LLC interest, the Estate will not recover those interests unless and until, he obtains a replacement guarantor acceptable to the respective lenders and indemnifies the defendant from any guaranty claims if that does not occur.

- (4) The Objection argues that several of these actions took place after this firm appeared for the Klaynbergs and no notice of these transactions with Daniel was ever provided to the undersigned.

The merits of the Objection and the Trustee's response are discussed in detail in the Analysis section below.

## II.      ANALYSIS

### A.  The Plan Satisfies All Applicable Section 1129(a) Subsections

####    1.  Section 1129(a)(1): Meets Requirements Subject to Inquiry

Section 1129(a)(1) requires that a plan comply with applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The Proposed Plan, therefore, must satisfy sections 1122 and 1123 of the Bankruptcy Code.  *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y.

1988) ("In determining whether a plan complies with section 1129(a)(1), reference must be made

to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan

of reorganization").

### a.   Section 1122: Meets Requirements

Section 1122 governs the classification of claims in plans.  Section 1122 states:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.  Claims or interests may only be placed in a particular class if such claims or

interests are "substantially similar to the other claims or interests of such class."  *Id.* § 1122(a).

"A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there

is a reasonable basis for the classification scheme and if all claims within a particular class are

substantially similar."  *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr.

S.D.N.Y. 1992); *see also Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*,

89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:

Dissimilar claims may not be classified together; similar claims may be classified separately only

for a legitimate reason.").

Article III of the Plan classifies Claims into six individual Classes: (i) Class 1, which

contains priority claims other than Priority Tax Claims, (ii) Class 2, which is the claim of Series

2020A of Nahla Capital LLC ("Nahla"), including any potential secured claim of Nahla, (ii)

Classes 3 and 4, which contain the contingent (Class 3) and non-contingent (Class 4) guaranty

claims that may be asserted against the Estate related to the Debtor's guaranty obligations for

existing real estate projects as well as the Citizens Claim on consent of Citizens Bank, N.A., and (iii) Class 5, which contains General Unsecured Claims, and (iv) Class 6, which contains Penalty Claims, of which there are none.  Article III of the Plan classifies the residual interest of the Debtor in Class 7.  The Plan's classification of Claims and the residual interests of the Debtor into seven Classes satisfies the requirements of section 1122 because each Class differs from each other in a legal or factual nature or based on other relevant criteria. In each instance of separate classification, the Plan classifies Claims and the residual interests of the Debtor based upon their different rights and attributes. At the same time, each of the Claims in each particular Class is substantially similar to the other Claims in such Class. Thus, the Plan satisfies section 1122.

Accordingly, the Proposed Plan meets the requirements of section 1122.

> b.  *Section 1123(a): Meets Requirements*

A plan must fulfill the following eight requirements to satisfy section 1123(a):

(1)    designate classes of claims and interests;

(2)    specify unimpaired classes of claims and interests;

(3)    specify treatment of impaired classes of claims and interests;

(4)    provide for equality of treatment within each class;

(5)    provide adequate means for the plan's implementation;

(6)    provide for the prohibition of non-voting equity securities and provide an appropriate distribution of voting power among the classes of securities;

(7)    contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors; and

(8)    in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

Article III of the Plan designates six (6) Classes of Claims and a Class for the residual interest of the Debtor, not including Claims of the kinds specified in sections 507(a)(1), (2) and (8) of the Bankruptcy Code, (*see* Proposed Plan Art. III), identifies impaired classes (*see id.*), specifies treatment of impaired classes, (*see id.*) and does not provide disparate treatment within classes, providing the information required by 11 U.S.C. § 1123(a)(1)-(4).

Section 1123(a)(5) is satisfied because Article IV of the Plan, titled "Means for Implementation of the Plan," sets forth the means for implementation of the Plan, including, but not limited to (i) vesting of Estate assets in the Post-Confirmation Estate (Plan at ¶ IV.G); and (ii) continued liquidation by the Plan Administrator of the Post-Confirmation Estate post-confirmation (see Plan at ¶ IV.J). Further, the conditions precedent to confirmation have been satisfied or shall be satisfied upon confirmation of the Plan in accordance with Article IX of the Plan.

Section 1123(a)(6) does not appear to be applicable and was not briefed by the Trustee.

Section 1123(a)(7) is satisfied because the Plan provides that the Trustee shall serve as the Plan Administrator of the Post-Confirmation Estate after confirmation. Pursuant to Article IV.J of the Plan, the Plan Administrator shall oversee the liquidation of the Post-Confirmation Estate in accordance with the terms and conditions set forth in the Plan. The Trustee serving as Plan Administrator is in the interest of creditors because of the Trustee's extensive knowledge of and familiarity with facts and circumstances regarding the Debtor and its Estate. Thus, the Plan

is consistent with the interests of creditors and equity security holders and with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

Section 1123(a)(8) applies in this case because the Debtor is an individual, but the Plan does not address any issues regarding that subsection, which provides as follows:

> (8)    in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

11 U.S.C. § 1123(a)(8).

During the Confirmation hearing, the Trustee's counsel explained that because the Debtor is retired and has no sources of income other than from the assets that have been turned over to the estate, the Debtor has no future income available for execution of the Plan. No objections were filed or raised at the hearing concerning this issue.

*c. Section 1123(b): Meets Requirements*

Section 1123(b) of the Bankruptcy Code sets forth provisions that may be incorporated into a chapter 11 plan, and each non-mandatory provision of the Proposed Plan is consistent with section 1123(b) of the Bankruptcy Code.

The Plan contains certain of the provisions specifically contemplated by section 1123(b), including provisions regarding (a) the impairment and non-impairment of Classes of Claims as provided for in section 1123(b)(1) (*see* Article III of the Plan); and (b) the assumption or rejection of executory contracts and unexpired leases as provided for in section 1123(b)(2) (*see* Article V of the Plan).

Pursuant to section 1123(b)(6), a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [Title 11]." The Plan includes additional

appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy

Code, including, but not limited to: (i) the provisions of Article VI of the Plan governing

distributions and reserves; (ii) the provisions of Article IX of the Plan regarding the conditions

precedent to confirmation and to the Effective Date; and (iii) the provisions of Article XI

regarding retention of jurisdiction by the Court over certain matters after the Effective Date. The

Trustee submits that the foregoing provisions and all other provisions of the Plan comply with

and are consistent with all other applicable provisions of the Bankruptcy Code, thereby meeting

the requirements of section 1123(b)(6).

Thus, the Plan meets all of the requirements of sections 1122 and 1123, it complies with

section 1129(a)(1) of the Bankruptcy Code.

2.   Section 1129(a)(2): Meets Requirements

Under section 1129(a)(2), the plan proponent must comply "with the applicable

provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2).  Courts have interpreted the

section 1129(a)(2) requirement to include satisfaction of the disclosure and solicitation

requirements of sections 1125 and 1126 of the Bankruptcy Code. *In re WorldCom, Inc.*, No. 02-

13533(ALG), 2003 WL 23861928, at *25–26 (Bankr. S.D.N.Y. 2003); *In re Johns-Manville*

*Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986).

Here, the Debtor has satisfied the requirements of section 1129(a)(2).

a.   *Section 1125: Meets Requirements*

Section 1125 of the Bankruptcy Code provides:

(b) An acceptance or rejection of a plan may not be solicited after the
commencement of the case under this title from a holder of a claim or
interest with respect to such claim or interest, unless, at the time of or before
such solicitation, there is transmitted to such holder the plan or a summary
of the plan, and a written disclosure statement approved, after notice and a
hearing, by the court as containing adequate information. The court may

> approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.
>
> (c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

The Trustee has complied with the applicable provisions of section 1125(b), for example, regarding disclosure and solicitation of acceptances to the Plan. Section 1125 prohibits the solicitation of acceptances or rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." On June 7, 2023, the Bankruptcy Court entered an order approving the Disclosure Statement (the "Disclosure Statement Order," ECF Doc. # 324), which, among other things, specifically found that the Disclosure Statement contained adequate information within the meaning of section 1125 and approved the transmittal of the Disclosure Statement to creditors and parties in interest.

### b. Section 1126: Meets Requirements

Section 1126 indicates that a holder of a claim or interest may accept or reject a plan, outlines the classes entitled to vote on proposed plans, and describes how it is determined whether a class of claims or interests either accepts or rejects a plan. "A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c). "Only creditors that actually voted count in determining whether the requisite majorities in number and amount are met." 7 COLLIER ON BANKRUPTCY ¶ 1126.04. "[A] class that is not impaired under a plan, and each

holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation . . . is not required." 11 U.S.C. § 1126(f).

Section 1126 indicates that a creditor may accept or reject a plan and delineates the classes entitled to vote on proposed plans.

In the Disclosure Statement Order the Court approved (i) the form of ballots to be transmitted to those creditors entitled to vote on the Plan, (ii) the timing and method of delivery of the ballots, notices and all other solicitation materials (collectively, the "Solicitation Packages"), (iii) the rules for tabulating votes to accept or reject the Plan, and (iv) the timing and method of service of a notice of the Confirmation Hearing and related matters (the "Confirmation Hearing Notice").

On June 9, 2023, counsel to the Trustee transmitted Solicitation Packages to holders of Claims and the Debtor, and any other parties in interest, in accordance with the Disclosure Statement Order. (*See* "Affidavit of Service," ECF Doc. # 329.) Thus, holders of Claims and the Debtor that were entitled to vote on the Plan were given the opportunity to vote to accept or reject the Plan as contemplated by section 1126.

3.   Section 1129(a)(3): Meets Requirements

Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means forbidden by law." 11 U.S.C § 1129(a)(3). This means that plans must have been "proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988). Courts have held that a plan is considered proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *In re The Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893,

907 (Bankr. S.D.N.Y. 1988)).  "The requirement of good faith must be viewed in light of the

totality of the circumstances surrounding the establishment of a chapter 11 plan." *Leslie Fay*,

207 B.R. at 781 (citations omitted); *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL

694421, at *9 (S.D.N.Y. Dec. 4, 1996) ("failure to propose a plan in good faith occurs when the

Plan is not proposed with honesty, good intentions, and to effectuate the reorganization of the

enterprise, but rather for some other motive") (citing *Kane*, 843 F.2d at 649).

The Proposed Plan appears to have been proposed in good faith.  Subject to the

discussion regarding the Objection at the end of this memo, no one has suggested otherwise.  As

set forth in the Flaxer Declaration, the Plan has been proposed in "good faith."  See Flaxer Decl.

¶ 16.  Since his appointment, the Trustee has properly carried out his fiduciary duty to all

stakeholders.  Further, the Plan has not been proposed in any manner prohibited by law.

Accordingly, the Proposed Plan meets the requirements of Section 1129(a)(3).

4.  <u>Section 1129(a)(4): Meets Requirements</u>

Section 1129(a)(4) mandates that:

> Any payment made or to be made by the proponent, by the debtor,
> or by a person issuing securities or acquiring property under the
> plan, for services or for costs and expenses in or in connection with
> the case, or in connection with the plan and incident to the case, has
> been approved by, or is subject to the approval of, the court as
> reasonable.

This requires a plan to provide for the disclosure and Court approval of payment of any

fees promised or received in connection with the chapter 11 case.  *See* 7 COLLIER ON

BANKRUPTCY ¶ 1129.03[4].

Section II.A of the Plan provides for payment of Allowed Administrative Claims in full.

Section II.C. of the Plan sets forth procedures for filing Administrative Claims by the Trustee

and Professionals, and procedures for the payment of such fees.  Moreover, the proposed

Confirmation Order contains additional provisions regarding applications of Professionals for final approval of fees and expenses in these cases. All fees and expenses of the Trustee and the Professionals (retained by either the Debtor or the Trustee) are subject to final review by the Bankruptcy Court for reasonableness under section 330(a) of the Bankruptcy Code.

The foregoing procedures for the Bankruptcy Court's review and ultimate determination of the fees, costs and expenses to be paid by the Estate satisfy the requirements of section 1129(a)(4). *See In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990) (as long as fees, costs and expenses are subject to final approval of the court, section 1129(a)(4) is satisfied); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed" administrative expenses). No payments within the scope of section 1129(a)(4) will be made without Court approval. In addition, Article XI of the Plan provides for the Bankruptcy Court's retention of jurisdiction to hear and determine all applications for compensation and reimbursement of expenses of Professionals in this case.

Accordingly, the Plan complies with the requirements of section 1129(a)(4).

5. <u>Section 1129(a)(5): Meets Requirements</u>

Section 1129(a)(5) requires that:

(A) (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. § 1129(a)(5).

Article IV of the Plan provides for the appointment of Jonathan L. Flaxer as Plan Administrator. As the Trustee for the Estate of the Debtor, Mr. Flaxer is familiar with the Estate and the matters that will need to be addressed after confirmation. Accordingly, the Trustee submits that the Plan fully satisfies the requirements of section 1129(a)(5).

6. <u>Section 1129(a)(6): Not Applicable</u>

Under section 1129(a)(6), if the plan provides for changes in rates controlled by governmental agencies, the rate change must have been pre-approved by the relevant agency. 7 COLLIER ON BANKRUPTCY ¶ 1129.03[6]. This requirement applies to debtors who are "utilities or other entities whose ability to price their products or services are subject to regulation by governmental agencies." *Id*. Here, the Proposed Plan does not provide for any changes in the rates that require regulatory approval by any governmental agency. Accordingly, the requirements of section 1129(a)(6) are not applicable to the Proposed Plan.

7. <u>Section 1129(a)(7): Meets Requirements</u>

Section 1129(a)(7)—the so-called "best-interests" requirement—mandates that each creditor or interest impaired under a plan must either have (i) accepted the plan, or (ii) would receive at least as much under the plan as it would under a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7); 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7].

Subsection (i) of Section 1129(a)(7) is satisfied as to Classes 1 through 7 of the Plan. As discussed above, Class 1 is not impaired under the Plan, Class 2 has voted to accept the Plan, and Class 6 is vacant. See Weinstein Decl. ¶¶ 5-7. Thus, Classes 3, 4, 5, and 7, which are impaired and presumptively deemed to have rejected the Plan, must be considered under Subsection (ii) of Section 1129(a)(7), commonly known as the "best interests" test.

As to Class 7 (the residual interest of the Debtor), the best interests test is satisfied by virtue of the fact that Class 7 would receive nothing under the Plan, and would receive nothing in a Chapter 7 case.  The best interest test is satisfied as to such Class.

As to Class 3, such class includes contingent claims that, once non-contingent, would be entitled to payment in Class 4.  In accordance with Article III of the Plan, Classes 4 and 5 are each entitled to receive distributions pari passu as unsecured creditors, which is what each Holder of a Claim in such Class would otherwise be entitled to under the Bankruptcy Code.  Thus, the best interest test is satisfied as to such Classes.  The Trustee also filed a Liquidation Analysis as Exhibit B to the Disclosure Statement in support of these contentions.

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

8.  Section 1129(a)(8): Not Met (But see Section 1129(b))

Pursuant to section 1129(a)(8), the plan may be confirmed where each class of creditors (i) has accepted the plan; or (ii) is not impaired under the plan.  11 U.S.C. § 1129(a)(8).  A class of creditors is considered to have accepted a plan when at least two-thirds in amount and more than one-half in number of allowed claims of such class accept the plan, measured out of those claims that vote.

Class 1 is not impaired under the Plan and Class 2 has voted to accept the Plan. Notwithstanding the fact that Classes 3, 4, 5 and 7 are deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b).  Section 1129(a)(8) is the only requirement for plan confirmation that can be fulfilled through other means.  If a plan otherwise satisfies Section 1129(a), including the requirement that at least one impaired class of creditors has accepted the plan under § 1129(a)(10), the plan may be confirmed pursuant to Section 1129(b).  7 COLLIER ON BANKRUPTCY ¶ 1129.03[8].  As to these Classes here, the Proposed Plan may be confirmed over

their dissent under the "cram down" provisions of section 1129(b) of the Bankruptcy Code as discussed *infra*.

9.  Section 1129(a)(9): Meets Requirements

Section 1129(a)(9) requires that, except to the extent that the holder of a particular claim agrees to a different treatment of such claim, the plan provide that:

> (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive . . . cash equal to the allowed amount of such claim;
>
> (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of [the Bankruptcy Code], each holder . . . will receive -- (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;
>
> (C) with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive . . . regular installment payments in cash -- (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief . . . and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan . . .

Section 1129(a)(9)(A) requires that claims identified in 507(a)(2) and (3) are paid on the effective date of a plan. Section 507(a)(2) specifies administrative expenses allowed under section 503(b). Section 507(a)(3) specifies unsecured claims in involuntary cases.

Here, the Proposed Plan satisfies all three of these requirements. Section II.A. of the Plan provides that, unless the holder of an Allowed Administrative Claim agrees to less favorable

treatment, each holder of an Allowed Administrative Claim shall be paid in full by the Estate or the Post-Confirmation Estate, as applicable, on the Effective Date or as soon as practicable after such Claims become Allowed Administrative Claims.   Section II.D. of the Plan provides that each holder of an Allowed Priority Tax Claim shall be paid in full by the Estate or the Post-Confirmation Estate, as applicable, on the Effective Date or as soon as practicable after such Claims become Allowed Priority Tax Claims.  Section II.C. of the Plan provides that each holder of a Professional Fee Claim shall be paid in full by the Estate or the Post-Confirmation Estate, as applicable, as soon as practicable after entry of an order(s) of the Court approving such commission, fees and expenses, as applicable.

Accordingly, the Proposed Plan satisfies the requirements of section 1129(a) of the Code.

10. Section 1129(a)(10): Meets Requirements

Section 1129(a)(10) of the Bankruptcy Code requires, if a class of claims is impaired, the affirmative acceptance of the plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10).

The Plan satisfies this requirement as Class 2 is impaired, the requisite amount in dollar and number of the holders of Class 2 have voted to accept the Plan, and Class 2 does not contain any insiders.  Accordingly, the Proposed Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

11. Section 1129(a)(11): Meets Requirements

Section 1129(a)(11) requires the Court to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  That requirement, commonly known as the

"feasibility" standard, requires that "the Plan is workable and has a reasonable likelihood of success." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 762. "It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success." *Id*. (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129-54 (15th ed. 1991)); *see also In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) ("[T]he plan proponent need only demonstrate that there exists the reasonable probability that the provisions of the Plan can be performed") (internal quotation omitted).

"Although it is perfectly legitimate for a Chapter 11 debtor to adopt a plan that liquidates all or part of its assets, logic and authorities suggest that the feasibility analysis under such plans will vary somewhat from that used in 'true' reorganizations. . . . In particular, the courts in these [liquidation] cases were concerned over the absence of a reliable cash flow or proven earning power that could ensure regular payments to the creditors." *Resolution Trust Corp. v. Wood (In re Wood)*, 1991 WL 332637, *3 (W.D. Va. 1991).

Here, the Proposed Plan has more than a reasonable likelihood of success and thus is feasible. The Plan itself is a liquidating plan. And as set forth in the Flaxer Declaration, the Trustee anticipates that sufficient cash will be available to meet the obligations under the Plan. (*See* Flaxer Decl. ¶ 24.) Thus, the Proposed Plan meets the feasibility requirement under Section 1129(a)(11).

### 12. Section 1129(a)(12): Meets Requirements

Section 1129(a)(12) requires that fees payable under 28 U.S.C. § 1930, as determined by the court at a hearing on confirmation of a plan, have been paid or are provided under the plan to be paid on its effective date.

In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section II.B of the Plan provides that, on the Effective Date, and thereafter as required, the Debtor shall pay all U.S. Trustee Fees, plus interest due and payable under 31 U.S.C. § 3717, until the entry of a final decree, dismissal of the case, or conversion of the case to Chapter 7. Accordingly, the Proposed Plan meets the requirements of section 1129(a)(12).

13. <u>Section 1129(a)(13)–(16): Not Applicable/One Inquiry</u>

Section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to section 1114. 11 U.S.C. § 1129(a)(13). The Debtor does not have any obligation to pay retiree benefits. Accordingly, section 1129(a)(13) does not apply.

Section 1129(a)(14) relates to the payment of domestic support obligations. 11 U.S.C. § 1129(a)(14). Section 1129(a)(14) does not apply.

Section 1129(a)(15) applies in cases in which the debtor is an "individual." It provides as follows:

> (15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—
>
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15).

Here, since no unsecured creditors objected to the Plan, the subsection is inapplicable.

Section 1129(a)(16) states that "all transfers of property under [a] plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. § 1129(a)(16). "This provision limits the permissible transfers by any nonprofit entity[.]" 7 COLLIER ON BANKRUPTCY ¶ 1129.02. The Debtor is not a nonprofit entity. Therefore, section 1129(a)(16) does not apply.

### B. The Plan Satisfies All Remaining Section 1129 Subsections

1. Section 1129(b): Meets Requirements

When at least one class of impaired creditors votes for confirmation of a plan, pursuant to section 1129(b) the court may "cram down" a plan over the dissent of another impaired class. Cramdown is permitted so long as a plan (i) does not discriminate unfairly; and (ii) is fair and equitable. Unfair discrimination includes instances where the plan discriminates among creditors with equal non-bankruptcy priority. 7 COLLIER ON BANKRUPTCY ¶ 1129.04[3][b][ix]. Courts will consider a cramdown fair and equitable if the absolute priority rule is followed. That is, if no claim that is junior to the dissenting class benefits from the proposed plan. *Id.* ¶ 1129.04[4][a].

As set forth above, Classes 3, 4, 5 and 7 are impaired classes that did not vote on the Plan. Nevertheless, for the reasons set forth below, the Plan may be confirmed under section 1129(b).

*a. Unfair Discrimination*

Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310–11 (Bankr. S.D.N.Y. 2016)

33

("Courts generally will approve placement of similar claims in different classes provided there is a 'rational' or 'reasonable' basis for doing so" and "satisfies the flexible requirements of section 1122 because a valid business, factual, and/or legal reason exists for separately classifying the various classes of claims and interests created under the Plan. . . [W]here claims or interests of the same priority are separately classified, such claims or interests are either dissimilar or another good business reason exists for such classification.")

As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *In re Johns-Manville Corp.*, 68 B.R. 636, 636 (2d Cir. 1988), or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992).

Here, "unfair discrimination" is not present because under the Plan, Classes 3, 4, 5, and 7 are dissimilar to the Claims in Classes 1 and 2. See *In re Jartran, Inc.*, 44 B.R. 331, 381-84 (Bankr. N.D. Ill. 1984) (there is no unfair discrimination where separate classes contain different types of claims). Accordingly, the Plan does not discriminate unfairly against Classes 3, 4, 5, and 7, thereby satisfying the first prong of section 1129(b)(1).

### b.   The Proposed Plan is Fair & Equitable

To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (i) each holder of the nonaccepting class will receive or retain on account of such claim property of a value equal to the allowed amount of

such claim, or (ii) a holder of a claim or interest that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan. *See* 11 U.S.C. § 1129(b)(2)(B).

As to Class 7, Subsection (C)(ii) is satisfied because there is no Class junior to the Class 7 that will receive or retain any property under the Plan. As to Class 3, such Class is not entitled to distributions, but rather any claim in Class 3 that is determined to be non-contingent shall be treated as Class 4. Classes 4 and 5 are entitled to receive distributions under the Plan, and there are no junior Classes that will receive or retain any property under the Plan. Thus, the Plan satisfies the "cramdown" requirements of section 1129(b), and the Plan may be confirmed notwithstanding the Trustee's inability to comply with section 1129(a)(8).

### 2.    Section 1129(c): Meets Requirements

Section 1129(c) of the Bankruptcy Code provides that a court "may only confirm one plan." 11 U.S.C. § 1129(c). The Proposed Plan submitted is the only plan the Trustee or any other party is seeking to confirm in this case. Therefore, the Proposed Plan meets the requirements of section 1129(c).

### 3.    Section 1129(d): Meets Requirements

Section 1129(d) provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 4 of the Securities Act of 1933." Here, no such objection was raised. Thus, section 1129(d) does not apply.

### 4.    Section 1129(e): Not Applicable

Section 1129(e) is applicable to small business cases. These Chapter 11 Cases are not small business cases, as that term is defined in the Bankruptcy Code, nor is the Debtor a small business debtor. Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

### C.  Other Aspects of the Plan Are Permissible

Outside the scope of Section 1129, the Debtor also provides reasoning for why certain
provisions of the Proposed Plan are permissible under applicable authorities.

#### 1.  Exculpation Provisions

Section VIII.C of the Plan exculpates the Trustee, any Professional retained by the
Trustee or the Debtor, and Nahla and any professionals retained by Nahla that appeared in this
case (*i.e.*, the Exculpated Parties), for any claim, obligation, suit, judgment, damage, demand,
debt, right, cause of action, remedy, loss, and liability for, any conduct occurring on or after the
Petition Date based on the negotiation, execution, and implementation of any transactions
approved by the Bankruptcy Court in the Chapter 11 Case, including without limitation: in
connection with or arising out of the postpetition marketing and sale process with respect to the
Sales Point Property; the negotiation and pursuit of the Disclosure Statement and this Plan; the
implementation, administration, confirmation, and consummation of the Plan, or the solicitation
of votes for, or confirmation of, the Plan; the distribution of property under the Plan; or other
actions taken pursuant to orders of the Bankruptcy Court; other than acts or omissions found in a
final judgment by a court of competent jurisdiction (not subject to further appeal) to constitute
fraud, willful misconduct, gross negligence, *ultra vires* acts, or breach of fiduciary duty, by such
person or entity. Nothing in the Plan shall limit the liability of the lawyers to their respective
clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009). For the
avoidance of doubt, except as otherwise provided in an Order authorizing the retention of a
Professional, nothing in this paragraph shall limit the ability of any party to object to a
Professional Fee Claim for any reason permitted by the Bankruptcy Code.

Exculpation provisions are permissible when they are important to a debtor's plan or where the exculpated party has provided substantial consideration to a debtor's reorganization. *See In re Chemtura*, 439 B.R. at 610-11 (citing *In re DBSD*, 419 B.R. at 218); *see also In re Residential Cap. LLC*, Case No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan contained exculpations for parties "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors.").  In determining whether to approve exculpation provisions, courts also consider whether the beneficiaries of the exculpation participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.  *See In re BearingPoint, Inc*., 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decisionmakers[.]").

Courts have specified certain parties that generally are appropriate candidates for exculpation, including parties to a consensual plan or parties to unique transactions who "contribute[] substantial consideration to the reorganization."  *See, e.g.*, *In re Residential Capital, LLC*, Case No. 12-12020 (MG), at ¶ 291 (Bankr. S.D.N.Y. Dec. 11, 2013) (ECF Doc. # 6066) (approving exculpation of certain prepetition lenders who "played a meaningful role. . . in the mediation process, and through the negotiation and implementation of the Global Settlement and Plan"); *Adelphia*, 368 B.R. at 268.

Courts in this and other districts have approved exculpation provisions similar in scope and application for estate fiduciaries and non-estate fiduciaries. *See, e.g., Evergreen Gardens Mezz, LLC, et al.*, Case No. 21-10035 (MG) (Bankr. SD.N.Y. 2021) (ECF Doc. # 222)

(approving plan exculpation provision providing for exculpation for certain non-estate fiduciaries); *KG Winddown, LLC, et al*. Case No. 20-11723 (MG) (Bankr. S.D.N.Y. 2020) (ECF Doc. # 494) (permitting exculpation of purchaser as non-estate fiduciary); *Genco Shipping & Trading Ltd.*, Case No. 14-1108 (SHL), ¶ 24(d), (Bankr. S.D.N.Y. July 2, 2014) (ECF Doc. # 322) (approving exculpation provision in plan providing exculpation for non-estate fiduciaries).

Courts in the Second Circuit have held that provisions like the exculpation provisions set forth in Section VIII.C. of the Plan are appropriate when confined to postpetition activity and explicitly exclude gross negligence and willful misconduct. *See In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (noting that the exculpation provision was appropriate because it excluded acts of gross negligence and willful misconduct); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (exculpation provision that carves out gross negligence and willful misconduct, and covers only acts done in connection with the chapter 11 cases is appropriate).

Accordingly, the exculpation provision does not violate section 1129(a)(1) or (a)(3) of the Bankruptcy Code and should be approved.

### 2. Settlement via the Plan

The Trustee seeks approval of the provisions of the Plan pursuant to Bankruptcy Rule 9019 insofar as they shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan or relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim (the "Settlement"). The Trustee cites to the factors from *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) as controlling on this determination, with which the Court is familiar.

The Trustee submits that the Settlement embodied by the Plan meets the above criteria

for approval pursuant to Bankruptcy Rule 9019. The Plan addresses the treatment of all Claims,

including the claims of Nahla – who allegedly holds a secured claim – and the holders of

contingent guaranty claims. The Trustee further submits that the Settlement embodied the Plan as

to the treatment of Claims is the best alternative to bring finality and create the potential for

distributions to be made to creditors. Accordingly, the Trustee requests that the Settlement

embodied by the Plan be approved because such Settlement is in the best interests of the Debtor,

the Estate, and Holders of Claims and is fair, equitable, and reasonable.

### D.  The Daniel Klaynberg Objection Should be Overruled

The arguments made by the Daniel Klaynberg Objection (i.e., the "Objection") were

detailed above in Section I.F.  In sum, they do not make clear arguments under the Bankruptcy

Code or caselaw, and instead contain a list of factual complaints regarding the effect of the Plan

on Daniel Klaynberg.  The Trustee seizes on this and disposes of all the arguments made in the

Objection, which can be grouped into three general arguments.

1.  <u>Daniel Klaynberg's Guarantor Status Has No Effect on Plan</u>

As the Court is aware, the Debtor developed certain real estate projects in both New York

and Connecticut. Each of these projects has one or more loans secured by the underlying real

property or certain other assets related to the relevant projects.  The Trustee acknowledges that

Daniel has signed a guaranty to become a substitute guarantor with respect to at least one of

these loans.  However, the Trustee points out that the Objection misstates the Trustee's

obligations both to Daniel Klaynberg and the Court; he asks for amendments that are premised

on these misunderstandings and unnecessary as a result.  (Confirmation Brief ¶ 81.)

The Trustee explains that contrary to the implication of the Objection, the genesis of Daniel becoming a substitute guarantor was not the Trustee. (*Id.* ¶ 82.) The Debtor has the same business partner for all of his real estate projects in Connecticut, and the Debtor's business partner approached the Trustee to consent to Daniel becoming a substitute guarantor in order to resolve certain technical loan defaults resulting from the Debtor's bankruptcy filing.[2] (*Id.*) The Trustee had no contact with Daniel Klaynberg regarding such request and communicated solely with counsel for the business partner. (*Id.*) Whether Daniel had obtained advice from his own counsel about becoming a substitute guarantor is not within the Trustee's purview, and any suggestion that the Trustee had an obligation to inform Daniel's counsel about his actions is misplaced. (*Id.*)

In addition, while the Objection asserts that the Trustee failed to obtain Court approval of the loan amendment adding Daniel as a substitute guarantor, the Trustee's view is that such approval was not required. If any rights of the Estate were altered by the loan amendment, then the Trustee would have needed Court approval (e.g., if the Estate were to release any claims against the lender), but no such rights were altered by the loan amendment, and thus the Trustee saw no reason to incur additional cost and expense to unnecessarily seek approval from this Court. (*Id.* ¶ 83.)

Putting aside the inaccurate assertions in the Objection regarding the Trustee's obligations, the Objection includes certain specific requests relating to Daniel's decision to become a substitute guarantor, none of which should alter the Plan. First, the Objection asserts that Daniel has an administrative claim against the Estate as a result of his actions. (*Id.* ¶ 84.)

---

[2] To the Trustee's knowledge, the properties are performing financially and there is no other alleged default other than as a result of the bankruptcy of the Debtor.

The Trustee disagrees, but if Daniel believes he has a basis to assert an administrative claim, the Plan sets forth the time by which such claim must be asserted. (*Id.*)

Second, the Objection requests that the Plan be modified to obligate the Plan Administrator to obtain a replacement guarantor to Daniel as a condition to avoiding any transfers of equity interests to Daniel or others. Daniel independently decided to become a substitute guarantor, notwithstanding the Trustee's stated position that certain equity interests transferred for his benefit are fraudulent conveyances. (*Id.* ¶ 84.) Indeed, as acknowledged by the Objection, the consent signed by the Trustee and Daniel approving the loan modification included an express reservation of rights as to such fraudulent conveyance claims. (*Id.*) Ultimately, the Plan Administrator will have to balance the Estate's interest in steps which may preserve the value of the equity interests in these real estate projects against the benefits of recovering the fraudulent conveyances made to or for the benefit of Daniel and other third parties. (*Id.*) But that does not give Daniel any right to disregard the Plan Administrator's business judgment by requiring him to obtain a substitute guarantor as a condition to avoiding fraudulent conveyances. (*Id.*)

Accordingly, for the reasons set forth herein, there is no basis to make any changes to the Plan because of Daniel choosing to become a substitute guarantor.

2.    The Plan is Feasible

In addition to the foregoing, the Objection contends that there are "too many unanswered questions and variables for this Court to determine the feasibility of this case." (Objection at 4.) The Trustee has shown that this is not accurate. As set forth above, the "feasibility" standard, requires that "the Plan is workable and has a reasonable likelihood of success." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 762. At present, the Estate currently has over

$1,600,000 in cash, which is more than sufficient to pay all projected administrative claims and fund the Plan Administrator's operating reserve, with funds to potentially to spare for a potential distribution to creditors.  (Confirmation Brief ¶ 87.)

As the Estate currently has sufficient resources, the Plan is feasible and whether creditors receive more than just the cash on hand is not a feasibility issue.  (*Id.* ¶ 88.)  Nevertheless, the Plan and Disclosure Statement describe the potential litigation and owned minority interests. (*Id.*)  Moreover, the variability in recovering on these types of assets was considered in estimating the potential recoveries set forth in the Plan.  (*Id.*)  Although the Objection contends that such remaining assets require delaying confirmation, the Objection lacks any basis or citation for this assertion.  Indeed, it is commonplace to confirm a plan with a post-confirmation estate or trust charged with liquidating the remaining claims and assets.

### 3.    Daniel Klaynberg's Other Arguments Are Overruled

Finally, the Objection's contention that confirmation of the Plan will avoid oversight of fee applications and settlements is incorrect.  The Plan establishes the process for filing fee applications (Section II.C) and all parties in interest retain the right to object.  With respect to settlements, Section IV.J.(m). of the Plan obligates the Plan Administrator to give notice to creditors of settlements of certain significant causes of action, and if a creditor objects, then the Court will decide whether such settlement should be approved pursuant to Bankruptcy Rule 9019.

The Objection also alludes to the Trustee having failed to provide proper notice of the Plan to all lenders on projects, but ignores the requirements of the Bankruptcy Code. (Confirmation Brief ¶ 90.)  The Trustee provided notice to every lender who asserted a claim

against the Estate. (*Id.*) Certain lenders did not assert claims against the Estate, and thus were

not entitled to notice with respect to the Plan. (*Id.*)

### III.    <u>CONCLUSION</u>

For the reasons set forth above, the Court **OVERRULES** the Objection and

**CONFIRMS** the **CHAPTER 11 TRUSTEE'S FIRST AMENDED CHAPTER 11 PLAN OF**

**LIQUIDATION FOR JOSEPH KLAYNBERG.** Counsel for the Chapter 11 Trustee shall

submit a Confirmation Order consistent with this Opinion.

Dated:    August 21, 2023
          New York, New York

                                   *Martin Glenn*
                              _____
                                  MARTIN GLENN
                         Chief United States Bankruptcy Judge